```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
 2

 3   ----------------------------------X
                                       :
 4   HEATHER DINE,                      :
                                        : 03-CV-02811 (HBP)
 5                   Plaintiff,         :
                                        : December 21, 2004
 6              v.                      :
                                        : 500 Pearl Street
 7   HERTZ CORPORATION, ET AL.,         : New York, New York
                                        :
 8                   Defendants.        :
     ----------------------------------X
 9

10       TRANSCRIPT OF CIVIL CAUSE FOR MOTION FOR SUMMARY JUDGMENT
      BY PLAINTIFF, MOTION IN LIMINE REGARDING DEFENDANT'S EXPERT,
11                       SETTING OF TRIAL DATE
                  BEFORE THE HONORABLE HENRY B. PITMAN
12                   UNITED STATES MAGISTRATE JUDGE

13
     APPEARANCES:
14
     For the Plaintiff:          GREGORY WALTER BAGEN, ESQ.
15                               Office of Gregory W. Bagen
                                 317 Clock Tower Commons
16                               P.O. Box 380
                                 Brewster, New York 10509
17

18   For the Defendants:         JENNIFER R. FREEDMAN, ESQ.
                                 Cerussi & Spring
19                               One North Lexington Avenue
                                 White Plains, New York 10601
20

21

22
     Court Transcriber:          SHARI RIEMER, CET-805
23                               TypeWrite Word Processing Service
                                 211 N. Milton Road
24                               Saratoga Springs, New York 12866

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

1          THE CLERK:  Dine v. Hertz Corp.

2          Counsel, state your name for the record.

3          MR. BAGEN:  Gregory Bagen for plaintiff, Your Honor.

4          MS. FREEDMAN:  Jennifer Freedman with Cerussi &

5    Spring for Hertz.  We are in the process of taking over for

6    Hertz, so I am appearing --

7          THE COURT:  Okay.

8          MS. FREEDMAN:  -- on behalf of Hertz and Timothy

9    McLachlan until we get all the necessary paperwork signed off.

10         THE COURT:  Okay.  You're here for both Hertz and

11   McLachlan?

12         MS. FREEDMAN:  Yes.

13         THE COURT:  Okay.

14         MS. FREEDMAN:  We're going to discontinue the action

15   against McLachlan once all the necessary paperwork is taken

16   out.  Anti-subrogation [indiscernible].

17         THE COURT: All right.  Okay.  All right.  There are

18   two motions on for consideration.  There's a motion by

19   plaintiff for summary judgment on the issue of liability, and

20   there's also a motion in limine with respect to plaintiff's

21   expert, Dr. Ojalvo, I guess.

22         MR. BAGEN:  Defendant's expert, Your Honor.

23         THE COURT:  Defendant's expert.  Excuse me.  Okay.

24   Let me first, let's first address the summary judgment motion.

25   Is there any substantive objection to the summary judgment

3

1   motion?   There's a procedural objection about the Rule 56

2   statement, which in a case this simple I don't think is --

3   quite honestly, I don't think is terribly compelling.

4          The notion that the driver -- as a matter of law I

5   -- is there any authority suggesting that the conduct of the

6   driver of the vehicle in which Ms. Dine was situated could

7   constitute a defense to defendant here?

8          MS. FREEDMAN:   The only thing that we have looked at

9   is what's set forth in the VTL and interpretive case law that

10  every driver of a vehicle has the duty to exercise reasonable

11  care for their own safety to see what is to be seen and to

12  exercise reasonable care to avoid the happening of an

13  accident.

14          When we read plaintiff's deposition testimony we

15  found that plaintiff observed Mr. McLachlan's vehicle prior to

16  the impact and had sufficient time in which to brace herself.

17  And we found there was no testimony that a horn was sounded,

18  brakes -- that there was screeching of the brakes, or that

19  Ms. Warner [phonetic], the driver of the vehicle applied any

20  type of defensive maneuver to remove the vehicle from the road

21  to try and avoid the happening of the accident.

22          THE COURT:   Is there any case law though that

23  suggests that that presents a total defense to Hertz and

24  McLachlan here?

25          MS. FREEDMAN:   I haven't found anything that would

4

1    make it a total defense.  It could create an issue of fact for

2    a jury.

3            THE COURT:  As to what?

4            MS. FREEDMAN:  As to whether Mr. McLachlan's actions

5    were --

6            THE COURT:  He was on the wrong side of the road.

7            MS. FREEDMAN:  Correct.

8            THE COURT:  That's your -- I think you're estopped

9    from arguing anything else.  I mean I believe there is case

10   law -- I have not researched it -- that holds that a driver

11   has no duty to -- or let me rephrase that.  That a driver is

12   entitled to assume that the other drivers on the road will

13   assume the rules of the road.

14           If I'm crossing in a crosswalk with a green light I

15   don't believe I have an obligation to look to the left and the

16   right.  That if a driver runs a red light and runs me over in

17   the crosswalk, he has no comparative negligence defense.

18           I mean if you have case law that suggests that there

19   is some legal defense here, I'm happy to consider it.  You

20   should also bear in mind though the denial of the motion at

21   this stage may have as a consequence a directed verdict in

22   front of a jury on liability.  You know, tactically and

23   strategically I'm not sure which is better for a defendant,

24   but I'm not sure that there's a legal defense here.

25           MR. BAGEN:  May I --

5

1          THE COURT:  I'm going to -- give me one second,
2    okay, Mr. Bagen?
3          I mean are you aware of any case in which --
4    involving similar facts where the conduct of the driver on the
5    right, on the correct side of the road constituted a complete
6    defense to a claim against a driver driving on the wrong side
7    of the road?
8          MS. FREEDMAN:  I'm not aware of any case law that
9    provides it to be a complete defense.
10          THE COURT:  Even a partial defense?
11          MS. FREEDMAN:  The only case that we found, which we
12    cited in our papers, dealt with the issues of -- that a driver
13    has a duty to exercise reasonable care, every driver on the
14    road, even one that, you know, is on the wrong side of the
15    road.  Mr. McLachlan had that duty as did Ms. Warner.
16          THE COURT:  Yeah, I think -- well, Mr. Bagen, go
17    ahead.
18          MR. BAGEN:  Your Honor, first of all, defendant's
19    negligence is established by his convictions for the traffic
20    violations.  Negligence per se has been established against
21    him.  All they're trying to do is speculate that there may
22    have been something else, which is rather late now to be doing
23    that.  And in fact even if the other driver had done something
24    that was not the best, she would have been entitled to an
25    emergency defense and the standard of care for her would have

6

1   been even lower than the normal standard of care.

2              So this is -- as I said in my papers, maybe not

3   frivolous but I think it's a facetious argument to be

4   speculating by counsel with no statements of facts from

5   anyone, her client, anyone that the driver of the van did

6   anything wrong.

7              THE COURT:  The other issue is I guess --

8              MR. BAGEN:  She saw the car coming and hit the

9   brakes.

10             THE COURT:  -- the conduct of the driver of the van

11  is not attributable to plaintiff here.

12             MR. BAGEN:  No.

13             THE COURT:  So I mean maybe there's a contribution

14  claim but I don't -- which could be asserted in a separate

15  action.  But I don't see how it's a defense to a claim by

16  Ms. Dine.  Ms. Dine was not driving.

17             MS. FREEDMAN:  Correct.

18             MR. BAGEN:  I also stated that in my papers,

19  Your Honor.

20             THE COURT:  Yeah.

21             MR. BAGEN:  And it's too late to bring it into this

22  case.  And if they had a reason for it I'm sure they would

23  have done it a year ago.

24             THE COURT:  I mean it seems to me that what we have

25  here -- I mean assuming that there's any legal -- assuming

7

1    without deciding it there is some legal validity to

2    defendant's theory, and I'm not sure that there is but let's

3    assume for the purpose of argument that there is though.  It

4    seems to me that at most that gives rise to a contribution

5    claim.  It's not a defense against Ms. Dine.  Because as I

6    understand it there's no dispute Ms. Dine was a passenger.

7    She was not driving the minivan.

8              Is that correct?

9              MS. FREEDMAN:  That is correct.

10             THE COURT:  I mean that being the case, I don't see

11   -- and given the fact that defendants are collaterally

12   estopped from challenging the allegation that the defendant

13   vehicle was on the wrong side of the road, I don't see that

14   there's any defense on the issue of liability.  And I'm going

15   to grant the motion for summary judgment on liability because

16   it appears to me that there is no genuine issue of fact, no

17   genuine issue on any material fact with respect to liability.

18             Whatever relevance the conduct of the minivan had --

19   whatever relevance the conduct of the driver of the minivan

20   has, the driver of the minivan was not Ms. Dine.  And it's not

21   attributable to Ms. Dine, that conduct is not attributable to

22   Ms. Dine.  Maybe there's a claim for contribution here or

23   maybe a claim for indemnity, I don't know.  But it's not a

24   defense to Ms. Dine's claim.

25             All right, let's go on to the motion in limine.  I

8

1   read the papers, and I guess the -- there are certainly

2   methodological issues I think concerning Dr. Ojalvo, but I

3   think there is an overarching relevance issue which I guess

4   I'd like to hear from defendant on.

5          In his report, Ojalvo -- hang on one second, let me

6   just get the page in front of me.  I mean I think there is an

7   issue of relevance or fit here with respect to Dr. Ojalvo's

8   conclusion, even assuming without deciding that the

9   methodological objections can be overcome.  At page 9 of

10  Ojalvo's report he states "typical injury threshold limits --"

11  let me back up one second.

12     My understanding of the nature of Ms. Dine's injuries

13  here, she is claiming injuries to her vertebrae and to her

14  disks.  Is that correct?

15         MR. BAGEN:  Cervical, yes, Your Honor.

16         THE COURT:  And to the pertinent, for want of a

17  better term, neurological connections that exist in the spine

18  and -- okay.  I mean that's the nature of her claimed

19  injuries.

20         MR. BAGEN:  Cervical spine injuries, Your Honor.

21         THE COURT:  Right.  Okay.  At page 9 of Dr. Ojalvo's

22  report he writes "typical injury threshold limits for

23  permanent neck injury are considered to be in the range of 140

24  foot pounds in flexion, head and neck bent forward, and 42

25  foot pounds in extension, head and neck bent backward."  And

1  then he cites, and for that he cites an article, H. J. Mertz

2  and L. M. Patrick's "Strength and Response of the Human Neck,"

3  which is also -- which is cited in another article, "Human

4  Tolerance to Impact Conditions as Related to Motor Vehicles,"

5  SAE J 885, July 1986, which is cited in footnote 13 of

6  Ojalvo's report.

7        SAE J 885 summarizes the Hertz and Patrick -- the

8  Mertz, excuse me, Mertz and Patrick article, and the Mertz and

9  Patrick article is described as follows.  I'm looking at

10  Exhibit B to plaintiff's reply affidavit at page 34.489

11  through 34.490.

12        "Mertz and Patrick, reference 41 and 42, found that the

13  resulting bending moment was an excellent indicator of neck

14  strength.  Based on their cadaver data they suggested

15  tolerance levels for the 50th percentile adult male.  For a

16  flexion resultant bending moment of 140 foot pounds --" excuse

17  me.  "For flexion, a resulting bending moment of 140 foot

18  pounds was proposed as a lower boundary for an injury

19  tolerance level.  This bending moment did not produce any

20  discernible ligamentous damage to a human cadaver.  For

21  example --"

22        Excuse me.  "For extension, an injury tolerance

23  level of 42 foot pounds was suggested.  This level was

24  associated with ligamentous damage to a human cadaver.

25  However, it should be noted that the human cadaver was

1  relatively old and also there may have been a degeneration of

2  the strength of the ligamentous tissue compared to the living

3  tissue.  Based on these suggested bending moment tolerance

4  levels, the neck appears to be at least three times stronger

5  in resisting flexion than extension."

6           And the problem that I'm having is that the injuries

7  -- the injury thresholds reported in the Mertz/Patrick article

8  report -- relate to ligamentous damage, not disk damage.  So

9  even assuming that defendant prevailed on all the

10 methodological issues, the injuries, the injury threshold that

11 Ojalvo is relying on are a different type of injury.  And I

12 don't see how that's relevant to a claim for cervical spine

13 injury.

14           MS. FREEDMAN:  Well, the --

15           THE COURT:  What does defendant say about that?

16           MS. FREEDMAN:  Okay.  The limits that Dr. Ojalvo was

17 referring to for neck injury --

18           THE COURT:  No, no, but the source that he's citing

19 relates to ligamentous injury.  I mean this is the problem.

20 The Mertz/Patrick article relates to ligamentous injury, and

21 without explanation he translates that to all types of injury.

22           MS. FREEDMAN:  I think he was using it as an

23 example.  If you look at the tests that he did --

24           THE COURT:  Well, no, example isn't good enough.  It

25 has to be relevant to the injury claimed here.

11

1      MS. FREEDMAN:  Okay.

2      THE COURT:  The fact that a certain force level is

3 necessary to produce a different type of injury, how is that

4 helpful information with respect to the injury claimed here?

5      The ligaments are the structures that holds your

6 bones together, they're not the disks.  They're a different

7 structure than the disk.  And that's why I don't understand,

8 and Dr. Ojalvo doesn't explain, how injury threshold with

9 respect to a different anatomical structure tells us anything

10 about the injury threshold with respect to disks.

11      MS. FREEDMAN:  Well, Dr. Ojalvo was not testifying

12 as to a medical opinion.

13      THE COURT:  No, but he's talking about the injury

14 threshold for plaintiff, that's what he's trying to do.

15      MS. FREEDMAN:  Well --

16      THE COURT:  And the source that he is relying on

17 provides -- assuming it's a valid source and a valid study,

18 provides injury thresholds for a different anatomical

19 structure.

20      MS. FREEDMAN:  I believe all these structures are

21 related.  Plaintiff just doesn't make --

22      THE COURT:  Well, you're --

23      MS. FREEDMAN:  -- claims --

24      THE COURT:  I'm sorry, but the ligaments are not the

25 disks.  I mean they're all related in the sense that we all

12

1  have them, but your ligaments are not your disks.  And he

2  doesn't explain how you can jump from one to the other.

3          MR. BAGEN:  May I say something, Your Honor?

4          MS. FREEDMAN:  Well, I think that he --

5          THE COURT:  Well, let me stick with defendant.  I

6  mean right now -- I don't think you need to say anything right

7  now.  Okay?

8          MR. BAGEN:  I understand what you mean, Judge.

9          THE COURT:  Go ahead.

10          MS. FREEDMAN:  My understanding of Dr. Ojalvo's

11  report and his scientific opinion that he would like to render

12  looks at the neck injury as a whole.  The forces on the neck

13  from --

14          THE COURT:  Right.

15          MS. FREEDMAN:  -- that impact from the accident in a

16  general sense, what these forces were and their impact on a

17  hypothetical person in plaintiff's height and weight, sitting

18  in her position at the time of the accident, and how the

19  hypothetical person responds to those forces as they're

20  applied.

21          THE COURT:  With respect to ligamentous injuries,

22  not disk injuries.

23          MS. FREEDMAN:  Well, I believe that's one aspect of

24  his report.

25          THE COURT:  Well, where's the --

13

1          MS. FREEDMAN:  If we look at his report as a whole -

2  -

3          THE COURT:  -- aspect of his report in which he

4  cites a study disclosing the effect of certain force levels on

5  an individual's disks?

6          MS. FREEDMAN:  Well, he's not going to be testifying

7  about the disks.  He's not going to be testifying to --

8          THE COURT:  Well, you want --

9          MS. FREEDMAN:  -- that medical opinion.

10         THE COURT:  You him to render an opinion that the

11  force levels here couldn't have caused the injuries Ms. Dine

12  claims.  Isn't that what you want him to testify to?

13         MS. FREEDMAN:  Well, i believe the way the case law

14  provides it, he can --

15         THE COURT:  No, no, answer my question.

16         MS. FREEDMAN:  I want Dr. Ojalvo to be testifying as

17  to what the forces were, the injury causation forces resulting

18  from the impact, and their --

19         THE COURT:  For ligamentous -- but all he can

20  testify to is what is in his report, and his report relates to

21  ligamentous damage.

22         MS. FREEDMAN:  I believe there's other portions of

23  his report that relate to --

24         THE COURT:  Well, what does he cite for threshold

25  levels for disk damage in front-end collisions?

14

1          MS. FREEDMAN:  I don't believe there's any tests by

2  any individuals on that particular issue.

3          THE COURT:  Then how can he express an opinion on

4  what level of force is necessary to cause disk damage?

5          MS. FREEDMAN:  Well, if you look --

6          THE COURT:  He's not a doctor.  He's not a

7  physician, not a medical doctor.

8          MS. FREEDMAN:  I agree with that.

9          THE COURT:  Yeah.

10          MS. FREEDMAN:  He's not testifying for medical

11  purposes.  He's testifying for scientific purposes, the

12  application of --

13          THE COURT:  Well, hopefully --

14          MS. FREEDMAN:  -- principles of --

15          THE COURT:  -- medicine is scientific.

16          MS. FREEDMAN:  -- biomechanical engineering.

17          THE COURT:  All right.  Anything else you want to

18  tell me?

19          MS. FREEDMAN:  Yes, I do want to focus on these

20  cases of Smeltzer [phonetic] and Laskey [phonetic], they're --

21          THE COURT:  Well, the issue right now to me is fit,

22  is relevance as to whether or not his conclusion bears on the

23  claim right now.  I mean if it doesn't bear on the claim, the

24  methodological issues I think are -- need not be addressed.  I

25  mean I -- you know, he is looking at a study which has its own

15

1    problems, because the study appears to involve one cadaver.

2    So I'm not sure how much you learn from that.

3           But what Mertz and Patrick studied was ligamentous

4    damage, not cervical spine injury.  And they focused on a

5    different structure, not on the disks.  So I don't see how his

6    conclusions based on Mertz and Patrick bear any relationship

7    to what's an issue here.

8           I mean it's sort of -- I mean to sort of simplify

9    this or to illustrate the problem with sort of a gross

10   example, you know, if defendant hits plaintiff in the eye and

11   damages plaintiff's eye a study showing that you need, you

12   know, seven foot pounds of force to break an arm doesn't tell

13   us anything relevant with respect to the claimed eye injury.

14   Because the injury is not a broken arm, it's -- the injury

15   claimed is injury to the eye.

16          And what he's seem, what -- the Mertz/Patrick study

17   seems to relate to ligamentous damage, not disk damage, which

18   is what's in issue here, and that's the problem I'm having.

19          MS. FREEDMAN:  I see.  Well, there are other cases,

20   other studies cited by Dr. Ojalvo.  There's other studies out

21   there.

22          THE COURT:  Where's there a study relating to

23   threshold force levels necessary for disk injury?

24          MS. FREEDMAN:  Apparently not in my papers, but I

25   have --

16

1          THE COURT:  He's your expert.

2          MS. FREEDMAN:  I understand that.  Unfortunately,

3    there aren't studies on the front-end collisions.  There are

4    very few studies.

5          THE COURT:  Then how can he express an opinion on

6    what level of force is necessary to injure a disk?

7          MS. FREEDMAN:  Based on his analysis of the crush

8    values, his years of reconstructing accidents, the hundreds of

9    papers he's written, his expertise in the field and the

10   experience associated with it.  He found an exemplar vehicle,

11   he looked at the photographs, he then was able to determine

12   the equivalent barrier of velocity, the crush values.

13         He put it into the ETB simulated computer program,

14   came out with a result.  Then he tested it by varying the

15   parameters of the facts he put in, such as velocity speed,

16   damage to the vehicles, and he was then able to determine that

17   the parameters he had set were proper parameters based on the

18   known facts of the case as plaintiff testified to them, based

19   on the speed, her movement in the vehicle at the time of the

20   accident.  That is what he bases his opinion on.

21         THE COURT:  All right.

22         Mr. Bagen, what are your thoughts on this issue?

23         MR. BAGEN:  Well, obviously it's their burden of

24   proof, and I don't think they've come anywhere near carrying

25   their burden of proof that this doctor should be testifying

17

1   the things he says he is.

2            And the thing that bothers me is they keep saying

3   over and over again we're not asking him to give a medical

4   opinion.  That's exactly what they're asking him to give.  He

5   said it very clearly in his deposition he was hired to give an

6   opinion that she, Heather Dine, did not suffer these specific

7   injuries in this specific accident.  And there's no science

8   behind that whatsoever.

9            I also have a couple more cases if Your Honor wants

10  them that I came across yesterday getting ready for today

11  where another federal District Court rejected using

12  photographs to estimate crush damage, and another --

13            THE COURT:  Well --

14            MR. BAGEN:  -- federal Court of Appeals, the Ninth

15  Circuit said engineers can't testify as to what forces cause a

16  particular injury.

17            THE COURT:  I mean in all candor, Mr. Bagen, I mean

18  to me the more significant issue here is assuming the validity

19  -- assuming without deciding the validity of his methodology,

20  the computer simulator and estimating velocity from crush

21  damages, assuming the validity of all that, and that's a big

22  assumption, but assuming without deciding the validity of all

23  those methodological issues, his reliance on the Mertz/Patrick

24  study for injury threshold -- for the force levels necessary

25  to cause ligamentous injuries I just don't think tells us

18

1    anything about the force levels necessary to cause disk

2    injuries.

3              MR. BAGEN:  I completely agree, Your Honor.  And

4    it's not only that study but all the studies he relied on were

5    small groups which tending to extrapolate to the general

6    public.  He's got one mid-age male cadaver that he wants to

7    extrapolate to a middle-aged living woman in a dynamic

8    accident as opposed to a planned occurrence.

9              THE COURT:  Yeah.

10             MR. BAGEN:  There's just no connection.

11             THE COURT:  Yeah, you know, and when you think about

12   it it becomes, with a little bit of thought it becomes clear

13   why this study, why the Mertz/Patrick study didn't address

14   disks.  Presumably if they wanted to study for disk damage

15   they would have had to perform MRIs or x-rays on the cadaver

16   before they did the tests and look at the condition of the

17   disks before and after the impact.  Whereas the ligaments, I

18   presume they just expose the ligaments and look at them.  But

19   I mean, you know, you need to know the condition before the

20   impact to know whether or not the impact had any effect.

21             Is there anything else you want to tell me on

22   Dr. Ojalvo, Ms. Freedman?

23             MS. FREEDMAN:  On this particular issue or

24   generally?

25             THE COURT:  I mean I'm ready to rule on the motion

19

1  in limine unless there's something else you want to tell me.

2  If there's something else you want to tell me, go ahead.

3          MS. FREEDMAN:  Okay.  Well, I disagree with your

4  reasoning and review of the articles.  I think that if you

5  look at other cases that have -- look at the <u>Phelan</u> case which

6  found Dr. Ojalvo to be qualified to give opinions based on --

7          THE COURT:  Was that the one --

8          MS. FREEDMAN:  -- biomechanical engineering.

9          THE COURT:  -- from Connecticut?

10          MS. FREEDMAN:  It's -- yeah, District Court in

11  Connecticut.

12          THE COURT:  Yeah, and that's the issue was the

13  motion, not the force, wasn't it?

14          MR. BAGEN:  Yes, Your Honor.  The body movement

15  within the vehicle.  Which is why I'm kind of concerned.

16          THE COURT:  Yeah.

17          MS. FREEDMAN:  That is also looking at Ms. Dine, the

18  way her body moved with and without a seatbelt.  This is what

19  he tested, and he gave the graph which showed the varying

20  speeds.  He tested a hypothetical person with the seatbelt,

21  without a seatbelt, and how the body moved.

22          THE COURT:  Well, I mean did Ms. Dine testify as to

23  how her body moved at the time of the impact?

24          MR. BAGEN:  Yes, Your Honor.

25          MS. FREEDMAN:  Yes, she did.

20

1          THE COURT:  I presume it went forward first and then

2  back?

3          MR. BAGEN:  Her head was thrown forward and back,

4  she was braced with her arms --

5          THE COURT:  Yeah.

6          MR. BAGEN:  -- against the seat in front of her.

7  Her rear-end moved a few inches, not enough to contact the

8  seat in front of her.  It was head movement, which the

9  seatbelt nothing but another red herring.  The seat --

10          THE COURT:  Well, is there any dispute as to the

11  direction her body moved in?

12          MR. BAGEN:  No.  It was a direct -- it was a frontal

13  impact.

14          THE COURT:  I mean, you know, it seems to me that

15  Dr. Ojalvo's testimony concerning force thresholds necessary

16  to cause injury here is based on a study that doesn't have a

17  relationship -- that has no relevance to the nature of the

18  injury claimed here.  As I said a few moments ago, he relies

19  on the Mertz/Patrick study, which reports force levels to

20  cause ligamentous damage, not cervical disk injury, which is

21  what's at issue here.

22          And he doesn't -- ligaments are a different

23  structure than disks.  Ligaments are the structures that

24  connect the bones together, as I understand it, based on

25  consulting a medical dictionary.  And they're not -- they're

1   just a different structure.

2          His report does not explain how one can draw a

3   conclusion from the force level necessary to cause ligamentous

4   damage to the force level necessary to cause disk damage.  And

5   he seems, what he seems to be doing is extrapolating from the

6   ligamentous injury thresholds to all injuries without

7   explanation.

8          Without trying to be an expert, I think it's common

9   knowledge that the human body has a variety of different

10  structures in it, and the different structures -- different

11  structures will tolerate different levels of force without

12  injury.  Without his -- without an explanation as to how

13  injury thresholds for ligamentous damage, again assuming

14  without deciding the validity of all the methodological

15  issues, without deciding how ligamentous damage thresholds

16  relate to cervical spine damage threshold, I don't think his

17  report, to the extent it quantifies forces and expresses an

18  opinion as to whether or not the quantification -- the forces

19  as quantified could have caused the damage really fits with

20  the nature of the claimed injury here.  It's not relevant,

21  it's based on thresholds for a different bodily structure than

22  the cervical spine.

23          To the extent his report recounts the motion of

24  Ms. Dine's body at the time of the impact, it appears that

25  there's no dispute on the direction in which her body moved.

22

1   And I don't think the testimony -- and therefore I don't think

2   the testimony adds anything.  It seems to me to be either

3   irrelevant to the extent it quantifies forces and expresses an

4   opinion on the sufficiency of those forces to cause the

5   injury, and to the extent it just relates to the nature of the

6   movement of her body, it seems cumulative and seems to relate

7   to a matter that's not in dispute.

8           MS. FREEDMAN:  Well, Your Honor, there --

9           THE COURT:  So because there is not a fit between

10  Ojalvo's testimony and the issue here, I'm going to grant the

11  motion to preclude him from testifying.

12          MR. BAGEN:  Thank you, Your Honor.

13          THE COURT:  What did you want to say?

14          MS. FREEDMAN:  What I wanted to say that I believe

15  there is an issue as to the movement of her body with and

16  without a seatbelt.  She testified she was not wearing a

17  seatbelt at the time of the accident.  Her body moved, as

18  Dr. Ojalvo's tests had shown, more without a seatbelt than

19  with a seatbelt.  And plaintiff does have a duty to -- we

20  raised it as a affirmative defense that plaintiff failed to

21  mitigate her damages by failing to wear a seatbelt.

22          THE COURT:  Yeah, but that's common knowledge that

23  you're going -- that a body in a car in an accident is going

24  to move more without a seatbelt than with a seatbelt.  You

25  don't need an expert to -- the jury doesn't need an expert to

23

1  tell us there.

2        MS. FREEDMAN:  But experts are allowed to testify on

3  that topic.

4        THE COURT:  Well, experts are allowed to testify if

5  it's a matter of specialized knowledge or training.  I mean

6  the fact that an restrained body is going to move more in a

7  collision than a restrained body I don't think is a matter, is

8  necessarily a matter for common knowledge.

9        I mean, Mr. Bagen, is there any dispute that an

10  unrestrained person in a car is going to move more than a

11  restrained person?

12        MR. BAGEN:  No, Your Honor.

13        THE COURT:  I mean it sounds like you can get a

14  stipulation as to that.

15        MS. FREEDMAN:  Well, I believe it's to the amount

16  that her body moved and the effect that it has on her body,

17  the forces that are --

18        THE COURT:  The effect is where you have the

19  problem.  Because the effect on her body is based on a study

20  concerning a different kind of damage that she's not claiming.

21  So I mean the effect on her body is precisely where you have

22  the problem.

23        I mean, you know, I thought about this, and there

24  may be -- you know, perhaps Ojalvo could testify as to, kind

25  of depending upon what Mr. Bagen is willing to stipulate to,

24

1    perhaps he could testify to the way in which her body would

2    have moved in the collision.  But I don't think he can

3    quantify the forces or express an opinion as to what the -- as

4    to the significance of those forces.

5            I mean I think the most he could testify to is to

6    describe, you know, the direction of her body's movement or

7    movements.  But the quantification of the forces I think is --

8    he has -- to the extent he quantifies the forces, the

9    quantification has no relevance because there's nothing in his

10   report that correlates the quantifications to relevant injury

11   threshold levels.

12           MS. FREEDMAN:  Okay.

13           THE COURT:  So.  I mean, look, I'm going to grant

14   the motion to preclude.  If after you consider it, if you want

15   to have him testify -- if you want to make a motion for

16   reconsideration limited to his testifying to the movements of

17   her body, to the movement or movements of her body without

18   quantification of forces, I might be inclined to let him

19   testify as to the movements of her body.  I'm not sure if

20   there's going to be any dispute on that.

21           But the most I think he could do is similar to what

22   he testified to in that Connecticut case, that her body moved

23   in a certain direction or directions after the accident.  But

24   there is no -- he is not -- he would not be permitted to

25   testify to the quantification of the forces or to the effect

25

 1    of those forces or express an opinion as to whether or not

 2    those forces were or were not sufficient to cause the injuries

 3    she's claiming.  Which I think is pretty much what he did in

 4    the case before Judge Arterton, just the direction of the head

 5    movement, but that was it.

 6               I think we also need to set a trial date here.

 7               MR. BAGEN:  I was hoping it was the next thing,

 8    Your Honor.

 9               MS. FREEDMAN:  Your Honor, I have a bit of

10    outstanding discovery I'd like to address.  I have no problem

11    setting a trial date but I believe there's some outstanding

12    discovery I'd like to address before the Court.

13               THE COURT:  Isn't the discovery date long past?

14               MS. FREEDMAN:  Well, Your Honor did put out a recent

15    order regarding Dr. Rigney [phonetic], have his deposition

16    before January 10th, which we have scheduled, and gave an

17    additional 30 days thereafter for defendants to --

18               THE COURT:  Yeah.

19               MS. FREEDMAN:  -- set forth --

20               THE COURT:  If they want to put in a sur reply, yeah

21               MS. FREEDMAN:  -- a sur reply if we so choose.  No,

22    there were some other outstanding discovery.  I've sent

23    plaintiff four letters between October and the present

24    regarding getting a copy of his Rule 26(a) disclosures putting

25    forth his witnesses, his documents.  I've never received a

26

1    response to my letters.  And I've spoken with counsel for

2    Hertz, they didn't have a copy of it.  And I'm just trying to

3    get a response to that.

4          THE COURT:  Is there a problem with giving her a

5    copy of the 26(a)?

6          MR. BAGEN:  Well, the problem is that early on in

7    this case we went through three or four or five judges, I

8    forget how many, before we got to you.  During that time Mr.

9    Cohen and I engaged in discovery, he served interrogatories,

10   we answered interrogatories, we did all those things before we

11   ever did a 26.  And in fact neither one of us ever did it

12   because we were past that point before we got to a judge.

13         THE COURT:  Okay.

14         MR. BAGEN:  Now, at counsel for Hertz request, Mr.

15   Cohen put together something and sent it out recently.  I

16   guess I could go back and do that, but she's got far more than

17   would have been in that since then.

18         THE COURT:  Well, do you have --

19         MR. BAGEN:  It's moot, I think.

20         THE COURT:  -- all the discovery, do you have all

21   the discovery responses from plaintiff?

22         MS. FREEDMAN:  I hope so.  I have response to the

23   interrogatories and an amended response.  Is there anything

24   else that's going to list any additional witnesses, discovery

25   documents?

27

1          MR. BAGEN:  Well, there's something if you think

2    you're missing I'll be happy to give it to you.  But it seems

3    to me like you've got far more than you would have gotten in a

4    Rule 26.

5          THE COURT:  Okay, let me put it this way.  I mean

6    are there any witnesses you're going to call that have not

7    already been identified in discovery, Mr. Bagen?

8          MR. BAGEN:  I don't believe so.

9          MS. FREEDMAN:  Okay.

10          THE COURT:  All right.

11          MS. FREEDMAN:  There's no additional documents?

12          MR. BAGEN:  You have everything.  You've got so much

13    stuff.

14          MS. FREEDMAN:  I agree that I do have a lot of

15    stuff.  There was a couple other things.  We had recently

16    ascertained an address for a doctor, Dr. Ann Jenkins, and

17    we're requesting an authorization.

18          MR. BAGEN:  It was either mailed yesterday or today.

19    She requested it.

20          THE COURT:  Okay.

21          MS. FREEDMAN:  We had recently come into that.

22          MR. BAGEN:  We sent it to South Carolina.  It was

23    signed, notarized, sent back.  It came back to my office

24    yesterday, so it was either mailed yesterday or today.

25          THE COURT:  All right.

28

1          MS. FREEDMAN:  That sounds fine.  Now, also we had

2    sent a request for production for some documents.  Plaintiff

3    had testified at her deposition that she had -- she would send

4    correspondence, emails, letters to her doctors.  We'd

5    requested copies of these.  She testified at her deposition

6    she had copies.  We've yet to receive them.

7          THE COURT:  The emails to her doctors?

8          MS. FREEDMAN:  Emails and hard copies of letters she

9    would send to her doctors.  She said she kept copies of

10   everything.

11         MR. BAGEN:  They have all the doctor's records, they

12   have copies of those, multiple copies of them.  And for me to

13   go back through it to get something that they could have asked

14   for a year ago, it just doesn't make any sense when they

15   already have all those things.  Because they have both

16   doctors' complete charts.

17         MS. FREEDMAN:  It was asked for a couple months ago.

18   I do believe we're entitled to it.  I don't know if the

19   doctors have complete copies.  Plaintiff testified she has a

20   complete copy.  I believe we're entitled to it.  It doesn't

21   seem like a difficult thing to provide to us.

22         MR. BAGEN:  I just think it's cumulative,

23   Your Honor.

24         THE COURT:  I'm sorry?

25         MR. BAGEN:  I just think it's cumulative.  They have

29

1    everything.

2          MS. FREEDMAN:  I don't know if the doctors have had

3    complete records.  We've had difficulty getting complete

4    records from these doctors, as you're aware.

5          THE COURT:  Well, I'm not sure that there's

6    assurance that the doctor kept the emails.  I'm not sure that

7    this --

8          MR. BAGEN:  In fact, Your Honor --

9          MS. FREEDMAN:  In fact, there are -- the doctor --

10   okay.

11         THE COURT:  Okay, let me hear from Mr. Bagen.

12   Okay.  Hang on a second.

13         Go ahead.

14         MR. BAGEN:  There are no emails.  She doesn't use

15   email.  She uses faxes.  I've never seen an email.

16         MS. FREEDMAN:  No, Dr. Duke had testified he had

17   received some emails from her, which were not part of his

18   file.

19         MR. BAGEN:  He must have meant faxes because she

20   doesn't do email.  I've never got an email from her either.

21         THE COURT:  All right.  To the extent that written

22   communications -- you have a -- you have some of her

23   communications to doctors?

24         MS. FREEDMAN:  I have what's contained, yes, in the

25   doctor's reports.

30

1           THE COURT:  All right.

2           MS. FREEDMAN:  I don't know if that's the complete

3   extent.

4           THE COURT:  All right, this is what I'm going to

5   direct.  It's kind of late in the day here but all right.  By

6   January 6th defendant is to identify for plaintiff all the

7   communications or all the letters -- strike that -- all the

8   written communications from plaintiff to the doctors that

9   defendant has.  Okay.  By January 21 plaintiff is to produce

10  any additional written communications in her possession,

11  custody or control.

12          MR. BAGEN:  Your Honor, if I may?

13          THE COURT:  Yeah.

14          MR. BAGEN:  If I understand what you're saying, you

15  want them to identify what they have and for me to supply

16  what's missing.

17          THE COURT:  Right.

18          MR. BAGEN:  It'd be quicker for me to just have her

19  copy everything and --

20          THE COURT:  If you want to do it that way, that's

21  fine.

22          MR. BAGEN:  -- do it by January 6th instead of --

23          THE COURT:  If you want to do it that way --

24          MR. BAGEN:  -- having three more weeks of wasted

25  time.

31

```
 1              THE COURT:  If you want to do it that way, that's
 2   fine.
 3              MR. BAGEN:  Okay.
 4              THE COURT:  Okay.
 5              MR. BAGEN:  That's what I'll do, Your Honor.
 6              THE COURT:  All right.
 7              MR. BAGEN:  January 7 is a Friday, if that will be
 8   okay.
 9              THE COURT:  Fine.  All right.  All right.  Anything
10   else?
11              MS. FREEDMAN:  If you want --
12              MR. BAGEN:  The last deposition is scheduled --
13              THE COURT:  No, I wanted to finish with Ms. Freedman
14   first.
15              MR. BAGEN:  Oh, I'm sorry.
16              MS. FREEDMAN:  No, if there was a opportunity to
17   make the motion for reconsideration, what would be a time
18   frame on that?
19              THE COURT:  Ten day, ten business days.  And you've
20   got to cite -- I mean apart from the issue of just the nature
21   of her -- the way her body moved -- well, I'm not -- apart
22   from the issue of the way her body moved after the accident,
23   reconsideration is limited to controlling facts or authorities
24   that were overlooked.  So all right.  Any other discovery
25   issues from the defendant's side?
```

32

1        MS. FREEDMAN:  No.

2        THE COURT:  Okay.  Mr. Bagen, what did you want to

3   say?

4        MR. BAGEN:  Just the remaining deposition of Dr.

5   Biggen [phonetic] is scheduled for the 3rd.  And that's the

6   last thing that I know of that needs to be done and the

7   correspondence you just ordered me to do.  So in terms of

8   setting a trial date I wanted to bring that to your attention,

9   Your Honor.

10        MS. FREEDMAN:  Well, we would have 30 days from the

11   order, I guess till the beginning of February if you wanted to

12   do any sur rebuttal response.

13        THE COURT:  No, no, no, no, no, no.  You -- no.

14   He's getting the last word, on the expert reports he has the

15   last word.

16        MS. FREEDMAN:  No, wasn't that from your order, your

17   recent order regarding Dr. Rigney?  You gave us 60 days from

18   the date of the order to designate any sur rebuttal witness or

19   testimony?

20        THE COURT:  Oh, I'm sorry, I'm sorry.  Hold on a

21   minute.  I may have the parties reversed in my mind.  Hold on

22   one second.

23        MS. FREEDMAN:  Okay.

24        THE COURT:  Hold on.  No, you're correct, Ms.

25   Freedman.  I had the parties flipped in my mind.  Okay, so you

33

1  have until February, roughly February 10th is your -- is when

2  you get -- is the deadline for your sur rebuttal.

3         MR. BAGEN:  How did it get to the 10th, Your Honor?

4         THE COURT:  Pardon?

5         MR. BAGEN:  How did it get to the 10th?  The

6  deposition is on the 3rd.

7         MS. FREEDMAN:  No, it's from the date of the order,

8  which was --

9         THE COURT:  Defendant and third party defendant are

10  granted -- I'm looking at the penultimate sentence of my

11  December 10th order.  Defendant and third party defendant are

12  granted 60 days from the date of this order to designate any

13  sur rebuttal witness or testimony they deem appropriate and to

14  provide this as required by Rule 26(a)(2).  And my order was

15  dated December 10, 2004, so 60 days from December 10 is

16  roughly February 10.

17         MR. BAGEN:  Okay, sorry.  What I had in my head was

18  30 days after the deposition, so it was my mistake.

19         THE COURT:  All right.  Okay.  All right.  Now, the

20  pretrial order has not been prepared yet?

21         MR. BAGEN:  I think we were waiting to see what we

22  did today before we could do anything else.

23         THE COURT:  Okay.  Well, let me ask, all right, when

24  do you want to try this case?  I guess we're looking at

25  sometime after February 10th.  I've got time --

34

1          MR. BAGEN:  Sooner the better from my perspective,
2  Your Honor.
3          THE COURT:  All right.  Do you want to do it March -
4  - the week of March 14th?
5          MR. BAGEN:  If that's the soonest, yeah, that's --
6          THE COURT:  All right.  Do you want to do it the
7  week of February -- when's President's Day, do you know, 21st?
8          MR. BAGEN:  Third Monday.  So it'll be the 21st.
9          THE COURT:  One, two -- hold on.
10          MR. BAGEN:  21st is President's Day.  Do you guys
11  get Lincoln's Day?
12          MS. FREEDMAN:  We prefer the March date, Your Honor.
13          THE COURT:  Yeah, we get both days of federal
14  holidays, I believe.  President's Day is the 21st.  All right.
15  How's March 7th?
16          MR. BAGEN:  It's good for me, Your Honor.
17          MS. FREEDMAN:  Okay.
18          THE COURT:  All right.  All right.  The pretrial
19  order and request to charge will be due on February 25.  With
20  respect to the request to charge, just give me requests on the
21  substantive issues in the case.  I don't need request to
22  charge on function of court and jury, credibility of
23  witnesses.  I don't need request to charge on the sort of
24  boilerplate issues.  I need just give me request to charge on
25  the substantive damages issues here.  Liability is out of the

35

1  case.

2          And also with respect to the request to charge, give

3  me in your request the substance of what you're asking for.

4  What some attorneys have done, and which is not very helpful,

5  is give me a list of citations to pattern jury instructions.

6  I oftentimes work at on the request to charge at home.  I

7  don't carry home the pattern jury instructions.  So just

8  giving a list of citations isn't helpful.

9          If you want to annex pages from the pattern jury

10 instructions, that's fine.  You don't have to retype them.

11 But your request should include the substance of what you're

12 asking for.  And if you want to do it by copying pages, that's

13 fine.  I'm not trying to make work for anybody.  But don't

14 just give me a list of citations.  That doesn't help me.  All

15 right?

16         All right.  The requirements of the pretrial order

17 are in my rules, which are on the internet on the court's

18 website.  It's a plain vanilla pretrial order, contested and

19 noncontested facts, list of witnesses, list of exhibits.

20 There's nothing fancy.  It's the kind of thing I'm sure you're

21 familiar with.

22         You should contact your witnesses forthwith, both

23 sides should contact their respective witnesses forthwith to

24 ensure everybody is available during the week of March 7th.

25 If someone has a problem with that date, let me know by

36

1    January 14th.  Okay.  After January 14th I will only entertain

2    applications for an adjournment based on unforeseeable

3    emergencies.

4            If somebody has a long-standing planned vacation or

5    something like that, I'm happy to accommodate everybody's

6    schedule.  But I don't want to be told on March 4th that, you

7    know, someone has tickets to Disney World.  If someone's got a

8    problem with that date, let me know by March -- let me know by

9    January 14 or else applications -- or adjournments will only

10   be granted for unforeseeable emergencies.

11           MS. FREEDMAN:  What about any motions in limine,

12   would they be by the 25th as well?

13           THE COURT:  Yeah.  Yeah, if you have any additional

14   motions.  All right.  With respect to jury selection, we -- in

15   civil cases we go with a jury of eight.  As you may know,

16   everyone deliberates, there are no more alternates in civil

17   trials.  With respect to jury selection, I use what is

18   referred to by some as the struck panel method.

19           We put 14 people -- 14 people are selected at random

20   and put in the jury box.  I conduct voir dire on the entire

21   14.  Assuming there are no challenges for cause, we then do

22   the peremptories addressed to the 14 in the box.  This way you

23   know who the -- the advantage of this, I think this advantages

24   lawyers because the advantage to doing it this way is that you

25   know who the replacement is going to be if you exercise a

37

1   peremptory.  The jury is going to be the first eight remaining

2   after the exercise of the peremptories.

3         All right.  Also any voir dire should be submitted

4   by February 25th.  So the pretrial order, voir dire, and

5   request to charge by January -- by February 25th, excuse me,

6   February 25th.  All right.

7         Is there anything else we should be considering from

8   your point of view, Mr. Bagen?

9         MR. BAGEN:  No, sir.

10        THE COURT:  Okay.  Ms. Freedman, anything else from

11  your point of view?

12        MS. FREEDMAN:  No.

13        THE COURT:  Okay.  All right.

14        MS. FREEDMAN:  Thank you.

15        THE COURT:  Thank you all.

16        MR. BAGEN:  Thank you, Your Honor.

17  (End of hearing.)

18

19

20

21

22

23

24

25

38

1          I certify that the foregoing is a court transcript

2    from an electronic sound recording of the proceedings in the

3    above-entitled matter.

4

5                              _____

6                                   Shari Riemer, CET-805

7    Dated: December 17, 2015