UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

DANIEL WHALEN,                                    Docket No.: 13 CV 3784 (LGS)

        Plaintiff,

    -against-

CSX TRANSPORTATION, INC.,

        Defendant.

---------------------------------------------------------------------x

CSX TRANSPORTATION, INC.,

    Defendant/Third-Party Plaintiff,

    -against-

HAWORTH INC. and OFFICE ENVIRONMENTS
SERVICE INC.,

    Third-Party Defendants.

---------------------------------------------------------------------x

## **MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO PRECLUDE JAMIE WILLIAMS, PH.D.**

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

By: _____
       RICHARD H. RUBENSTEIN (RHR 4194)
       150 E. 42d St.
       New York, New York 10017-5639
       Tel.: (212) 915-5798
       Fax: (212) 490-3038
       Richard.Rubenstein@WilsonElser.com
       File No.: 08856.00003

ATTORNEYS FOR THIRD-PARTY DEFENDANT
**HAWORTH, INC.**

ECKERT, SEAMANS, CHERIN & MELLOTT, LLC

By: _Lawrence R Bailey Jr._ (RHR)

LAWRENCE R. BAILEY, JR. (LRB 3267)
10 Bank St., Suite 700
White Plains, New York 10606
Tel.: (914) 949-9209
File No.: 301631-00052

ATTORNEYS FOR DEFENDANT/THIRD PARTY PLAINTIFF
**CSX TRANSPORTATION, INC.**

ROPERS, MAJESKI, KOHN & BENTLEY, PC

By: _Scott Bermack_ (RHR)

SCOTT BERMACK ( SB 8842)
750 Third Ave., 25th Floor
New York, New York 10017
Tel.: (646) 454-3266

ATTORNEYS FOR THIRD PARTY DEFENDANT
**OFFICE ENVIRONMENTS SERVICE, INC.**

Dated: January 4, 2016

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL SUMMARY ................................................................................... 3

ARGUMENT ................................................................................................. 6

POINT I    THE "GENERAL"/"SPECIFIC" DICHOTOMY FOR CAUSATION
OPINIONS BY BIOMECHANICS EXPERTS ESPOUSED BY
SMELSER IS NOT UNIVERSALLY ACCEPTED, INCLUDING IN
THE SOUTHERN DISTRICT OF NEW YORK ............................................. 6

    A.    *Smelser* and Its Progeny ........................................................ 6

    B.    Cases in the Southern District of New York Which Did
Not Restrict "Specific" Causation Opinions Regarding
Plaintiff's Injuries to Medical Doctors ................................. 8

    C.    Cases from Other Jurisdictions Which Do Allow
Biomechanics Experts to Offer "Specific" Injury
Causation Opinions .......................................................... 10

    D.    Even in a "General"/"Specific" Causation Jurisdiction,
the Biomechanics Expert Can Offer "Specific" Injury
Causation Testimony Under the Proper Circumstances ...................... 11

POINT II    DR. WILLIAMS' METHODOLOGY IS RELIABLE AND
ADMISSIBLE ............................................................................. 12

    A.    Other Courts Have Found Dr. Williams' Methodology
to Be Reliable ................................................................... 12

    B.    The Methodology Used by Dr. Williams in This Case Is
Reliable [Plaintiff's Issues #1-3 of Docket Entry #207
at p.3] ............................................................................. 13

           Unstated Methodology .......................................................... 13

           Use of Exemplar Chair Instead of the Subject Chair ......................... 14

           Reliance on Cadaver Study .................................................... 15

POINT III    THERE IS NO PROHIBITION AGAINST DR. WILLIAMS
EXPRESSING AN OPINION THAT CONTRADICTS WITNESS
TESTIMONY ............................................................................. 16

i

POINT IV BY NOTING THAT HER CONCLUSIONS WERE CONSISTENT WITH THE DIAGNOSES OF PLAINTIFF'S TREATING PHYSICIAN, DR. WILLIAMS WAS SIMPLY STATING A FACT, NOT "VOUCHING FOR HER OWN CREDIBILITY" AS PLAINTIFF CLAIMS [Plaintiff's Issue #4 of Docket Entry #207 at p. 4] .......................... 20

POINT V THIS COURT SHOULD NOT AWARD PLAINTIFF COSTS AND ATTORNEYS FEES FOR THE MAKING OF THIS MOTION .................. 20

CONCLUSION .................................................................................................................... 21

7182202v.4

## CASES

*Berner v. Carnival Corp.,*
    632 F. Supp.2d 1208 (S.D. Fla. 2009) ................................................................ 7, 8, 11, 12, 21

*Berry v. Transportation Distribution Co.,*
    2013 U.S. Dist. LEXIS 170634 (N.D. Okla.) ................................................................ 11

*Finn v. BSNF Railway Co.,*
    2013 U.S. Dist. LEXIS 16557 (D. Wyo.) ................................................................ 10, 11

*General Electric Co. v. Joiner,*
    522 U.S. 136, 118 S. Ct. 512 (1997) ................................................................ 6

*Krause v. CSX Transportation,*
    984 F. Supp.2d 62 (N.D.N.Y. 2013) ................................................................ 9

*Laski v. Bellwood,*
    2000 U.S. App. LEXIS 12068 (6th Cir.) ................................................................ 7

*Morgan v. Girgis,*
    2008 U.S. Dist. LEXIS 39780 (S.D.N.Y.) ................................................................ 2, 3, 6, 7, 8, 9, 21

*Morrison v. Ercole,*
    2008 U.S. Dist. LEXIS 84494 (E.D.N.Y.) ................................................................ 20

*Nimely v. City of New York,*
    414 F.3d 381 (2d Cir. 2005) ................................................................ 18, 19

*Peters v. Metro-North Commuter Railroad Co.,*
    2010 U.S. Dist. LEXIS 102117 (S.D.N.Y.) ................................................................ 2, 9, 21

*Phillips v. The Raymond Corp.,*
    364 F. Supp.2d 730 (N.D. Ill. 2005) ................................................................ 11, 17

*Reynoso v. Ford Motor Co.,*
    2005 U.S. Dist. LEXIS 46065 (S.D. Tex.) ................................................................ 11

*Robinson v. Washington Metropolitan Area Transit Authority,*
    858 F. Supp.2d 33 ................................................................ 10

*Rodriguez v. Athenium House Corp.,*
    2013 U.S. Dist. LEXIS 32748 (S.D.N.Y.) ................................................................ 2, 3, 7, 8, 9, 10, 21

*Smelser v. Norfolk Southern Railway Co.,*
    105 F.3d 299 (6th Cir. 1997) ................................................................ 6, 7, 10, 12

7182202v.4

*The Pennsylvania Trust Co. v. Dorel Juvenile Group, Inc.*,
    851 F. Supp.2d 831 (E.D. Pa. 2011) ....................................................... 11

*Thorndike v. Daimlerchrysler Corp.*,
    266 F. Supp.2d 172 (D. Me. 2003) .................................................... 14-15

*United States of America v. Charley*,
    189 F.3d 1251 (10th Cir. 1999) ............................................................ 19

*United States of America v. Lumpkin*,
    192 F.3d 280 (2d Cir. 1999) .......................................................... 18, 19

*United States of America v. Scop*,
    846 F.2d 135 (2d Cir. 1998) ................................................................ 19

*Wagonner v. Schlumberger*,
    2008 U.S. Dist. LEXIS 109634 (D. Wyo.) ......................................... 11

*Westcott v. Crinklaw*,
    68 F.3d 1073 (8th Cir. 1995) ............................................................... 19

*Yu-Santos v. Ford Motor Co.*,
    2009 U.S. Dist. LEXIS 41001 (E.D. Cal.) ......................................... 11

## OTHER AUTHORITIES

Nightingale R.W., *et al.*,
    Journal of Biomechanics 35 (2002) 725-732 ......................................... 5

## RULES

Fed. R. Civ. Proc. 11 ............................................................................ 20

Fed. R. Civ. Proc. 37 ............................................................................ 20

7182202v.4

# PRELIMINARY STATEMENT

Third Party Defendant Haworth, Inc. ["Haworth"], joined by Defendant/Third Party Plaintiff CSX Transportation, Inc. ["CSX"] and Third Party Defendant Office Environments Service, Inc. ["OES"][collectively "the defense parties"] hereby submit this Memorandum of Law in opposition to Plaintiff's *Daubert* Motion to Preclude Jamie Williams, Ph.D., who the defense parties jointly retained. Dr. Williams is a highly qualified biomechanics expert who has important testimony for the jury based on reliable methodology and her opinions should not be limited or precluded.

Causation is a hotly disputed issue in this case. Plaintiff contends that he needed two spinal fusion surgeries as a result of the injuries caused or aggravated by the November 8, 2011 incident with an office chair that reclined more rapidly than he expected. The medical doctors that examined plaintiff after the accident noted "degenerative" injuries to his cervical discs, implying that the injuries pre-dated the accident. Plaintiff's pre-accident medical records confirm that he had pre-existing herniations of cervical discs, with complaints of pain and numbness in his neck, shoulder and elbow, for which he received medical treatment, including epidural injections.

Prior to his railroad jobs, plaintiff performed roofing work, which called for him to do heavy lifting. His job as a carman at CSX was physical and called for frequent lifting of heavy objects.

In April of 2012, Mr. Whelan had fusion surgery on his neck and the pain that he had been experiencing resolved. In July of 2012, Mr. Whalen returned to his job at CSX and performed the same duties, including lifting of heavy objects. He allegedly further aggravated his injuries and took leave of his job at CSX after a few months and underwent a second fusion surgery in April of 2014.

1

Given his history of injuries to the back and pre-existing problems with the neck, and the fact that his job duties entailed frequent lifting of heavy objects, the defense parties questioned whether or not Mr. Whalen's alleged injuries are attributable to the November 8, 2011 chair incident. In that regard, the defense parties retained Dr. Williams to study the accident, pertinent evidence, and an exemplar Zody task chair and offer an opinion, based on the principles of biomechanics, as to whether the forces involved were of sufficient magnitude and in the proper direction to have caused or aggravated Daniel Whalen's posterolateral cervical disc herniations.

Plaintiff contends that two cases, *Morgan v. Girgis*, 2008 U.S. Dist. LEXIS 39780 (S.D.N.Y.) and *Rodriguez v. Athenium House Corp.*, 2013 U.S. Dist. LEXIS 32748 (S.D.N.Y.) signify a "modern trend within the Southern District [of New York] to preclude biomechanical experts without medical degrees from offering opinions on the cause of a plaintiff's injuries since they are not medical doctors". The defense parties take issue with that assertion on two grounds. First, those cases do not stand for the proposition that a biomechanics expert without a medical degree should be precluded from testifying. The cases allow a biomechanics expert to opine as to "general" injury causation, although they did not permit an opinion on "specific" injury causation.

Second, we submit that two decisions hardly amount to "a trend", especially where, as here, there is an intervening decision from the Southern District between *Morgan* and *Rodriguez*, namely, *Peters v. Metro-North Commuter Railroad Co.*, 2010 U.S. Dist. LEXIS 102117 (S.D.N.Y.), which allowed "specific" injury causation testimony by an expert in ergonomics and biomechanics over the defense objection that the expert was not a medical doctor. In addition, there are decisions from other courts which allow "specific" injury causation opinions by a

2

biomechanics expert and the Second Circuit itself has not yet ruled on this issue. This Court should not, therefore, consider itself bound to follow the "general"/"specific" analysis of *Morgan* and *Rodriguez* as plaintiff urges.

Finally, plaintiff raises several points with respect to the reliability of Dr. Williams' opinions. As will be demonstrated, those criticisms go to the weight and not the admissibility of those opinions. Plaintiff's arguments about Dr. Williams not being allowed to offer an opinion that conflicts with plaintiff's testimony or "vouching" for her opinion are without merit.

## FACTUAL SUMMARY

Mr. Whalen has had a long history of injuries to various body parts, especially his lower back. In addition, he also has a history of injury to his cervical region. On December 21, 2000, eleven years prior to the accident at issue, Mr. Whalen received an epidural injection in the C6-C7 region from Dr. Robert Choi, in order to address complaints of left clavicle and left elbow numbness and tingling on a pain scale of from 7 to 10 on a scale of 10. *See* pre-accident medical records of Daniel Whalen, docket entry #200, Exhibit B at pp. 524-525. An MRI of the cervical spine taken at that time showed a posterolateral disc herniation of C6-C7. *Id.* at p. 547. On February 1, 2001, Dr. Choi administered another epidural injection in the C6-C7 region in order to address complaints of pain in the cervical region of the neck on the left side and in the left elbow, and numbness and tingling of the left arm, with a reported pain level of 9 out of 10. *Id.* at pp. 535-536.

In his deposition taken on January 16, 2015, Mr. Whalen acknowledged a history of neck and arm pain which pre-dated the chair incident. *See* docket entry #199 at Exhibit H at 36:24-38:25. He claimed that he could not recall any incident that led to his neck problems prior to 2000. *See* additional excerpts from the deposition of Daniel Whalen taken on January 16, 2015 annexed as Exhibit "A" at 201:21-203:5.

3

With respect to lumbar injuries, annexed as Exhibit "B" is a report by Robert L. Boothe, M.D., describing, based on his review of previous medical records, various "episodes" between 1985 and 1990 that Mr. Whalen had with respect to his lower back region, including a 1986 incident with a "knuckle" at work in which he felt a "snap" in his back. Annexed as Exhibit "C" is an "Initial Report of Injury" dated February 20, 1984 in which Mr. Whalen reported pain in his chest and back as a result of having been struck by a hose and knocked to the ground.

On the day of the November 8, 2011 chair incident, Mr. Whalen was examined at Hudson Valley Hospital. Annexed as Exhibit "D" is a two page report from that hospital. It notes under "History of Present Illness: ...has no history of prior neck problem". Under "Final Report", it notes that the x-rays and MRIs showed no evidence of a fracture, but did show "degenerative disc disease at C5-C6 and C6-C7." Annexed as Exhibit "E" is Mr. Whalen's chart from his November 8, 2011 treatment at Hudson Valley Hospital that was evidently used to prepare Exhibit D.

After the November 8, 2011 chair incident, Mr. Whalen's primary physician, Dr. Valerie Zarcone, referred him for an orthopedic consult with Barry Krosser, M.D., at the Mount Kisco Medical Group PC. Dr. Krosser's report dated November 16, 2011, is annexed as Exhibit "F". In this report, Dr. Krosser indicates that x-rays and MRIs show evidence of "degenerative" [*i.e.*, long-standing] disease at C5-C6 and C6-C7, without any evidence of a fracture. Dr. Krosser concluded that Mr. Whalen just twisted his neck and has "just inflammation."

Mr. Whalen's job at CSX was physical and called for him to frequently lift objects weighing at least 50 pounds. *See* Exhibit A at 198:10-200:10. He claimed that he would occasionally be called upon to lift objects weighing up to 200 pounds, together with a co-worker.

7182202v.4

*Id.* at 198:24-199:19. Prior to his railroad work, Mr. Whalen performed roofing jobs, in which he would have to lift bundles of shingles weighing 60 pounds. *Id.* at 200:11-201:10.

Mr. Whalen underwent a fusion procedure in April of 2012. *See* Exhibit A at 149:5-151:11. He returned to work at CSX in July of 2012. *Id.* at 153:19-153:23. He had no complaints when he first returned to work. *Id.* at 153:24-154:5. After he had returned to work (and heavy lifting) for about two months, the pain returned. *Id.* at 154:6-155:6. There was no accommodation in the work place for Mr. Whalen's injury. *See* excerpt from deposition of Mr. Whalen's supervisor at CSX, Timothy Brereton, taken on February 4, 2015, annexed as Exhibit "G" at 122:3-122:12. Mr. Whalen stopped work in January of 2013 and had a second fusion procedure in April of 2014. *See* Exhibit A at 155:10-155:21; 278:22-279:12.

Annexed as Exhibit "H" is the c.v. of Dr. Williams. Dr. Williams examined the testimony and pleadings in the case, Mr. Whalen's medical records and an exemplar Zody task chair and issued her Rule 26 report dated August 26, 2015. *See* docket entry # 207, Exhibit 1. Based upon the work she conducted, her extensive experience in the field and Newton's Laws of physics, Dr. Williams concluded that the bending forces experienced during the recline were compressing the posterior region of the cervical discs and could not, therefore, have produced a posterolateral disc herniation, as plaintiff's treating physicians had documented. *Id.* at ¶¶17-21. Based upon all of the foregoing, plus the Law of Conservation of Energy and a peer-reviewed publication entitled: "Comparative strengths and structural properties of the upper and lower cervical spine in flexion and extension", Nightingale R.W., *et al.*, Journal of Biomechanics 35 (2002) 725-732, annexed as Exhibit "J", she further concluded that the forward motion of the chair caused by Mr. Whalen's reaction to the unexpected recline, would not have produced sufficient bending forces to have caused or aggravated Mr. Whalen's disc herniations. *Id.*

## ARGUMENT

## POINT I

## THE "GENERAL"/"SPECIFIC" DICHOTOMY FOR CAUSATION OPINIONS BY BIOMECHANICS EXPERTS ESPOUSED BY SMELSER IS NOT UNIVERSALLY ACCEPTED, INCLUDING IN THE SOUTHERN DISTRICT OF NEW YORK

### A. *Smelser* and Its Progeny

In *Smelser v. Norfolk Southern Railway Co.*, 105 F.3d 299 (6th Cir. 1997), *abrogated on other grounds by General Electric Co. v. Joiner,* 522 U.S. 136, 118 S. Ct. 512 (1997), at issue was the opinion of plaintiff's biomechanics expert, Dr. Huston, in an automobile accident/FELA case. Dr. Huston proffered the opinion that the cause of plaintiff's back injuries and aggravation of his neck injuries was a defective shoulder belt in the defendant's pick-up truck and not the rear-end collision itself. The trial court admitted the opinion, but the Sixth Circuit viewed the opinion as exceeding the scope of what a biomechanics expert could testify about:

> This opinion testimony goes beyond Huston's expertise in biomechanics. As he previously admitted, he was qualified to render an opinion that made use of his discipline's **general** principles, described the forces generated in the August 1989 rear-end collision, and spoke **in general** about the types of injuries those forces would generate. Huston is not a medical doctor who had reviewed Smelser's complete medical history, and his expertise in biomechanics did not qualify him to testify about the cause of Smelser's **specific** injuries.

105 F.3d at 305 [emphasis added.]

Dr. Huston's causation opinion was ultimately ruled entirely inadmissible because it lacked the requisite reliability. *Id.*

The case of *Morgan v. Girgis*, 2008 U.S. Dist. LEXIS (S.D.N.Y.) following *Smelser* and other cases, applied a "general"/"specific" line of demarcation for causation testimony by a biomechanics expert. According to the *Morgan* court, a biomechanics expert "is qualified to

6

offer testimony regarding the forces generated by certain accidents and the likely effects of such forces on the human body, but not to offer an opinion on whether or not the accident at issue could have caused the plaintiff's injuries." *Id.* at *12. Biomechanics are qualified to determine what injury causation forces are **in general** and can tell how a hypothetical person's body will respond to those forces, but are not qualified to render medical opinions regarding the precise cause of a **specific** injury." *Id.* at *14, *quoting Laski v. Bellwood*, 2000 U.S. App. LEXIS 12068 (6th Cir.) at *3-*4 [emphasis added]. The expert in *Morgan* was not precluded, but was allowed to offer opinions as to "general" causation.

The court in *Rodriguez v. Athenium House Corp.*, 2013 U.S. Dist. LEXIS 32748 (S.D.N.Y.) at *12-*15 similarly applied the "general"/"specific" analysis and allowed a biomechanics expert to offer testimony about "general" causation in a case where a hanging bulletin board fell and struck plaintiff in the head. The expert was allowed to testify that the head accelerations experienced by the plaintiff were well below the accelerations associated with mild traumatic brain injury and within the head accelerations measured in vigorous everyday activities.

Another such case involving Dr. Williams herself is *Berner v. Carnival Corp.*, 632 F. Supp.2d 1208 (S.D. Fla. 2009). In *Berner*, Dr. Williams was retained by the plaintiff to testify about the forces required to achieve the injuries that he sustained in an assault. *Id.* at 1209. Although citing *Smelser* and its progeny, the court did allow Dr. Williams to offer injury causation testimony as follows:

> Under *Smelser* and the cases following it, and owing to her qualifications and experience as a biomechanical engineer, Dr. Williams may testify that the "energy on Berner's head upon striking the floor was sufficient to have cause his mild to moderate traumatic brain injury." Dr. Williams will not testify that Berner *has* a mild to moderate traumatic brain injury----or a brain injury at

7

all. She will not testify that Berner's brain injury (if any) *was caused* by his head striking the floor. As Carnival quite correctly points out, she may not give an opinion about whether Berner has suffered a brain injury or about the cause thereof.

But Dr. Williams is not called to give an opinion that Berner has suffered a brain injury or that his head striking the floor caused an injury. Rather, she may give an opinion about the energy involved and whether the energy is *sufficient* to have caused an injury of the type Berner alleges to have suffered. Biomechanical engineers are qualified to testify about how forces may affect or injure an individual. [citation]. And Dr. Williams, by her education, knowledge, and training as a biomechanical engineer, is qualified to testify about the forces involved here and the kinds of injuries that may have resulted therefrom.

*Id.* at 1212-1213 [italics in original].

Plaintiff also cites to Your Honor's ruling on the Plaintiff's Motion to Preclude the defendant's biomechanics expert in *Dine v. Hertz Corp.*, 03-Civ.-02811 (HBP), docket entry #208, Exhibit 2, as additional support for the argument that only a medical doctor can offer "specific" injury causation opinions. Plaintiff's reliance is misplaced. A reading of the transcript as a whole shows that Your Honor was troubled by the fact that the defense biomechanics expert was rendering opinions in a disc injury case by relying on a published study regarding threshold injury limits for ligamentous [soft tissue] injuries. *Id.* at 10:6-14:4. Your Honor indicated several times that the expert was going to be precluded on relevancy or "fit" grounds, not because he didn't have a medical degree. *Id.* at 8:6-8:9; 10:11-10:13; 10:24-10:25; 21:16-21:22; 22:9-22:11.

**B. Cases in the Southern District of New York Which Did Not Restrict "Specific" Causation Opinions Regarding Plaintiff's Injuries to Medical Doctors**

From the *Morgan* case in 2008 and the *Rodriguez* case in 2013, plaintiff draws the erroneous conclusion that the "modern trend" in the Southern District "is to preclude biomechanical experts without medical degrees from offering opinions on the cause of a

plaintiff's injuries since they are not medical doctors." Docket entry #207 at p.7. Aside from the fact that that statement does not even acknowledge that the cases cited allow the biomechanics expert to offer "general" injury causation opinions, plaintiff has overlooked an intervening case between *Morgan* and *Rodriguez*, which dashes plaintiff's hopes of finding a "trend" in the Southern District's handling of this issue.

The case of *Peters v. Metro-North Commuter Railroad Co.*, 2010 U.S. Dist. LEXIS 102117 (S.D.N.Y.) involved a FELA claim by a railroad employee who alleged that he sustained cumulative trauma injuries as a result of inadequate working conditions over a 21 year period. Plaintiff's expert claimed expertise in ergonomics and biomechanics. *Id.* at *6. Metro-North moved to preclude his opinion that the cause of plaintiff's injuries was the ergonomic risk factors of the working conditions at the railroad, because he was not a medical doctor. *Id.* at *7[1]. The court denied Metro-North's motion, explaining:

> Ultimately, Metro-North's notion of what expertise and evidence must be relied upon for an expert to offer an opinion on causation is too narrow. A medical doctor is not the only expert qualified to offer such an opinion. Heidebrecht has shown, through scientifically reliable epidemiological evidence, that the ergonomic risk factors he identified are a likely contributing cause to the injuries Peters suffered.

*Id.* at *13[2].

---

[1] It should be noted that this is a "specific" causation opinion, and not a "general" one.

[2] Compare *Krause v. CSX Transportation*, 984 F. Supp.2d 62, 78-79 (N.D.N.Y. 2013) in which plaintiff's expert, who had an educational background in business administration and experience in railroad accident investigation and consulting, tried to offer an opinion regarding a railroad worker's stress level, fatigue and requirement for nourishment in the middle of the day. The court precluded the expert from testifying on various grounds, including lack of qualifications, but the fact that he lacked a medical degree was not determinative. Plaintiff has misstated the holding of *Krause* when he writes: "[T]he Hon. Glenn T. Suddaby found that because he was not a medical doctor, plaintiff's railroad safety expert was unqualified to opine as to the causation of plaintiff's injuries." Docket entry #207 at p.8.

7182202v.4

**C. Cases from Other Jurisdictions Which Do Allow Biomechanics Experts to Offer "Specific" Injury Causation Opinions**

Given that the Second Circuit has not ruled on this issue and New York District Court cases are inconsistent, it is appropriate to consider cases from other jurisdictions. The October 21, 2014 Order from United States District Judge Rudy Lozano in the case of *Kresich v. City of Lake Station*, 2:12-CV-50 (N.D. Indiana) annexed as Exhibit "I", is of particular interest because it involves Dr. Williams herself. The court, after reviewing *Smelser, Rodriguez* and similar cases, decided that the "more persuasive" view is to allow a biomechanics expert to testify about "specific" injury causation. *Id.* at pp. 13-15.

The *Kresich* court acknowledges that because she is not a medical doctor, Dr. Williams cannot make diagnoses and treat patients. *Id.* at p.14. She can, however, opine that the injury diagnosed in that case by Dr. Gruszka, could not have occurred in the manner alleged by the plaintiff, Kresich. *Id.* at p.14. That is precisely what Dr. Williams has done in the *Whalen* case. She has accepted, at face value, the diagnoses of posterolateral disc herniations at C5-C6 and C6-C7 rendered by the treating physicians, and explained why, from a biomechanics standpoint, those injuries could not have been caused or aggravated by the chair incident. *Cf. Robinson v. Washington Metropolitan Area Transit Authority,* 858 F. Supp.2d 33, 41-42 (D.D.C. 2012)("The Court, however, finds that Williams' testimony regarding the degree of force necessary to break an average grip and explaining how Robinson's ankle was fractured may aid the jury in evaluating plaintiff's testimony." )

Other cases which have allowed a biomechanics expert to offer "specific" causation opinions include: *Finn v. BSNF Railway Co.*, 2013 U.S. Dist. LEXIS 16557 at *5-*9 (D. Wyo.)("Such testimony is not to determine a party's medical condition, but rather, to determine whether a condition or conditions are consistent with the types of forces in an accident.");

10

*Phillips v. The Raymond Corp.*, 364 F. Supp.2d 730 (N.D. Ill. 2005); *Yu-Santos v. Ford Motor Co.*, 2009 U.S. Dist. LEXIS 41001 at \*37-\*40 (E.D. Cal.); *The Pennsylvania Trust Co., v. Dorel Juvenile Group, Inc.*, 851 F. Supp.2d 831, 837-839 (E.D. Pa. 2011)("A medical degree is not a prerequisite to qualification as an expert capable of testifying as to the cause of a person's injuries"); *Berry v. Transportation Distribution Co.*, 2013 U.S. Dist. LEXIS 170634 at \*2-\*5 (N.D. Okla.); *Reynoso v. Ford Motor Co.*, 2005 U.S. Dist. LEXIS 46065 (S.D. Tex.).

### D. Even in a "General"/"Specific" Causation Jurisdiction, the Biomechanics Expert Can Offer "Specific" Injury Causation Testimony Under the Proper Circumstances

The *Finn* court, *supra*, from the District Court of Wyoming, reconciled its holding with *Wagonner v. Schlumberger*, 2008 U.S. Dist. LEXIS 109634 (D. Wyo.), cited by plaintiff, by noting that in *Finn*, the defendant's biomechanics expert did not render a diagnosis or a medical opinion, but did incorporate the opinions of the treating physicians into his biomechanical analysis. *Id.* at \*7-\*8. As such, the expert was allowed to testify concerning the forces involved in the accident and the relationship between those forces and medical conditions diagnosed by plaintiff's treating physicians. *Id.* at \*7. That is precisely what Dr. Williams has done in the *Whalen* case and the crux of her testimony. She has accepted the diagnoses of plaintiff's treating physicians and incorporated them into her biomechanical analysis. She will testify about the forces involved in the chair accident and the relationship between those forces and the medical conditions diagnosed by plaintiff's treating physicians. Thus, even in a court that ostensibly follows the "general"/"specific" causation analysis, *e.g.*, the District Court of Wyoming, there is latitude for allowing the "specific" causation opinion of a biomechanics expert where the expert has accepted the diagnoses of the treating physicians and incorporated them into the expert's analysis. *See also Berner v. Carnival Corp.*, 632 F. Supp.2d 1208, 1211-1213 (S.D. Fla. 2009)(Dr. Williams allowed to opine that the "energy on [plaintiff's] head upon striking the floor

11

was sufficient to have caused his mild to moderate traumatic brain injury" by a court which follows *Smelser*).

We submit that there is an ample authority for the Court to allow Dr. Williams to offer opinions that that the chair incident at issue created insufficient bending loads on Mr. Whalen's cervical region [either in magnitude or direction or both] to have caused or aggravated his posterolateral cervical disc herniations, accepting and incorporating the diagnoses provided by plaintiff's treating physicians.

## POINT II

### DR. WILLIAMS' METHODOLOGY IS RELIABLE AND ADMISSIBLE

#### A. Other Courts Have Found Dr. Williams' Methodology to Be Reliable

Dr. Williams has testified extensively in both federal and state court, including the courts of New York. *See* annexed affidavit of Jamie Williams, Ph.D. at ¶ 12. Moreover, her methodology was found to be reliable in the reported decision of *Berner v. Carnival Corp.*, 632 F. Supp.2d 1208, 1213-1215 (S.D. Fla. 2009) in which the court pronounced:

> Dr. Williams's conclusions are not merely an *ipse dixit,* as Carnival contends. Rather, Dr. Williams uses well-reasoned and established methodologies to conclude that the impact energy on Berner's head on striking the ground was sufficient to cause a mild to moderate traumatic brain injury.

*Id.* at 1215.

*See also* the Order of October 21, 2014 in *Kresich v. City of Lake Station*, 2:12-CV-50 (N.D. Indiana 2014), Exhibit I. In that case, plaintiff's counsel did not even challenge the reliability of Dr. Williams' analysis: "Kresich is not arguing that her opinions are based on bogus science (they are based on an application of Newton's Laws of Physics to injury causation and on information that 'appears in any basic biomechanics textbook' ". *Id.* at p. 5.

**B. The Methodology Used by Dr. Williams in This Case Is Reliable [Plaintiff's Issues #1-3 of Docket Entry #207 at p.3]**

In general, plaintiff's attacks on Dr. Williams' methodology[3] are based on the following:

1) They are the product of an unstated and therefore unreliable methodology;

2) Dr. Williams examined and tested an exemplar Zody task chair and not the subject chair; and

3) The peer-reviewed study on injury-producing loadings for cervical disc herniations was conducted on cadavers and not on living tissue.

*Unstated Methodology*

Dr. Williams' report explains that she has relied on the basic principles of Newton's Laws of physics, the Conservation of Energy, her own extensive background in cervical and lumbar spine injury cases and her own published papers in the field. *See* annexed Affidavit of Jamie Williams, Ph.D. at ¶¶16-22; Exhibit H at list of publications. Dr. Williams examined and tested an exemplar Zody task chair and concluded that the force tending to push the reclined backrest to an upright position is insufficient to overcome the weight of a human being sitting in the chair. *See* docket entry #208, Exhibit 1 at pp. 5-6; Williams affidavit at ¶22. That is an adequate basis to express the opinion that Mr. Whalen was not propelled forward by the chair, as he claims. [Plaintiff's Issue #1, docket entry #207, at p.3.]

From Dr. Williams background and experience, in conjunction with Newton's Laws, she opined that the rearward motion of the chair when Mr. Whalen first sat down could not have caused or contributed to Mr. Whalen's posterolateral cervical disc herniations (as diagnosed by his treating physicians) because the posterior portion of the discs would be in compression at that time. As explained by Dr. Williams, if the posterior of the disc is in compression, any herniation

---

[3] Plaintiff is also attacking Dr. Williams' opinions on the ground that she is not a medical doctor, but that goes to "qualifications", as opposed to "reliability", and has already been addressed in this Memorandum.

that resulted would be manifested in the anterior portion of the disc. *See* Docket entry #208, Exhibit 1 at 5[4]; Williams affidavit at ¶¶16-21. Dr. Williams has clearly stated the basis for her conclusion that the bending loads during the rearward motion were not in the correct direction to cause or exacerbate plaintiff's injuries and so plaintiff's criticism is unfounded. [Plaintiff's Issue #2, docket entry #207 at p.3.]

Dr. Williams has stated that she used her background and experience, her examination of the exemplar chair, Newton's Laws, the Law of Conservation of Energy and the peer-reviewed publication which studied loading on cervical discs, to reach the conclusion that the bending loads generated would not have been sufficient to have caused or exacerbated Mr. Whalen's cervical disc injuries when the chair came forward. Dr. Williams has adequately stated the basis for her opinion. *See* Williams affidavit at ¶¶16-21. [Plaintiff's Issue #3, docket entry #207 at p.3.]

### *Use of Exemplar Chair Instead of the Subject Chair*

Plaintiff asserts that Dr. Williams' expert opinions should be inadmissible based solely on the fact that Dr. Williams' inspection was conducted on an exemplar chair, as opposed to the one involved in the accident. *See* Docket entry #208 at p. 11. Whether or not Dr. Williams inspected the accident chair should have no bearing on the admissibility of her expert opinion. As an initial matter, Dr. Williams was not testifying as whether the subject chair had a design or manufacturing defect. She was offering an opinion as to whether the subject model Zody task chair was capable of generating forces consistent with those injuries plaintiff claims to have suffered. *See, e.g., Thorndike v. Daimlerchrysler Corp.*, 266 F. Supp.2d 172, 180-84 (D. Me.

---

[4] If one thinks of the fluid-filled disc as a water balloon, if you "squish" [compress] the posterior of the balloon, the water will tend to flow to the anterior portion and potentially leak, *i.e.*, "herniate" at that end, which would be contrary to the diagnoses of posterolateral herniations.

2003)( biomechanics expert allowed to rely on exemplar testing performed by another expert in forming his opinions).

Plaintiff is free to cross-examine Dr. Williams regarding the use of an exemplar chair instead of the subject chair. Such criticisms go to the weight of the testimony and not its admissibility.

*Reliance on Cadaver Study*

Contrary to plaintiff's contentions that Dr. Williams' report cites no literature in support of her findings, Dr. Williams does identify a specific cadaveric study titled "Comparative Strengths and Structural Properties of the Upper and Lower Cervical Spine in Flexion and Extension," published in the Journal of Biomechanics (Exhibit J) which scientifically supports Dr. Williams opinion with regard to the medical effect upon plaintiff's cervical spine as a result of directional forces. *See* Docket entry 208, Exhibit 1 at p. 6, n. 1.

Further, plaintiff counsel's attempt to rely on Your Honor's recorded proceeding in the matter of *Dine v. Hertz Corp.*, 03 Civ. 02811 (HBP) is misplaced. Plaintiff claims that Your Honor precluded a biomechanical expert from testifying solely because his study had no relationship to the nature of the injury at issue and thus Your Honor should do the same in this matter. On the contrary, Your Honor precluded that expert on the grounds that the expert relied on an injury threshold study which dealt with forces necessary to cause ligamentous injuries, when the *Dine* case specifically dealt with disc injuries. *See* Docket entry #208, Exhibit 2. Because the injury threshold the expert relied on was different than the type of injury alleged in the case, Your Honor deemed it irrelevant to a claim for cervical disc injury and thus precluded the expert.

7182202v.4

Despite the fact that Dr. Williams in the *Whalen* matter presents scientific data of cadaveric studies, she relies on an injury threshold which is pertinent to cervical disc injuries and thus her testimony would be relevant to plaintiff's claim for cervical disc injury. She notes that the studies used male and female samples of age and degree of cervical disc degeneration comparable to Mr. Whalen. Therefore, unlike the expert in *Dine* who attempted to equate the result of ligamentous testing with cervical injuries, Dr. Williams relies on a cervical disc study to draw conclusions about cervical injuries.

Dr. Williams has stated that: "Cadaveric studies are utilized extensively in the biomechanical literature to elucidate the causation and propagation of injuries under various loading conditions." Docket entry #208, Exhibit 1 at p.6. Plaintiff has not submitted a countervailing affidavit from a biomechanics or other expert in support of the Motion to Preclude Dr. Williams which challenges that assertion, and so it should be regarded as undisputed. Any other criticisms that plaintiff may have regarding the use of this study go to the weight of Dr. Williams' testimony and not its admissibility.

Dr. Williams' methodology is reliable and she should not be precluded.

## POINT III

### THERE IS NO PROHIBITION AGAINST DR. WILLIAMS EXPRESSING AN OPINION THAT CONTRADICTS WITNESS TESTIMONY

If plaintiff's position is correct that an expert cannot contradict witness testimony, then there would be no reason to have experts in our judicial system. If a witness testified that he saw "a cow jump over the moon", no expert would be allowed to say that such a feat would violate the laws of physics. There would be no need for independent medical examinations because all

of plaintiffs' subjective complaints would be taken as true. Obviously, plaintiff's position is wrong.

In the Order of October 21, 2014 in *Kresich v. City of Lake Station*, 2:12-CV-50 (N.D. Indiana 2014), Exhibit I, the Court recited the various opinions of Dr. Williams and then stated: "The expert opinion, if admissible, would contradict Kresich's statements regarding how his injuries occurred." *Id.* at p.3. Dr. Williams' opinions were, in fact, ruled admissible. *Id.* at 15.

A similar objection was raised to the defendant's biomechanics expert, Catherine Ford Corrigan, Ph.D., in *Phillips v. The Raymond Corp.*, 364 F. Supp.2d 730, 743 (N.D. Ill. 2005) wherein the court responded:

> Second, Phillips maintains that Corrigan failed to engage in an objective analysis by improperly reaching opinions on witnesses' credibility, namely by concluding that the version of events Phillips alleges did not and could not have happened. However, it is not improper for Corrigan to have subjected Phillips's version of the facts to a rigorous analysis. Coming to her conclusion, Corrigan relied on objective analysis, test results, and medical records. As a result, she came to a conclusion at odds with Phillips's testimony and theory of the case. This version may or may not be accepted by the jury, and Phillips is certainly free to attempt to undermine Dr. Corrigan by cross-examining her. But Phillips's objection to Corrigan is not well taken.

The instant case is on all fours with *Kresich* and *Phillips*. Dr. Williams does not know Mr. Whalen and her opinion is not meant as a commentary on Mr. Whalen's overall credibility as a witness. It is simply a statement based on the laws of physics and an examination of an exemplar chair. There is no reason why it should be inadmissible simply because it conflicts with plaintiff's version of the accident. In fact, that is the whole point. If it supported plaintiff's version of the events, there is no reason why the defense parties would even want to use such an expert. Given our adversary system, it seems self-evident that such testimony would be allowable.

17

The cases relied upon by plaintiff are inapposite. *Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) was a civil rights action against a police officer, the City of New York and the New York City Police Department. *Id.* at 384. Plaintiff, Nimely, was shot by the police-officer defendant after a chase and there was an issue as to whether the officer fired his gun at the unarmed Nimely or whether the officer fired at Nimely as he was turning toward the officer with a gun in his hand and preparing to shoot. *Id.* at 388. A defense medical expert testified in an effort to reconcile the medical evidence that Nimely was shot in the back, with the testimony of the defendant-officer and his fellow officer that Nimely was shot in the chest while facing the officers. *Id.* at 386; 389. The expert's opinion was that the officer-defendant fired his gun while Nimely was in the act of turning to face the officers and that the officer "misperceived" Nimely as actually facing him at the time he fired. *Id.* at 393. During the course of his testimony, the expert repeatedly said that the two police officers were not lying about their version of the events. *Id.* at 395. The court held that expert opinions which constitute evaluations of witness credibility, even when rooted in scientific or technical expertise, usurp the function of the jury and are not admissible. *Id.* at 397-98.

*Nimely* is readily distinguishable. In *Nimely*, the expert was offering his personal opinion that the police officers were not lying in an effort to explain away physical facts which conflicted with their testimony. In *Whalen*, Dr. Williams is not offering her personal opinion on Mr. Whalen's credibility. She is simply stating the conclusion that her engineering analysis and the laws of physics mandates: the spring force in the chair is not sufficient to move a 180 pound person forward---and if Mr. Whalen perceived that it did----he was mistaken.

*United States of America v. Lumpkin*, 192 F.3d 280 (2d Cir. 1999), cited by *Nimely*, is not on point. In that case, the expert for the defendant in a criminal case wanted to present the

results of scientific studies showing that the degree of confidence that a witness has in his or her identification of the alleged defendant does not correlate with the accuracy of that identification. *Id.* at 288-89. The court refused, holding that it would usurp the function of the jury in assessing witness credibility. This case bears no relation to *Whalen.*

*United States of America v. Scop,* 846 F.2d 135, 142 (2d Cir. 1998), cited by *Nimely,* is also not on point. In that case, the government's expert on securities trading practices, standards and regulations included frequent references in his testimony to statutory and regulatory indications of guilt, which the court held to be improper. This bears no relations to *Whalen.*

*United States of America v. Charley,* 189 F.3d 1251, 1267 (10th Cir. 1999), cited by *Nimely,* is not on point. In that case, the testimony of the treating physician of two girls who were alleged victims of sexual abuse was held to be inadmissible when based solely on what the alleged victims had told the doctor and not on any objective evidence. This bears no relation to *Whalen.*

*Westcott v. Crinklaw,* 68 F.3d 1073, 1076-77 (8th Cir. 1995), cited by *Nimely,* is not on point. In that case, plaintiff brought a civil suit against a police officer for the shotting death of her husband. *Id.* at 1075. After the shooting, the officer-defendant made several damaging admissions when questioned by the police. *Id.* At trial, the defendant presented an expert physician who testified that the officer was under post-traumatic stress after the incident which may have caused him to give inaccurate statements to the police. *Id.* The appellate court held that this testimony usurped the jury's function in deciding witness credibility and was improperly admitted. *Id.* at 1076-77. This bears no relation to *Whalen.*

## POINT IV

### BY NOTING THAT HER CONCLUSIONS WERE CONSISTENT WITH THE DIAGNOSES OF PLAINTIFF'S TREATING PHYSICIAN, DR. WILLIAMS WAS SIMPLY STATING A FACT, NOT "VOUCHING FOR HER OWN CREDIBILITY" AS PLAINTIFF CLAIMS [Plaintiff's Issue #4 of Docket Entry #207 at p. 4]

It seems intuitively obvious that a good scientist would verify that his or her conclusions are consistent with the physical facts. That is precisely what Dr. Williams did when she states: "The results of my biomechanical analysis of Whalen's injuries are consistent with the medical diagnoses by Dr. Krosser, who noted that Whalen did not have any direct trauma, but just twisted his neck and was experiencing some inflammation." Docket entry #208, Exhibit 1 at p.6. "Vouching" is defined as expressing a personal opinion as to the credibility of a witness. *See Morrison v. Ercole*, 2008 U.S. Dist. LEXIS 84494 at *5 (E.D.N.Y.). Dr. Williams is not expressing an opinion as to her own credibility. She is merely stating a fact---plaintiff may take issue with her methodology or whether she should be allowed to testify—but there is no denying that Dr. Williams' statement is, in fact, true. That is, her conclusions **are** consistent with Dr. Krosser's diagnoses. There is nothing improper about this. The other "vouching" cases cited by plaintiff are similarly irrelevant.

## POINT V

### THIS COURT SHOULD NOT AWARD PLAINTIFF COSTS AND ATTORNEYS FEES FOR THE MAKING OF THIS MOTION

The tender of Dr. Williams was in no way frivolous within the meaning of FRCP Rules 11 and 37, as plaintiff alleges. The defense parties have not tendered Dr. Williams as an expert for "any improper purpose" and warrant that her expert contentions have evidentiary and legal support. FRCP 11. Specifically, Dr. Williams' experience and expertise allows her to offer expert testimony regarding the forces generated by plaintiff's accident and the likely effect of such forces on the human body. Where, as here, there is no straight line "cause and effect"

20

between Mr. Whalen's chair accident and his injuries, given the confounding factors of his pre-existing cervical herniations and his history of heavy lifting, both before and after the chair accident, the testimony of Dr. Williams will be important to the jury in its task of trying to decide this case.

## CONCLUSION

For all of the reasons cited, plaintiff's motion to preclude Dr. Williams should be denied in its entirety. If, however, the Court is persuaded, over our objection, that *Morgan* and *Rodriguez* should be followed instead of *Peters* and *Kresich*, Dr. Williams should not be precluded, but should be allowed to opine on "general" injury causation as delineated in *Morgan*, *Rodriguez* and *Berner*.

7182202v.4