UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
DANIEL WHALEN,

                              Plaintiff,

   -against-

CSX TRANSPORTATION, INC.,

                              Defendant.
-------------------------------------------------------------------X    13 Civ. 3784 (LGS)(HBP)
CSX TRANSPORTATION, INC.,

                              Third-Party Plaintiff,

   -against-

HAWORTH, INC. and OFFICE ENVIRONMENTS
SERVICE INC.,

                              Third-Party Defendants.
-------------------------------------------------------------------X


REPLY MEMORANDUM OF LAW IN SUPPORT OF "<u>DAUBERT</u>"
MOTION PRECLUDING BIOMECHANICAL EVIDENCE


Dated: Rockville Centre, New York
       January 11, 2016

                                                    Respectfully submitted,

                                                    *Philip J. Dinhofer*

                                                    By: Philip J. Dinhofer, #6940
                                                    **PHILIP J. DINHOFER, LLC**
                                                    Attorneys for Plaintiff(s)
                                                    77 N. Centre Ave. - Suite 311
                                                    Rockville Centre, NY 11570
                                                    516-678-3500

Point 1.    **DEFENDANTS ADMIT THAT THEY HIRED THEIR BIOMECHANICAL EXPERT FOR THE WRONGFUL PURPOSE OF PROVIDING AN INAPPROPRIATE MEDICAL OPINION REGARDING THE CAUSE OF DANIEL WHALEN'S INJURY**

At page 2 of their memorandum in opposition to plaintiff's <u>Daubert</u> motion to preclude the defendants[1] biomechanical expert (Docket # 233), defendants readily admit that they hired their biomechanical expert for the wrongful purpose of providing an inappropriate medical opinion regarding the "cause" of plaintiff's injuries. Therein defendants state:

> [T]he defense parties retained Dr. Williams to . . . offer an opinion . . . as to whether the forces involved were of sufficient magnitude and in the proper direction to have **caused or aggravated Daniel Whalen's posterolateral cervical disc herniations.** (Emphasis supplied.)

In a similar regard, in the introductory paragraph to her narrative report, the defendants biomechanical expert states:

> The purpose of this investigation was to determine if the Zody Task chair is capable of generating the forces necessary **to cause Whalen's claimed cervical spine injuries.** (Emphasis supplied.)

In obvious hindsight effort designed to circumvent the very purpose and function for which they and their expert both admit she was hired to address, at point I of their memorandum defendants desperately attempt to custom tailor the inappropriate medical opinions of causation explicitly stated by their expert so as to conform them to those cases that permit biomechanical experts to discuss general science with regard to a hypothetical person. In direct response to this motion, defendants now assert that their expert offers opinions of a general nature that do not specifically relate to plaintiff. Paradoxically, however, defendants point to no opinion offered by their expert, either in her report or her Affidavit, that discusses the general science of biomechanics with regard to a hypothetical person, and thus defendants are caught red-handed trying to fit a square peg into a round hole. Moreover, a simple reading of the two causative

---

[1] The plural term "defendants" is used herein to signify the defendant and the third-party defendants.

opinions offered by their expert explicitly belie their hasty newfangled contention. Opinions 2 & 3 as stated by this expert specifically challenge the medical cause of Dan Whalen's injury. One can only conclude that this hindsight reactive attempt to hijack the simple wording of their own expert's inappropriately stated medical opinions regarding the cause of plaintiff's injuries, stands in tacit admission of defendants' acceptance of the well accepted proposition of law that because she is not a medical doctor, defendant's biomechanical expert may not testify to her inadmissible medical opinions regarding the cause of Daniel Whalen's injuries as she so clearly does.

Point 2. THE OPINIONS OFFERED BY DEFENDANT'S BIOMECHANICAL EXPERT ARE THE PRODUCT OF INAPPROPRIATE JUNK SCIENCE

    A) Defendant's Biomechanical Expert Chronically Asserts Medical Facts Without Reference To Appropriate Medical Authority As Would Be Required Precisely Because She Is Not A Medical Doctor.

In her narrative report, defendant's biomechanical expert, who is not a medical doctor, states in boilerplate fashion a wide variety of medical facts without reference to any learned medical study, treatise, article, etc. in substantiation thereof. So too, defendant's biomechanical expert takes insult and offense to plaintiff's challenge to her methodology and thus explicitly repeats and restates in her affidavit the same unsubstantiated and undocumented medical facts in a woefully pathetic attempt to defend herself. In so doing, however, this biomechanical engineer fails to comprehend that because she is not a medical doctor she is incompetent to assert the medical facts she states without appropriate documentation, and therefore her opinions fail for being the kind of junk science that has been ruled inadmissible by the Courts.

Commencing at page 4 of her narrative report (and partially repeated in her affidavit) defendant's biomechanical expert provides the following prolific dissertation of individually discrete medical facts without reference to any reliable medical authority, no less the multiple kinds of authority that would be required to substantiate each individual item of medical fact she mentions:

> **Traumatic injuries of the intervertebral discs of the cervical and lumbar spine result from excessive bending and shear loads applied to the spine. During forward bending, the discs between the vertebral bodies undergo a combination of compression and tension. The front *or* anterior portion of the disc is compressed or squished while the posterior portion of the disc undergoes tension or stretching. The compression, in addition to the bending, forces the jelly (nucleus) in the center of the disc backward (like squeezing a water balloon). Disc herniations are frequently observed along the posterior or posterolateral aspect of the disc. This is because the posterior elements of the vertebra limit the degree of extension of the individual levels as compared to the amount of flexion allowed at each level.**
>
> **Degeneration of the spine, whether it be degenerative disc disease and/or degenerative joint disease, is commonly part of the aging process. Disc degeneration is a cascade of events that result in structural and cellular changes in the annulus and nucleus. Most notably, the gelatinous nucleus begins to dry out and becomes more fibrous in nature and the fibrous network of the annulus becomes less organized. The degenerative changes of the intervertebral disc are commonly accompanied by degenerative changes in the surrounding vertebral bone structures including but not limited to osteophyte formation and hypertrophy of the associated facet joints. The arthritic changes of the facet joints and deposition of excessive bone are not caused traumatically. Rather, these are anatomic changes that occur over a longer period of time and are indicative of a chronic degenerative process. However, the intervertebral discs of a degenerated spine can still be traumatically injured if the applied loads are of sufficient magnitude and in the appropriate direction.**
>
> * * * * *
>
> **However, Whalen's posterolateral disc herniations for which he was surgically treated, were not caused by any uncontrolled extension resulting from the rearward motion of Whalen's body. During extension, the posterolateral aspect of his cervical intervetebral discs would have been under compression (not the tensile loading which causes disruption of the fibrous matrix leading to disc herniations). Had the rearward motion of his body resulted in cervical spine injuries, Whalen should have sustained anterior disc herniations or strain/disruption of the ligamentous or muscular structures along the anterior (front) of his cervical spine.**
>
> **The bending loads on Whalen's cervical spine during his rearward motion were not in the correct direction to cause injury to or exacerbate the pre-existing conditions of his cervical spine intervertebral discs for which he was diagnosed and surgically treated.**

Defendant's biomechanical expert expects us to accept these medical facts as gospel, notwithstanding that she is not a medical doctor and therefore unqualified to discuss these matters.[2] We are therefore left to accept the *ipse dixit* of this non-medical doctor that these are

---

[2] The one recent case from within this district that defendants cite to dispute the more modern trend that precludes non-physician experts from offering medical opinion testimony as to causation, <u>Peters v. Metro North Commuter Railroad</u>, 2010 WL 3790720 (SDNY 2010) is quite readily distinguishable from the instant action, especially where Magistrate Judge Ellis went on to note at page 5 of his opinion that the ergonomic expert "identified <u>over forty articles</u> that provided evidence between the relationship between those risk factors" he identified and the injury at issue, whereas by comparison to the instant action (and as we show in full detail at Point 2(B) below) the singular article identified defendant's biomechanical expert actually concerns a different anatomy, ligaments, than that which she unsuccessfully tries to relate it to, cervical discs. Thus while the ergonomic expert in Peters gained the Court's confidence and trust when he proved with over forty articles the reliability of his medical opinion, as we will show below defendants biomechanical expert does the opposite, garnering nothing more than mistrust, suspicion and contempt when she egregiously misrepresents the content of the singular article upon which she relies, thereby proving that her facts, data and opinions are fraudulently stated.

the medical facts of the matter simply because she says so.[3] But where is the proof of any of these facts? Where is the supporting medical data? Where is the learned study? Simply put, what is the basis for any of these medical facts asserted by this expert who is not a medical doctor beyond the simple say so of the expert? The fact that the expert's report never answers any of the forgoing questions with regard to these missing element demonstrates the epitome of her inappropriate, unqualified and unstated methodology, no less her junk science.

> B) The One Learned Authority Upon Which Defendants Biomechanical Expert Relies Nowhere Mentions Any Of The Facts, Statistics, Data Or Findings Upon Which She Attempts To Predicate Her Blatantly Inappropriate Opinions.

Throughout the entirety of its presentation, defendants biomechanical engineer makes mention of just one learned study, which is attached to defendant's opposition papers as its Exhibit J, Docket #234-10. The expert asserts in conclusory fashion that this cadaveric study demonstrates "cervical disc failures with bending loads of 168in-lbs to 238 in-lbs." by actually referencing the article with a footnote citation deliberately placed immediately adjacent to those numbers. She further states that this cadaveric study "used samples retrieved from males and females of age and degrees of disc degeneration comparable to Whalen."

We have serious doubts as to whether or not defendant's biomechanical expert ever actually read the article she relies upon as nothing attributed by her report to the study appears within the article itself. 1) There is but one reference within the entire article to the word

---

[3] Similarly, in the Florida case of Berner v. Carnival Corp., 632 FSupp2d 1208 (SD FL 2009), while this biomechanical expert was permitted to testify generally, she was not allowed to give opinions about whether the plaintiff actually suffered an injury or its cause, it is clear that the Court permitted this because she did the math and applied the appropriate methodology when calculating the impact energy of that plaintiff's head when striking the floor (Id. at 1213). In the instant action, however, defendant's biomechanical expert offers no evidence whatsoever regarding a reliably provable general theory of biomechanical engineering science. Not only did defendants biomechanical engineer fail to do the math telling us what the plaintiff's probable bending load was upon his cervical discs at the time of his accident, but as we mentioned in the preceding footnote, the article upon which she relied never even supported her claim applying ligamentous data to a disc injury and therefore in this case the expert egregiously misrepresents the content of the singular article upon which she relied thereby proving that her palpably inadmissible facts, data and opinions are nothing more than the product of impermissible make believe junk science.

4

"disc".[4] That singular use of the word "disc" never makes mention of a disc failure, herniation or disc disease, but merely associated it in position with the ligamentous structures that they were actually testing. 2) The article states both in its abstract and throughout its body that the structural failure they were reporting upon were the ligaments of the spine. There simply is no study of disc failure as represented by the expert. The ligaments have nothing to do with the discs, they are a completely different anatomical object. Thus the defendants' biomechanical engineer fails to explain how a study of the ligaments of the spine relates in any way to an injury to the discs of the cervical spine? As Your Honor pointed out when discussing this same discrepancy in <u>Dine v. Hertz Corp.</u>, Supra, (Docket # 208-2, at page 11, line 5):

> The ligaments are the structures that holds your bones together, they're not the disks.
> They're a different structure than the disk. And that's why I don't understand,
> and Dr. Ojalvo doesn't explain, how injury threshold with respect to a different
> anatomical structure tells us anything about the injury threshold with respect to disks.

Thus, as they state at page 8 of their memorandum in opposition, defendants readily concede that like the expert in <u>Dine</u> their own biomechanical expert should be precluded from testifying in the <u>Whalen</u> action because the Court should be similarly "troubled by the fact that the defense biomechanics expert was rendering opinions in a disc injury case by relying on a published study regarding ... ligamentous [soft tissue] injuries." 3) Contrary to that stated by the biomechanical expert, within the abstract and the body of the article itself, it is made clear that only "Female" spinal segments were used. The claim that the study used male spinal segments as stated by the expert is simply not true. The study is limited to females and does not profess to apply to males with equal force. Moreover, the defendants biomechanical expert never tells us that the same anatomical results will be had in the male population, because she wrongfully asserts that the

---

[4] So as to avoid any misunderstanding as to plaintiff's science involved in the analysis of this study, plaintiff's counsel did an optical character recognition scan (OCR) on the text of the article so that a computerized word search could be performed. This is a process whose methodology can be replicated by the Court and all other counsel. To be sure that there was only the one reference to the anatomical structure known as a "disc", I also did a word search checking the article for use of the common alternate spelling "disk", which word does not appear at all.

5

study includes males when it did not.   4) In a similar regard the article never states that any of the "female" cervical spine segments that they used had any degree of disc degeneration as asserted by the biomechanical expert in her report.  In addition to the articles singular use of the word "disc", the root word "degen" as in "degenerative" or "degeneration" never appears within the article.  5) Nowhere within the article cited by the defendants biomechanical expert is there any mention that the study demonstrates "cervical disc failures with bending loads of 168in-lbs to 238 in-lbs." a) As noted before, the word disc never appears within the article in the context of the word failure.  b) Similarly, the phrase "bending loads" appears just once in the article and with that it is in the context of a new standard that will be developed in the future by the United States National Highway Traffic Safety Administration with regard to airbag deployment.  (See last sentence of introductory paragraph of page 1 of Docket #234-10.  c) The numbers "168" and "238" never appear anywhere in the article.  d) The measurement designation "in-lbs" never appears in the article.  As units of force, the article speaks in terms of Newton metres (Nm) which is a unit of torque.  We do not know if Newton meters can be converted to in-lbs as a unit of force or torque, the defendants biomechanical expert never tells us, further illustrating yet another wholly missing element of the mathematical methodology she used, if she ever really ever used any such mathematical methodology. 6) Lastly, neither the cited study, nor the defendants' expert ever define just what the degree "of disc degeneration" is that is "comparable" to that had by Daniel Whalen.  This is a two pronged factor, that requires a degree of disc degeneration from both the female cadavers studied and Daniel Whalen.  Yet the expert provides no such data, as this would be the product of a differential medical diagnosis for which she is not qualified, nor was any such analysis ever stated by the article upon which she relies.

      In view of the foregoing, which indisputably shows that none of the facts, data, opinions or findings that the defendants biomechanical expert relates, are actually mentioned within the

very learned study that she cites, the conclusion becomes all to clear that everything stated by this biomechanical expert is the product of fraud and deception. The undeniable fact of the matter is that the defendants biomechanical expert is devoid of any learned study herein. She imparts no expertise, no science and absolutely no methodology, but rather everything defendants biomechanical expert states is predicated upon her own *ipse dixit* and no more. Because she has so fraudulently misrepresented herself and her wholly vacant methodology in this action, defendants biomechanical expert is demonstrably unreliable as a matter of law and therefore she should be precluded from testifying at the trial of this action in all respects.

   C)  Defendants Biomechanical Expert Still Provides Us With No Methodology

  In spite of all the foregoing, defendant's biomechanical expert asserts that the medical facts set forth in Point 2(A) above are supported by the laws of physics. She references and recites Newton's first law, but she never demonstrates or explains just how the principles of a body in motion, a body at rest, or those of an outside force apply to the mechanics of the head, neck and cervical spine when a person suddenly, unexpectedly and forcefully reclines backwards and just as abruptly comes forward and upright in an office chair, no less the original Zody Task chair involved in this accident. Thus going beyond the fact that she is not a medical doctor and that her medical facts are the product of her unsupported and undocumented say so, we have yet another illustration of this expert's inappropriate and unstated methodology.

  The numerical data provided by defendants biomechanical expert is equally the product of her inappropriate and unstated methodology. Thus we see that when referencing cadaveric studies (the relevance of which we do not concede as per the previous section of this reply), the expert asserts in summary fashion that these studies demonstrate "cervical disc failures with

bending loads[5] of 168in-lbs to 238 in lbs." And while again referencing without any explanation or connection to any factual data herein Newton's Laws and those of Conservation of Energy, out of the thin air the expert simply announces numerical data concerning pulse durations, vertical distances and head weight that is devoid of any explanation of being relevant to her supposed study. The expert then summarily concludes without providing any indication of the formula that she uses, or the actual data that she inputs into that formula, that to cause a posterior disc herniation plaintiff "would have to had to accelerate his body at least 6 MPH in about 0.1 seconds or 60 MPH in 1 second just using his own muscle force." We are therefore left to guess as to just what formula, method or science the expert used to make these calculations as she simply does not provide us with that information.[6] Yet this is exactly what an engineering expert is hired to do. An engineering expert is hired to make and prove those mathematical calculations that are beyond the knowledge of the layperson. However, because in this case they are based upon the say so of the expert without any stated science, formula or methodology, this expert's numerical facts, opinions and conclusions can neither be tested, reproduced, nor challenged. They are therefore the product of the kind of junk science that <u>Daubert</u> explicitly prohibits.

---

[5] Significantly missing from this discussion, the expert does not say that the study upon which she relies limits these bending loads to flexion as opposed to extension. Indeed, the very article upon which she relies belies the experts claims that there is a difference between flexion and extension where it concludes "There were no significant differences between flexion and extension strengths for the C5-C6, and C7-T1 segments" - which coincidentally are the levels where the expert's own report indicates that plaintiff has suffered his cervical disc herniations. (Article at Docket 234-10 at page 727, third paragraph on right column, last sentence.)

[6] To better understand the conclusion that she should have drawn by use of the numbers she originally mentions concerning pulse durations, vertical distances and head weight compare for example the science and numerical findings this same expert uses with similar values in <u>Berner</u>, Supra at 1213, where she turns those same facts into "impact energy" measured in "lb-ft." Here however, without providing any formula, methodology or explanation whatsoever, this same biomechanical expert converts the same input data of pulse durations, vertical distances and head weight and turns it into an acceleration value measured in MPH per fraction of a second. There is a major disconnect here. These two outcomes result in numerical values stated in different and unrelated units of measurement, but are nonetheless derived from the supposed input of the same kind of raw data. These differences stand in profound demonstration of the unreliable results derived from an expert's unstated methodology and typify the unreliable kind of junk science employed by this biomechanical engineer.

Most importantly missing from her analysis, however, is the indisputable fact that the expert never concludes her study by stating just what the bending load forces were that plaintiff actually experienced in either flexion or extension during his accident. While she disputes that the seat back pushed plaintiff back to an upright position, the undeniable twice witnessed fact of the matter is that Daniel Whalen did indeed return to that upright position and therefore in the process of going down backwards and coming up forwards his cervical spine still nevertheless experienced the whiplash forces of flexion and extension. The expert simply excludes extension without any properly grounded medical or scientific basis for doing so and then wholly negates flexion altogether because she inexplicably concludes that the chair did not play a part in it. However, this does not mean that plaintiff did not experience the whiplash force of flexion, or that the reason why he experienced the whiplash force of extension was because the unsafe condition of the chair permitted it to recline in freefall fashion backwards in the original instance, thereby necessitating his recovery from even worse a catastrophe had the chair completely flipped over backwards. Thus even if Daniel Whalen was simply responding to the situation of regaining his balance after the chair went into a spontaneous freefall backwards recline by constricting his abdominal muscles, and pulling himself upright as if doing a sit-up, defendant CSX would still be responsible for the consequential flexion disc injury postulated by the expert under the emergency doctrine which precludes second guessing plaintiff's response to the emergency created by the unsafe conditions that defendant negligently permitted to exist in its workplace. [See e.g.: PJI 2:14, See also, Mancini v. CSX Transp., Inc., 2010 WL 1268021, at *3 (NDNY 2010)(Judge McEvoy applying emergency doctrine to FELA action.); and, In re Moran Towing Corp., 984 F.Supp.2d 150 at Footnote 3 (SDNY 2013)(Judge Sweet noting that emergency doctrine would apply in Jones Act case if its specific criteria had been met.); accord Consolidated Rail Corp. v. Gottshall, 512 US 532-533, 114 S.Ct. 2396, 2398 (1994)( "FELA

9

jurisprudence gleans guidance from common-law development.")] Clearly then, it does not matter whether plaintiff suffered the flexion only injury (as inappropriately postulated by the expert without any proper or reliable medical foundation) whether propelled by the chair or the strength of his own abdominal muscles, as the undeniable fact of the matter is that under either scenario the defendant CSX is still responsible for those injuries caused, in whole or in part, through its negligence under the liberal remedial provisions of the FELA. Thus, without negating all other accident related causes, the expert's conclusion that the chair did not cause the flexion mechanism of injury becomes an irrelevant, and therefore inadmissible, red-herring.

Lastly we note that while the expert asserts that her "test" of the exemplar chair found the seat back incapable of propelling plaintiff forward, her report and affidavit are bereft of stating with any reasonable degree of definition for purposes of replication the methodology the expert actually utilized in arriving at this barebones conclusion. Indeed, quite reminiscent of the very same deficiencies of which defendant HAWORTH complains as wanting from the testing performed by defendant CSX's expert, Dr. Ketchman, beyond describing the generic nature of the test defendants biomechanical expert does not tell us anything about the methodology she actually used. She does not tell us if she used a free weight, a person, a machine, or a force gauge in her testing. She does not tell us where along the seat back those forces were applied. She does not tell us if she used a static or a dynamic test that would replicate the seat back in motion as happened at the time of the accident. She does not even tell us if she measured the force that the seat back's springs exerted in counter force at the point where pushed to its ultimate tensile extreme of backwards extension as happened during plaintiff's accident. Here agin we are simply left to the undefined *ipse dixit* of the defendants' biomechanical expert. We only know that the chair could not allegedly do something because the expert says so, but she gives us no science that anyone else could ever replicate, confirm or dispute. Yet again this

10

experts opinions are the product of her inadequate and unstated methodology. Preclusion of this junk science is the only appropriate remedy under these circumstances.

      D)      Defendants Biomechanical Expert's Unexplained Failure To Test The Subject Chair That Was Readily Available To Her In The Same Condition As It Existed At The Time Of Plaintiff's Accident Is An Inexcusable And Fatal Flaw

Moreover significantly deficient in her methodology, the expert still never tells us that the testing of an exemplar is the functional equivalent of testing the actual chair involved.[7] Nor does she tell us that the subject chair was damaged or that testing of the chair involved in the accident would in any way be unreliable. The expert tells us nothing about the manufacture of the exemplar. Was it made within the same year as the subject chair? Was it made in the same assembly plant? Did it use all the same parts for its various components? Were the springs from the same supplier no less the same manufacturer? Were the springs from the same manufacturers lot? Were the springs of the same tensile strength? The fact of the matter is that in the absence of the experts explanation in relation to the actions of the exemplar to those of the original, the only relevant admissible information is that regarding the actions of the chair involved in the accident. Such information can only be obtained from the chair involved, as the defendant CSX itself asserts through its own mechanical engineering expert, Dr. Ketchman, who tested the actual chair, that the subject chair is defective and that this is the reason why defendant CSX is ostensibly suing the third-party defendants. The subject chair remains in the expert's hiring attorney's exclusive possession, remains in its same pre-and post accident condition, and

---

[7] In this regard we digress to note that defendants authority on point that seeks to excuse the expert's fatal failure to examine the chair involved, <u>Thorndike v. Daimlerchrysler Corp.</u>, 266 F. Supp. 2d 172 (Maine 2003) is readily distinguishable insofar as the vehicle involved therein was so significantly damaged such that the actual auto part subject to the claimed metallurgical failure could not be reliably tested for replication purposes precisely because it had failed and was thereby damaged. Therefore an exemplar needed to be used in effort to recreate actual accident circumstances without preexisting stressors and damages. Here there is no evidence whatsoever showing that the actual chair involved suffered any damage whatsoever as a result of the accident that would make its testing unreliable for any purpose needed by the defendants experts, and in fact the subject chair was actually tested by defendant CSX's mechanical engineering expert, Dr. Ketchman and found to be undamaged and fully functional.

was readily available for this biomechanical expert to inspect and test at her leisure, but she inexplicably did not!!! If defendant CSX asserts that the chair involved in plaintiff's accident is defective for product liability purposes, how then can their own biomechanical expert render any reliable or credible opinion as to what happened to plaintiff without testing the purportedly defective chair involved??? The exemplar was not reported to have the same defect as the subject chair and therefore its study by the biomechanical expert is useless to the understanding of the happening of plaintiff's accident or the whiplash forces Daniel Whalen actually experienced in the subject chair that the mechanical engineer finds actually defective. The point of the matter is, however, that without the biomechanical expert's connection as to the utility of exemplar studies in this particular instance in lieu of the original defective chair involved, her opinions based upon the exemplar bring an element of doubt and impermissible wild speculation into this case, whereas by use of the original chair actually involved she would instead bring elements of certainty and clarity. For these reasons too, her opinions are inadmissible and therefore defendants' biomechanical engineering expert should be precluded from testifying at the trial to be had herein.

CONCLUSION

As we have shown herein, all the opinions stated by defendant's biomechanical expert are inadmissible because 1) she is not a medical doctor who can opine as to medical causation or testify with regard to unsubstantiated medical facts; and 2) she chronically provides facts, data, results and opinions that are the product of unstated methodology. Even more egregious, however, the expert has fraudulently misrepresented her reliance on a learned study of female cadavers that never mentions any of the facts, opinions or data that she attributes to it, no less relates them to men or cervical discs as she contends. Because her report states no valid opinion and is fraught with the impermissibly odious rancor of fraud, this biomechanical expert should be precluded from testifying at trial in all respects.