UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

DANIEL WHALEN,                      :

                    Plaintiff,      :       13 Civ. 3784 (LGS)(HBP)

       -against-                    :       OPINION
                                            AND ORDER
CSX TRANSPORTATION, INC.,           :

                    Defendant.      :

----------------------------------X


            PITMAN, United States Magistrate Judge:


I.   Introduction


            I write to resolve three separate motions seeking to

preclude expert testimony pursuant to Fed. R. Evid. 702 -- (1)

third-party defendant Haworth, Inc.'s ("Haworth's") motion to

preclude Dr. Jeffrey Ketchman, an expert designated by

defendant/third-party plaintiff CSX Transportation, Inc. ("CSX");

(2) CSX's motion to preclude Dr. Theresa Bellingar, an expert

designated by Haworth and (3) plaintiff's motion to preclude Dr.

Jamie R. Williams, an expert designated by CSX, Haworth and

third-party co-defendant Office Environments Service Inc. ("OES")

(Notice of Motion, dated Dec. 9, 2015 (Docket Item ("D.I.") 199);

Notice of Motion, dated Dec. 18, 2015 (D.I. 196); Notice of

Motion, dated Dec. 18, 2015 (D.I. 211)).  With respect to the

motion to preclude Dr. Ketchman, plaintiff represents that, while he "support[s]" the motion "solely with regard to the third-party product liability action," he opposes the "total preclusion of this expert, insofar as that would prevent [Dr. Ketchman's] relevant and reliable testimony in the [Federal Employers Liability Act] action" (Memorandum of Law in Partial Support of Motion to Preclude Dr. Jeffrey Ketchman, dated Dec. 26, 2015 (D.I. 216) ("Pl. Ketchman Mem."), at 1).

For the reasons set forth below, Haworth's motion to preclude Dr. Ketchman is granted in part and denied in part, CSX's motion to preclude Dr. Bellingar is granted in part and denied in part and plaintiff's motion to preclude Dr. Williams is granted.

## II.  Facts

### A.  Background

Plaintiff, an employee of CSX at all relevant times, commenced this action against CSX on June 1, 2013, alleging a claim under the Federal Employers Liability Act, 45 U.S.C. § 51 et seq. ("FELA").  Plaintiff alleges that, on or about November 8, 2011, he was injured while working for CSX as a result of the negligence of CSX (Complaint, dated June 1, 2013 (D.I. 1)

("Compl.")).  Specifically, plaintiff alleges that an office
chair -- specifically a Zody task chair (the "Zody Chair") -- in
which plaintiff was sitting, moved in a sudden and unexpected
manner, causing injuries to plaintiff (Third-Party Complaint,
dated Sept. 27, 2013 (D.I. 12) ("Third-Party Compl.") ¶¶ 8-9).
In the third-party complaint against Haworth and OES, CSX alleges
that, if the allegations brought against it by plaintiff are
true, Haworth and OES, the manufacturer and distributor of the
Zody Chair, respectively, are strictly liable for defectively
designing, testing, inspecting, manufacturing, distributing,
labeling, selling and promoting the Zody Chair and, therefore,
must indemnify CSX for any liability it faces as a result of
plaintiff's claim against it (Third-Party Compl. ¶¶ 14, 18-26).

    In support of its theory that Haworth manufactured the
Zody Chair with a design defect, CSX has offered Dr. Ketchman,
and Haworth has offered Dr. Bellingar to contradict Dr. Ketchman.
In addition, Haworth and OES have offered Dr. Williams to opine
that the injuries plaintiff alleges did not occur as a result of
the incident at issue.

    B.  <u>Dr. Jeffrey Ketchman</u>

    Dr. Ketchman is a mechanical engineer, with a bache-
lor's degree in mechanical engineering from the City College of

3

New York, a master's degree in mechanical engineering from Ohio State University and a doctorate in engineering science from Columbia University; Dr. Ketchman has been licensed and registered as a professional engineer in New York since 1974 (Affidavit of Richard H. Rubenstein in Support of Motion In Limine to Preclude Jeffrey Ketchman, Ph.D., dated Dec. 9, 2015 (D.I. 200) ("Rubenstein Aff."), Ex. E-1, at 5[1]).  Currently, Dr. Ketchman is the Director of Mechanical and Safety Engineering of Inter-city Testing & Consulting Corporation (Declaration of Jeffrey Ketchman, filed Dec. 28, 2015 (D.I. 219) ("Ketchman Decl.") ¶ 1).

Dr. Ketchman represents that he is a "specialist in the areas of accident reconstruction and safety in the design and use of industrial and consumer products" (Rubenstein Aff., Ex. E-1, at 5).  In his curriculum vitae, Dr. Ketchman lists a variety of areas of "product and technical experience," which include, among other things, accident reconstruction; human factors in design, bioengineering and biomechanical analysis; fall protection; testing and instrumentation; exercise bicycles and equipment; bowling and warnings and instructions; his curriculum vitae does not, however, indicate that Dr. Ketchman has any experience with

---

[1] Because Exhibit E to the Rubenstein Aff. lacks consistent internal pagination, I use the page numbers assigned by the Court's ECF system.

office chairs (Rubenstein Aff., Ex. E-1, at 6).  In a declaration submitted in opposition to the instant motion, Dr. Ketchman represents that:  (1) he has experience in the "testing and use of chairs, including chairs in bowling establishments and lounge/bench seating"; (2) he has been involved in "half a dozen investigations involving office chairs"; (3) he has been "involved in the design of chairs" while he worked at American Machine and Foundry ("AMF") and (4) that he has served previously as an expert in connection with accidents involving chairs (Ketchman Decl. ¶¶ 7, 11, 14, 16).  Dr. Ketchman states that, during this expert testing and consulting, he utilized the ANSI/BIFMA[2] test methodology and that he has had to determine whether chairs were in accordance with BIFMA standards (Ketchman Decl. ¶¶ 7, 9, 11).  Dr. Ketchman also represents that, prior to this case, he has "had the opportunity to inspect and use Syn-

---

[2]ANSI is the American National Standards Institute and BIFMA is the Business and Institutional Furniture Manufacturers Association (Memorandum of Law in Support of Third Party Defendant Haworth, Inc.'s Motion to Preclude Jeffrey Ketchman, Ph.D., dated Dec. 9, 2015 (D.I. 203) ("Haworth Ketchman Mem."), at 2 n.1; Rubenstein Aff., Ex. D).  According to Dr. Bellingar, Haworth's ergonomist expert, BIFMA is an industry association, and ANSI/BIFMA Standard X5.1-2011 is the pertinent standard for the Zody Chair (Rubenstein Aff., Ex. K, at 15-17).  In his deposition, Dr. Ketchman appeared to agree that "the BIFMA 5.1 standard" applies to office chairs (Rubenstein Aff., Ex. F-1, 37:15-38:10).

chronous Tilt office chairs and [is] familiar with the character-
istics of such chairs" (Ketchman Decl. ¶ 21).

During his deposition, however, Dr. Ketchman stated
that he has never (1) designed office chairs, (2) written any
instructions or warnings for office chairs, (3) worked for a
company that manufactures or distributes office chairs or (4)
visited a factory of a company that makes office chairs; he also
testified that he has never been retained by a manufacturer or
distributor of office chairs in a non-litigation context
(Rubenstein Aff., Ex. F-1, 50:22-50:24, 54:22-55:17).  Dr.
Ketchman further testified that he has never published any arti-
cles, treatises or books regarding office chairs and has not
delivered any lectures or presentations concerning office chairs
(Rubenstein Aff., Ex. F-1, 38:11-38:18).  Dr. Ketchman further
testified that his purported expertise in the use of chairs is
based on his "personal experience" in having "used many different
types of office chairs" and "watching other people use them"
(Rubenstein Aff., Ex. F-1, 61:4-61:12).  Finally, Dr. Ketchman
stated that he has been retained as an expert in about six prior
cases involving office chairs; however, he could only remember
the details of three of those cases and stated that he did not
provide trial or deposition testimony in any of those cases

6

(Rubenstein Aff., Ex. F-1, 36:6-36:25; Ex. F-3, 180:22-181:17, 205:11-206:5).

In his expert report, Dr. Ketchman describes the Zody Chair as having a five-arm castered base and that the chair has hand controls that allow the user to adjust the seat height and position (Rubenstein Aff., Ex. E-1, at 9-10).  The backrest of the chair also has the ability to recline or tilt backward when pressure is applied by the user (Rubenstein Aff., Ex. E-1, at 9-10).  The chair includes a crank for adjusting the tension on the backrest so that the user may adjust the amount of pressure necessary to cause the chair to recline (Rubenstein Aff., Ex. E-1, at 9-10).  The chair also includes a "backstop control lever," which, when activated, limits the degree to which the backrest will recline (Rubenstein Aff., Ex. E-1, at 9-10).

In his report, Dr. Ketchman explains that he reached his opinion after reviewing background materials related to plaintiff's accident and inspecting the Zody Chair, as well as "other similar-purpose chairs" (Rubenstein Aff., Ex. E-1, at 8).[3]

---

[3]Dr. Ketchman does not expressly identify the "similar-purpose" chairs he examined.  As discussed below, Dr. Ketchman's report notes that a different office chair, the "SITWELL Model 0-30-AO-SS," includes a "back lock" instead of a backstop lever, which holds the chair in the chosen recline position when engaged, regardless of whether the user is sitting in the chair or not (Rubenstein Aff., Ex. E-1, at 13).  Dr. Ketchman's report

(continued...)

Ketchman's inspection included weighing the Zody Chair and mea-
suring the amount of force needed to recline the chair's backrest
at both minimum and maximum tension settings (Rubenstein Aff.,
Ex. E-1, at 11).  Dr. Ketchman also measured the angle of the
backrest when (1) no pressure is placed on it and the tension
setting is at its highest setting; (2) the backstop lever is
engaged and the individual pulls back on the backrest; (3) "ap-
proximately 66 lbs of force" is applied to the backrest and the
backstop lever is released and (4) the backstop lever is engaged
at a ten-degree and fifteen-degree recline and pressure is ap-
plied to the backrest (Rubenstein Aff., Ex. E-1, at 11).  In
addition, Dr. Ketchman measured the amount of force needed to
tilt the Zody Chair back to a 43-degree angle when the backrest
tension is at its lowest setting (Rubenstein Aff., Ex. E-1, at
11).

--------

[3](...continued)
also notes that Haworth manufactures a different chair, the
Improv, that includes instructions that store in the chair's seat
(Rubenstein Aff., Ex. E-1, at 14).  Finally, in his deposition,
Dr. Ketchman was asked which "synchronous tilt office chair[s]"
he has examined prior to this case, and he identified only the
"Human Scales Freedom chair" (Rubenstein Aff., Ex. F-1, 56:15-
56:25.  He further testified that he examined it because he was
"contemplating purchasing it" several years ago, and that, unlike
the Zody Chair, it does not have a mechanism for adjusting back
tension (Rubenstein Aff., Ex. F-1, 56:22-58:12).

Dr. Ketchman also made the following observations with respect to the Zody Chair's reclining features:  (1) the back of the chair will return to the upright position when the user gets up from the chair and pressure is removed from the backrest, regardless of whether the backstop lever has been engaged, with the consequence that it is impossible to discern whether the back of an unoccupied Zody Chair is locked in the upright position; (2) to lock the chair in the upright position after the backstop has been engaged in any other position, the user must unlock the backstop and re-engage it when the seat is in the upright position and (3) when the backrest tension is set at minimum resistance, the seat pan and the backrest will begin to recline when pressure is applied to the seatpan only (and not the backrest) (Rubenstein Aff., Ex. E-1, at 11-12).[4]

Dr. Ketchman opines that plaintiff's "tilt-back accident" occurred because the backstop had not been engaged and the backrest tension had been set at its lowest resistance setting, causing the chair's back, which was in an upright position when

_____

[4]Dr. Ketchman also performed "dynamic" testing on the Zody Chair by sitting in the chair and tilting himself backward.  He also testified in his deposition that he has previously performed these tests on other chairs in connection with other, unrelated work, to determine if those chairs could tip over; however, he could not recall the specific features of these chairs and whether they were similar to the Zody Chair (Rubenstein Aff., Ex. F, 61:18-67:6, 76:20-79:2, 92:18-96:7).

9

plaintiff approached it, to recline unexpectedly when plaintiff

sat down (Rubenstein Aff., Ex. E-1, at 12).  As discussed in

footnote 3, <u>supra</u>, Dr. Ketchman also notes that the "SITWELL

Model 0-30-AO-SS" includes a "backlock" instead of a backstop

lever, which holds the chair in the chosen recline position when

engaged, regardless of whether the chair is occupied or not

(Rubenstein Aff., Ex. E-1, at 13).  Dr. Ketchman further states

that the Zody Chair's design violates a

> long-standing standard of safe product design, the
> Design Safety Hierarchy, . . . namely, that: a manu-
> facturer should proactively identify potential hazards
> during the product's development; and (1) eliminate
> such hazards by design, if technically and economically
> feasible, (2) for those hazards remaining, take mea-
> sures, such as guarding, to reduce their injury poten-
> tial, and (3) warn and instruct accordingly.

(Rubenstein Aff., Ex. E-1, at 13).  Dr. Ketchman also states that

Haworth would have been aware of the defect, to wit, the chair's

tendency to recline unexpectedly if the back tension is at the

minimum setting, if it had conducted "adequate testing during

development of the Zody" (Rubenstein Aff., Ex. E-1, at 13).[5]

Further, Dr. Ketchman's report notes that Haworth designed and

sells another chair -- the Improv Desk Chair -- which, unlike the

---

[5]In his declaration, Dr. Ketchman clarifies that the type of
testing that he believes was necessary is "dynamic testing with
actual people sitting in the chair with the back-tilt tension set
to minimum" (Ketchman Decl. ¶ 23).

Zody Chair, includes instructions that store in the front of the seat (Rubenstein Aff., Ex. E-1, at 14).

Ultimately, Dr. Ketchman reaches five conclusions in his report regarding the Zody Chair:  that (1) plaintiff experienced a "tilt-back"[6] as he began to sit in the Zody Chair; (2) "[t]he accident occurred because the Zody has a safety design defect that results in latent hazard -- inadvertent recline"; (3) the nature of the defect is "concealed, or latent, such that neither the purchaser nor the end user would be expected to have notice of it in the absence of dedicated instructions or warning"; (4) the Zody Chair should have been sold "with adequate instructions and warnings included with/on each chair, as packaged" and (5) plaintiff failed to thoroughly examine the chair before he sat in it, which would have enabled him "to determine if the chair was in a proper and safe condition to sit in" (Rubenstein Aff., Ex. E-1, at 14-15).

Finally, in his declaration, Dr. Ketchman states that his measurements and his dynamic testing of the Zody Chair are

---

[6]Dr. Ketchman does not expressly define "tilt-back" in his report.  However, it appears from the report that the "tilt-back" or "back-tilt" angle of the chair is the angle to which the chair is capable of reclining, which is dependent on the chair's adjustable tension and control settings (Rubenstein Aff., Ex. E-1, at 8-10).

not the primary basis for his conclusion; rather, "[t]he underlying reasoning for [his] opinions -- that the chair has a latent tilt-back hazard and lacks adequate user instructions and warnings -- is self-evident to a qualified objective engineer with product design, and human factors expertise, which [he] surely possess[es]" (Ketchman Decl. ¶ 24).

C.   Dr. Bellingar

Dr. Bellingar has a bachelor of applied arts degree from Central Michigan University in clothing and textiles, a master's degree from Michigan State University in clothing and textiles and a doctorate in Industrial Engineering from Auburn University.  Dr. Bellingar is a Certified Professional Ergonomist[7] and has worked at Haworth as a corporate ergonomist since 2000.  Since 2004, Dr. Bellingar has served as Haworth's Senior Corporate Ergonomist (Rubenstein Aff., Ex. K., at 7).

Prior to her work at Haworth, Dr. Bellingar was an assistant professor at Illinois State University, where she taught courses in safety technology, disaster preparedness, hazardous materials regulation, fire protection and prevention

---

[7]Ergonomics is defined as the "[s]tudy of equipment design in order to reduce operator fatigue and discomfort."  Webster's Second New Riverside University Dictionary 441 (1994).

and directed practice (Rubenstein Aff., Ex. K., at 8).  Dr.
Bellingar has been associated with BIFMA since 2001, and has
served on a number of its subcommittees, including having served
as the Vice Chair of its Ergonomics Subcommittee since 2006
(Rubenstein Aff., Ex. K., at 14).  Dr. Bellingar is also affili-
ated with the Canadian General Standards Board ("CGSB") and the
Canadian Standards Association ("CSA"), as well as several other
chair industry and ergonomics associations (Rubenstein Aff., Ex.
K, at 14-15).

In her deposition, Dr. Bellingar testified that, prior
to her employment with Haworth, she had no training or experience
with respect to chairs (Declaration of Lawrence R. Bailey, Jr.,
dated Dec. 18, 2015 (D.I. 197) ("Bailey Decl."), Ex. D, 16:6-
16:16).  Dr. Bellingar further testified that she never person-
ally inspected the chair at issue in this case or chairs similar
to the Zody Chair prior to completing her report (Bailey Decl.,
Ex. D, 35:16-36:6).  Dr. Bellingar further explained that her
position at Haworth "deal[s] with ergonomics" and that she
"do[es]n't necessarily deal with safety"; she also stated that
ergonomics does not "generally [deal with] the safety" of a
product (Bailey Decl., Ex. D, 47:3-47:9).  Dr. Bellingar also
testified that she prefers a backstop design to a "back lock"
design but that her preference was based on her "personal opin-

ion" and originates from an "ergonomic point of view not a safety point of view"; she also confirmed that she "do[es]n't get involved in safety" (Bailey Decl., Ex. D, 56:3-56:19).

In her expert report, Dr. Bellingar states that her opinion is based on her education, experience and involvement with a number of industry associations, including BIFMA, the Human Factors and Ergonomics Society, the CGSB and CSA (Rubenstein Aff., Ex. K, at 15). Dr. Bellingar also states that her opinion is based on her own involvement with the design and development of the Zody Chair, her review of Dr. Ketchman's report and information she has received regarding the sales and performance record of the Zody Chair, as well as information about competitors' task chairs (Rubenstein Aff., Ex. K, at 15).

In her report, Dr. Bellingar opines that Dr. Ketchman's methodology does not comply with the applicable industry standards for measuring a chair properly and is, therefore, unreliable (Rubenstein Aff., Ex. K, at 15-16). Dr. Bellingar also states that Dr. Ketchman is incorrect in his opinion that the Zody Chair is defective because it may start to recline when the occupant sits in it even when no pressure is applied to the backrest (Rubenstein Aff., Ex. K, at 16). She writes that, "[i]n reality, this is a characteristic of all highly ergonomic synchronous tilt chairs set for a light recline force" (Rubenstein

14

Aff., Ex. K, at 16).  Dr. Bellingar further opines that the
backstop lever design is not a design defect, as Dr. Ketchman
opines; rather, she states that both backstop designs and "back
lock" designs comply with industry standards (Rubenstein Aff.,
Ex. K, at 18).  She further states that Haworth has sold "nearly
1.5 million Zody task chairs since . . . 2006" and that "Haworth
has never had any reported accidents, claims or law suits similar
to the Whalen accident and suit" (Rubenstein Aff., Ex. K, at 20).
Dr. Bellingar also takes issue with Dr. Ketchman's opinion that
Haworth failed to test adequately the Zody Chair, noting that
Haworth's tests included both ANSI/BIFMA tests, "as well as more
stringent tests of Haworth's own design" (Rubenstein Aff., Ex. K,
at 20).

        Finally, Dr. Bellingar concludes her report by giving
the following opinions:  (1) Dr. Ketchman's "chair measurements
are of dubious validity"; (2) "[t]he synchronous tilt design,
which Dr. Ketchman characterizes as a design defect, is recog-
nized by the ANSI/BIFMA standard, has been well-accepted in the
office chair industry since the 1980s, [and] offers ergonomic
benefits to the user"; (3) the Zody Chair was thoroughly tested
during its design and development and (4) the fact that there has
never been any reported incidents similar to plaintiff's "rein-
forces [her] opinion to a reasonable degree of engineering cer-

15

tainty, that the Zody task chair is reasonably safe" (Rubenstein Aff., Ex. K, at 21).

D.   Dr. Jamie Williams

Dr. Williams is a biomedical engineer who specializes in biomechanics and bioengineering[8] (Affidavit of Richard H. Rubenstein in Opposition to Plaintiff's Motion to Preclude Jamie Williams, Ph.D., dated Jan. 2, 2016 (D.I. 243) ("Rubenstein 2d Aff."), Ex. H, at 2[9]).  Dr. Williams has a bachelor's degree in Biomedical Engineering from the University of Iowa and a master's degree and doctorate in Bioengineering from the University of Illinois at Chicago (Rubenstein 2d Aff., Ex. H, at 3).  Dr. Williams' curriculum vitae states that she currently serves as a visiting professor with the Department of Orthopedic Surgery at

---

[8]According to Dr. Williams, "Biomedical Engineering (a.k.a. Bioengineering) is the engineering discipline that applies mechanical engineering, chemical engineering and electrical engineering to living systems, including the human body" (Affidavit of Jamie Williams, Ph.D., dated Jan. 4, 2016 (D.I. 235) ("Williams Aff.") ¶ 4).  She further explains that biomechanics is a specialty within the field of biomedical engineering and has been defined by the American Association of Orthopaedic Surgeons as "the branch of science that deals with the effects of energy and forces on biological systems, involving the application of Newton's laws of physics to describe the behavior and function of biological systems" (Williams Aff. ¶¶ 5, 7).

[9]Because Ex. H to the Rubenstein 2d Aff. lacks consistent internal pagination, I use the page numbers assigned by the Court's ECF system.

the Rush University Medical Center, an adjunct professor with the
Department of Bioengineering at the University of Illinois at
Chicago and an adjunct instructor in engineering at Messiah
College (Rubenstein 2d Aff., Ex. H, at 3).  Dr. Williams is also
employed as an associate of Robson Forensic, Inc. (Rubenstein 2d
Aff., Ex. H, at 2).

      Dr. Williams' <u>curriculum</u> <u>vitae</u> further states that Dr.
Williams has experience in assessing injuries involving, among
other things, the neck, back and spinal cord and determining the
causes of those injuries; Dr. Williams also states that she has
experience with personal injury cases involving "occupational and
work place injuries" (Rubenstein 2d Aff., Ex. H, at 2).  Dr.
Williams is a member of several professional organizations,
including the Orthopaedic Research Society, the American Society
of Mechanical Engineers, the Association for the Advancement of
Automotive Medicine and the American Society for Testing and
Materials (Rubenstein 2d Aff., Ex. H, at 3).  Dr. Williams has
also authored several publications relating to disc injury and
the lumbar spine (Rubenstein 2d Aff., Ex. H, at 4).  In a decla-
ration submitted in opposition to plaintiff's motion to preclude
Dr. Williams, Dr. Williams states that she has "extensive experi-
ence in cervical and lumbar spine injury cases" (Williams Aff. ¶
15).

In her expert report, Dr. Williams explains that she reviewed several of the filings in this action, plaintiff's medical records, CSX's personal injury report for plaintiff's accident and the transcripts for plaintiff's, Joseph Kirchner's and Robert Griggs' depositions[10] (Memorandum of Law in Support of "Daubert" Motion Precluding Biomechanical Evidence, dated Dec. 18, 2015 (D.I. 212) ("Pl. Williams Mem."), Ex. 1, at 1-2). Dr. Williams also inspected an exemplar Zody Chair (Pl. Williams Mem., Ex. 1, at 2).

In her report, Dr. Williams summarizes her understanding, based on the documents she reviewed, of the events that occurred at the time of plaintiff's accident and plaintiff's subsequent medical treatment. Dr. Williams then explains that "[t]raumatic injuries of the intervertebral discs of the cervical and lumbar spine result from excessive bending and shear loads applied to the spine" (Pl. Williams Mem., Ex. 1, at 4). Dr. Williams also explains that Newton's laws of physics, including his first law -- "every body at rest will remain at rest, and any body in motion will remain in motion at a constant velocity, unless acted on by an outside force" -- are applicable to understanding what happened to plaintiff while he was in the Zody

---

[10]Griggs and Kirchner are two of the witnesses to plaintiff's accident (Pl. Williams Mem., Ex. 1, at 2-3).

18

Chair (Pl. Williams Mem., Ex. 1, at 5).  Dr. Williams then states
that "[t]he bending loads on Whalen's cervical spine during his
rearward motion were not in the correct direction to cause injury
to or exacerbate the pre-existing conditions of his cervical
spine intervertebral discs for which he was diagnosed and surgi-
cally treated" (Pl. Williams Mem., Ex. 1, at 5, 7).  In her
affidavit, Dr. Williams explains that she used the "fundamental
and universally accepted laws of physics and
engineering . . . [her] education, experience, and research, . .-
. universally accepted principles in the bioengineering field .-
. . the universally accepted principles of the Conservation of
Energy, Newton's Laws of Physics and fundamental mechanics" to
reach this conclusion (Williams Aff. ¶¶ 16-19).

        Dr. Williams also states that "[n]either the incident
as described, nor the Zody task chair are able to produce the
magnitude of forces necessary to accelerate Whalen's body forward
to cause injury to or exacerbate the pre-existing conditions of
his cervical spine intervertebral discs for which he was diag-
nosed and surgically treated" (Pl. Williams Mem., Ex. 1, at 6).
In reaching this opinion, Dr. Williams relies on a paper analyz-
ing several cadaveric studies of the cervical spine and the
forces required to cause injuries to the upper and lower cervical

19

spine (Pl. Williams Mem., Ex. 1, at 6[11]; Williams Aff. ¶ 19).   Dr.

---

[11]Specifically, Dr. Williams states:

Cadaveric studies are utilized extensively in the biomechanical literature to elucidate the causation and propagation of injuries under various loading conditions.  Cadaveric studies have reported cervical disc failures with bending loads of 168 in-lbs to 238 in-lbs.  These studies used samples retrieved from males and females of age and degrees of disc degeneration comparable to Whalen.

The bending loads on cervical spine during an acceleration/deceleration event can be calculated using the Conservation of Energy Principles and Newton's Laws of Physics.  For a conservative estimate and using:

- A pulse duration of 0.1 seconds and 1.0 seconds
- A 6 inch vertical distance from the base of the head to the lower cervical spine levels
- Head weight of 10 lbs

For the bending loads on Whalen's cervical spine to have been sufficient to cause a posterior disc herniation, Whalen would have had to accelerate his body to at least 6 MPH in about 0.1 seconds or 60 MPH in 1 second just using his own muscle forces.

Neither the incident as described, nor the Zody Task chair are able to produce the magnitude of forces necessary to accelerate Whalen's body forward to cause injury to or exacerbate the pre-existing conditions of his cervical spine intervertebral discs for which he was diagnosed and surgically treated.

(Pl. Williams Mem., Ex. 1, at 6 (footnote omitted)).

However, the cadaveric study upon which Dr. Williams relies, which Haworth has submitted in connection with this motion, does not appear to expressly state that "cervical disc failures [occur] with bending loads of 168 in-lbs to 238 in-lbs," nor does it appear to address disc injuries (Rubenstein 2d Aff., Ex. J).

Williams opines that her inspection of an exemplar Zody Chair showed that the backrest of the chair was unable to overcome the weight of a person sitting in it and, therefore, the chair was incapable of propelling a person forward as plaintiff claims occurred in this case (Pl. Williams Mem., Ex. 1, at 5-6).

Ultimately, Dr. Williams makes the following conclusions within "the bounds of reasonable technical certainty":  (1) plaintiff was not propelled forward by the chair as he claims; (2) the "bending loads on [plaintiff]'s cervical spine during his rearward motion were not in the correct direction to cause injury to or exacerbate the pre-existing conditions of his cervical spine intervertebral discs for which he was diagnosed and surgically treated"; (3) "[n]either the incident as described, nor the Zody Task chair are able to produce the magnitude of forces necessary to accelerate [plaintiff]'s body forward to cause injury to or exacerbate [his] pre-existing conditions" and (4) Dr. Williams' "results of [her] biomechanical analysis of [plaintiff's] injuries are consistent with the medical diagnoses by [one of plaintiff's doctors] Dr. Krosser who noted that [plaintiff] did not have any direct trauma, but just twisted his neck and was experiencing some inflammation" (Pl. Williams Mem., Ex. 1, at 7).

III.  Analysis

    A.  Admissibility of Expert
       Testimony - Applicable Standards

       In order to be admissible, expert testimony must meet both the substantive requirements and limitations of Article VII of the Federal Rules of Evidence and the procedural requirements of Fed. R. Civ. P. 26(a)(2).[12]

       Rule 702 of the Federal Rule of Evidence provides:

       A witness who is qualified as an expert by knowl-
edge, skill, experience, training, or education may
testify in the form of an opinion or otherwise if:

       (a) the expert's scientific, technical, or other
specialized knowledge will help the trier of fact
to understand the evidence or to determine a fact
in issue;

       (b) the testimony is based on sufficient facts or
data;

       (c) the testimony is the product of reliable prin-
ciples and methods; and

       (d) the expert has reliably applied the principles
and methods to the facts of the case.

The proponent of expert testimony bears the burden of establish-ing its admissibility by a preponderance of the evidence.  United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007), citing

---

      [12]Only plaintiff has raised issues concerning compliance with Rule 26(a)(2)'s procedural requirements.  These issues are addressed in a separate Opinion and Order of even date.

Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 593 n.10
(1993).  However, "the rejection of expert testimony is the
exception rather than the rule."  Advisory Committee Notes to the
2000 Amendments to Fed. R. Evid. 702; Highland Capital Mgmt.,
L.P. v. Schneider, 551 F. Supp. 2d 173, 185 (S.D.N.Y. 2008)
(Leisure, D.J.).  "The admission of expert testimony is committed
to the broad discretion of the District Court and will not be
disturbed on review unless found to be 'manifestly erroneous.'"
United States v. Wexler, 522 F.3d 194, 204 (2d Cir. 2008), citing
United States v. Duncan, 42 F.3d 97, 102 n.3 (2d Cir. 1994).

          "To be admissible, expert testimony must be both rele-
vant and reliable."  Feinberg v. Katz, 01 Civ. 2739 (CSH), 2007
WL 4562930 at *6 (S.D.N.Y. Dec. 21, 2007) (Haight, D.J.), citing
Daubert v. Merrell Dow Pharm., Inc., supra, 509 U.S. at 589.

> As the Court explained in Daubert, the trial judge's
> task is to "ensure that an expert's testimony both
> rests on a reliable foundation and is relevant to the
> task at hand."  In its later opinion in Kumho Tire Co.
> v. Carmichael, 526 U.S. 137, 141 (1999), the Court
> characterized this task as "the trial judge's general
> 'gatekeeping' obligation."  While Daubert set forth a
> non-exclusive checklist for trial courts to use in
> assessing the reliability of scientific expert testi-
> mony, Kumho held held [sic] that these factors might
> also be applicable in assessing the reliability of
> non-scientific testimony, depending upon "the particu-
> lar circumstances of the particular case at issue."
>
> In discharging its gatekeeping obligation, the
> trial judge . . . must first find that the proposed
> witness's "scientific, technical, or other specialized

23

knowledge will assist the trier of fact to understand
the evidence or to determine a fact in issue," Fed. R.
Evid. 702.  If the court makes this finding, then "a
witness qualified as an expert by knowledge, skill,
experience, training, or education, may testify in the
form of an opinion, provided (1) the testimony is based
upon sufficient facts or data, (2) the testimony is the
product of reliable principles and methods, and (3) the
witness has applied the principals and methods reliably
to the facts of the case."  Id.

Feinberg v. Katz, supra, 2007 WL 4562930 at *6-*7; see also

S.E.C. v. Badian, 822 F. Supp. 2d 352, 356-57 (S.D.N.Y. 2011)

(Swain, D.J.), amended by 06 Civ. 2621 (LTS), 2012 WL 2354458

(S.D.N.Y. June 20, 2012) (Swain, D.J.); CIT Grp./Bus. Credit,

Inc. v. Graco Fishing & Rental Tools, Inc., 815 F. Supp. 2d 673,

676-77 (S.D.N.Y. 2011) (Marrero, D.J.).

        "Rule 702 is intended to ensure that the expert testi-

mony at issue is 'helpful to the jury in comprehending and decid-

ing issues beyond the understanding of a layperson.'"  Feinberg

v. Katz, supra, 2007 WL 4562930 at *7, quoting DiBella v. Hopkin-

s, 403 F.3d 102, 121 (2d Cir. 2005).  To that end, expert testi-

mony describing relevant background information, such as custom-

ary and industry practice in a given field, is frequently admis-

sible if it will be helpful to the jury.  See Marx & Co. v.

Diners Club, Inc., 550 F.2d 505, 508-09 (2d Cir. 1977) (testimony

about "step-by-step practices ordinarily followed . . . in shep-

herding a registration statement through the SEC" is admissible

"under the same theory as testimony concerning the ordinary practices of physicians or concerning other trade customs: to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry"); CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc., supra, 815 F. Supp. 2d at 678 ("[P]roposed testimony to establish prevailing customs and practices in the commercial lending indus-try is relevant and reliable and would be admissible for that purpose . . . ."). But see Marx & Co. v. Diners Club, Inc., supra, 550 F.2d at 509 n.11 ("Of course, expert testimony con-cerning the practices of a particular trade or business is not admissible if . . . only the jury's common understanding and not the customary practices or usages are relevant."). An expert witness may not, however, offer testimony that merely rehashes the testimony of percipient witnesses. United States v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994) ("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."); Arista Records LLC v. Usenet.com, Inc., 608 F. Supp. 2d 409, 424-25 (S.D.N.Y. 2009) (Katz, M.J.) ("An expert who simply regurgitates what a party has told him provides no assistance to the trier of fact through the applica-

tion of specialized knowledge."). Additionally, an expert may not generally testify as to facts not within his personal knowledge, and may not opine as to a party's state of mind, whether a party acted in bad faith, or as to the credibility of witnesses. See United States v. Scop, 846 F.2d 135, 142 (2d Cir. 1988), modified, 856 F.2d 5 (2d Cir. 1988); CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc., supra, 815 F. Supp. 2d at 678-79; Highland Capital Mgmt., L.P. v. Schneider, supra, 551 F. Supp. 2d at 180-81; Feinberg v. Katz, supra, 2007 WL 4562930 at *7-*8; see also In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) (Kaplan, D.J.) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.").

An expert may engage in a "factual discussion regarding the customs and practices of [an] . . . industry, an analysis of whether the conduct of the parties . . . conformed to those customs, and whether such behavior evidences the parties' intent to be bound by contract." Media Sport & Arts s.r.l. v. Kinney Shoe Corp., 95 Civ. 3901 (PKL), 1999 WL 946354 at *3 (S.D.N.Y. Oct. 19, 1999) (Leisure, D.J.).

Finally, performance of the gatekeeping function requires the trial court to conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is

scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." See Daubert v. Merrell Dow Pharm., Inc., supra, 509 U.S. at 592-93. Factors that trial courts may consider in evaluating the reliability of expert testimony include: "whether a theory or technique had been and could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or opera-tion." Nimely v. City of New York, 414 F.3d 381, 396 (2d Cir. 2005), quoting Daubert v. Merrell Dow Pharm., Inc., supra, 509 U.S. at 593-94. "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Indeed, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002).

B.   Application of the
     Foregoing Principles

   1.   Dr. Ketchman

     Haworth argues that Dr. Ketchman should be precluded
from testifying at trial because (1) Dr. Ketchman is not quali-
fied to offer opinions regarding design defects in office chairs;
(2) Dr. Ketchman's report and testimony regarding the Zody Chair-
's purported design defect is based on unreliable testing method-
ology and (3) Dr. Ketchman's opinions with respect to warnings
and instructions are prejudicial and would not assist the jury at
trial.

        a.   Dr. Ketchman's Qualifications

     Haworth first argues that Dr. Ketchman is not qualified
to offer design defect opinions with respect to the Zody Chair
(Haworth Ketchman Mem., at 8-12).  Specifically, Haworth relies
on the fact that, although Dr. Ketchman has a doctorate in me-
chanical engineering and is a licensed professional engineer, he
has no direct experience designing office chairs or the compo-
nents of office chairs and has never been qualified previously as
an expert in office chairs by any court.  In support of its
argument, Haworth relies primarily on two cases in which Dr.

28

Ketchman was precluded from offering opinions because the court
concluded he lacked the requisite experience.

     The first case is Noriega-Sanchez v. Ford Motor Co.,
No. 05-1967 (RLA/JAF), 2009 WL 2870643 at *5 (D.P.R. Sept. 2,
2009), in which the judge precluded Dr. Ketchman from offering
opinions relating to tire design and, specifically, belt wedge
design, and its causal connection to tread separation in the tire
at issue in that case.  The judge precluded Dr. Ketchman because
his prior work had not involved belt wedge design and his "lim-
ited knowledge of belt wedge design and its possible effect on
tread separation . . . has been acquired through the study of one
or two studies conducted by others, including those conducted by
the defendants."  Noriega-Sanchez v. Ford Motor Co., supra, 2009
WL 2870643 at *5.  The judge in Noriega-Sanchez did, however,
find that Dr. Ketchman was qualified to opine on the issue of
whether a tread separation occurred in the tire at issue because
he did have previous experience investigating tire tread separa-
tions as part of his prior work experience.  Noriega-Sanchez v.
Ford Motor Co., supra, 2009 WL 2870643 at *5.

     The second case upon which Haworth relies is Estate of
Bruess ex rel. Bruess v. Blount Int'l, Inc., No. C09-2055 (JSS),
2011 WL 2680760 (N.D. Iowa July 8, 2011) (Report & Recommenda-
tion), adopted, 2012 WL 37167 (N.D. Iowa Jan. 6, 2012).  In

29

Bruess, Dr. Ketchman was precluded from offering opinions that (1) the design of a riding mower was defective because it did not have a rollover protection system and (2) the manufacturer failed to provide adequate warnings with the riding mower.  Estate of Bruess ex rel. Bruess v. Blount Int'l, Inc., supra, 2011 WL 2680760 at *22, *26.  In precluding Dr. Ketchman's design defect testimony as irrelevant, the judge in Bruess relied on the facts that Dr. Ketchman had never designed an entire riding mower and had never designed a rollover protection system for a riding mower.  Estate of Bruess ex rel. Bruess v. Blount Int'l, Inc., supra, 2011 WL 2680760 at *22.  Similarly, in precluding Dr. Ketchman's testimony regarding failure to warn, the judge relied on the fact that Dr. Ketchman had never designed warning labels for a rollover protection system or a riding mower.  Estate of Bruess ex rel. Bruess v. Blount Int'l, Inc., supra, 2011 WL 2680760 at *25.[13]

CSX argues, however, that Dr. Ketchman is qualified to opine that the Zody Chair has a design defect given his academic credentials, extensive background in designing several consumer products and prior experience in testifying as an expert in

_____

[13]Haworth also cites several cases that also precluded mechanical engineering experts from testifying at trial because they lacked specific experience with the products at issue in those litigations (Haworth Ketchman Mem., at 10-12).

product design and failure-to-warn litigations.  CSX also argues

that Dr. Ketchman is qualified because he is familiar with the

BIFMA standards with respect to office chairs.  Finally, CSX

relies on the fact that Dr. Ketchman "has been involved in half a

dozen cases involving chairs wherein it was his responsibility to

determine if an office chair was designed safely and was stable"

(Memorandum of Law in Opposition to Haworth's <u>Daubert</u> Motion to

Preclude Jeffrey Ketchman, dated Dec. 28, 2015 (D.I. 220) ("CSX

Ketchman Mem."), at 3-4).

       In support of its argument that Ketchman's lack of

experience with chairs is not a disqualifier, CSX relies on a

number of cases from within this Circuit stating, in substance,

that "it is clear that if an 'expert has educational and experi-

ential qualifications in a general field closely related to the

subject matter in question, the court will not exclude [an ex-

pert's] testimony solely on the ground that the witness lacks

expertise in the specialized areas that are directly pertinent.'"

<u>Bee v. Novartis Pharm. Corp.</u>, 18 F. Supp. 3d 268, 303 (E.D.N.Y.

2014) (alteration in original), <u>quoting</u> <u>Davids v. Novartis Pharm.</u>

<u>Corp.</u>, 857 F. Supp. 2d 267, 277 (E.D.N.Y. 2012); <u>accord</u> <u>Rich v.</u>

<u>Tee Bar Corp.</u>, No. 1:10-CV-1371 (MAD/CFH), 2013 WL 5442277 at *8

(N.D.N.Y. Sept. 27, 2013) (finding an expert qualified to opine

as to snow tubing safety standards where the expert had "exten-

31

sive experience with modes of transportation, including the
design and construction details of bridges and roadways and their
surfacing, as well as coefficients of friction of such sur-
faces"); Pension Comm. of Univ. of Montreal Pension Plan v. Banc
of Am. Sec., LLC, 691 F. Supp. 2d 448, 479 (S.D.N.Y. 2010)
(Scheindlin, D.J.) (finding a hedge fund auditing expert quali-
fied even though he had performed only one hedge fund audit
because he had "substantial auditing experience" and had "re-
mained familiar with the practice of auditing and auditing stan-
dards through his role as a litigation consultant"); Rupolo v.
Oshkosh Truck Corp., 749 F. Supp. 2d 31, 37 (E.D.N.Y. 2010) ("In
a product liability action, an expert witness is not strictly
confined to his area of practice, but may testify concerning
related applications; a lack of specialization affects the weight
of the opinion, not its admissibility." (internal quotation marks
omitted)).[14]

CSX also relies on the Second Circuit's decision in
Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 81 (2d Cir. 1997).

_____

[14]In support of this argument, CSX also cites two cases in
which Dr. Ketchman was qualified as an expert regarding machine-
guarding on two products with which Dr. Ketchman had no direct
experience because he did have experience with machine-guarding
with respect to other products.  See Mayancela v. Biro Mfg. Co.,
08 Civ. 245 (LTS)(HBP), 2010 WL 774942 (S.D.N.Y. Mar. 5, 2010)
(Swain, D.J.); Humphrey v. Diamond Boart, Inc., 556 F. Supp. 2d
167 (E.D.N.Y. 2008).

In Stagl, the district court precluded a mechanical engineering expert from offering testimony as to whether an airline's baggage delivery system was unsafe for older passengers because the expert had no expertise specific to airline terminal or baggage claim design. Stagl v. Delta Air Lines, Inc., supra, 117 F.3d at 82. On appeal, the Court of Appeals reversed, stating that, because the mechanical engineer's expertise included expertise in the "interaction between people and machinery," he was sufficiently qualified to opine on whether the baggage delivery system was unsafe. Stagl v. Delta Air Lines, Inc., supra, 117 F.3d at 82. The Court of Appeals further noted that a holding requiring an expert to have direct experience in airport terminal design or baggage claim systems would likely result in only those who have worked in the airline industry being designated as experts, which would allow "that industry [to] indirectly set its own standards." Stagl v. Delta Air Lines, Inc., supra, 117 F.3d at 82. Accordingly, the court found that the expert's expertise in "human-machine interactions" was sufficient to allow him to opine on whether the baggage system at issue was unsafe. Stagl v. Delta Air Lines, Inc., supra, 117 F.3d at 82.

Here, while Dr. Ketchman has extensive experience with respect to mechanical engineering and has designed several consumer products, it does not appear that he has any direct work

experience designing office chairs similar to the Zody Chair.
From the record, it appears that the only work experience Dr.
Ketchman has with respect to chair design concerns bowling chairs
and lounge/bench seating, which, as Haworth notes in its papers,
is distinguishable from an ergonomically-designed office chair
such as the Zody Chair.  Further, even though Dr. Ketchman has
purportedly been retained as an expert in previous office chair
litigations, the fact that Dr. Ketchman has never been qualified
by a court as an expert on office chairs supports Haworth's
argument that he is unqualified to opine in this case.  See M.B.
ex rel. Scott v. CSX Transp., Inc., 130 F. Supp. 3d 654, 670
(N.D.N.Y. 2015) (finding an expert unqualified where he claimed
to have "prior experience in numerous similar train accident
cases," because "[w]hile experience can provide the basis to
qualify a witness as an expert, the experience must be demon-
strated and have direct relevance to the issues in the case"
(internal quotation marks omitted)).

        On the other hand, Dr. Ketchman does have extensive
educational and work experience in testing and designing a number
of consumer products and has been previously qualified by at
least one court as "adequately qualified to render opinions as to
'the interaction between people and machinery.'"  Mayancela v.
Biro Mfg. Co., supra, 2010 WL 774942 at *3, quoting Stagl v.

34

Delta Air Lines, Inc., supra, 117 F.3d at 83.  Dr. Ketchman also
is familiar with the BIFMA standards, which both sides concede
are the applicable industry standards for office chair testing.
Further, while Dr. Ketchman does not appear to have experience
designing office chairs, he does have some experience in design-
ing somewhat similar products -- i.e., bowling lounge chairs.
While "some courts have found an expert unqualified to render an
opinion where that expert did not have direct experience with the
particular product, machine or specific field at issue in the
litigation," such as the case with Dr. Ketchman, "other courts
have found that a lack of specific familiarity with a product,
machine or specific field does not, in itself, render an expert
unqualified to proffer their opinion."  Lara v. Delta Int'l Mach.
Corp., No. CV 13-6259 (AKT), 2016 WL 1254023 at *7 (E.D.N.Y. Mar.
31, 2016) (collecting cases).

        Accordingly, although this is a close case, "given
[Ketchman's] overall background, education, training and prior
experience in the field of engineering generally, the Court
concludes that he is qualified . . . to testify in this case, and
his lack of knowledge and experience goes to the weight of his
testimony."  Lara v. Delta Int'l Mach. Corp., supra, 2016 WL
1254023 at *7 (alteration in original) (internal quotation marks
omitted).

b.   The Reliability of
     Dr. Ketchman's Design Defect
     <u>Opinion and Underlying Methodology</u>

Haworth next argues that Dr. Ketchman's conclusion that
the Zody Chair has a design defect is based on unreliable method-
ology and is, therefore, inadmissible (Haworth Ketchman Mem., at
12-20).  Specifically, Haworth takes issue with (1) the force
measurements taken by Dr. Ketchman; (2) Dr. Ketchman's dynamic
testing; (3) Dr. Ketchman's observation that the backrest re-
clines at a minimum tension setting when weight is applied to the
seat even if the backrest is not contacted; (4) Dr. Ketchman's
comparisons to the Sitwell chair and the "Human Scale Freedom
chair," which Haworth characterizes as insufficient showings of
an alternative design; (5) Dr. Ketchman's failure to consider the
utility of the Zody Chair design as compared to any alternative
design and (6) Dr. Ketchman's failure to consider the Zody Chair-
's history of safety.

CSX argues that Dr. Ketchman's testing methodology
consisted of "necessary tests on the subject chair," including
"attempt[ing] to reconstruct the accident by sitting on the chair
and manipulating the levers and cranks at different levels" (CSX
Ketchman Mem., at 11).  CSX also argues that "[t]he reliability
of Dr. Ketchman's opinions are demonstrated by his proposed

numerous alternative designs" (CSX Ketchman Mem., at 12).  CSX
further argues that the quantitative testing Dr. Ketchman per-
formed, "which was done with professional and calibrated instru-
ments, in a reproducible manner, was an aid to substantiating and
clarifying witnesses' and Plaintiff's testimony with regard to .
. . how the accident happened.  As such, it is in fact not even
work that is properly subject to <u>Daubert</u> challenge criteria" (CSX
Ketchman Mem., at 12).  In addition, CSX argues that the "under-
lying reasoning for Dr. Ketchman's opinions -- that the chair has
a latent tilt-back hazard defect and lacks adequate user instruc-
tions and warnings -- is self-evident to a qualified objective
engineer with product design and human factors expertise, which
Dr. Ketchman surely possesses," and that "[h]is opinions are not
based on the testing [he performed]" (CSX Ketchman Mem., at 12,
15).  Finally, CSX argues that any issues with the reliability of
Dr. Ketchman's opinions go to the weight and not the admissibil-
ity of Dr. Ketchman's testimony (CSX Ketchman Mem., at 13).

        To prevail on its strict-products-liability claim for
defective design, CSX must show: "(1) the product as designed
posed a substantial likelihood of harm; (2) it was feasible to
design the product in a safer manner; and (3) the defective
design was a substantial factor in causing Plaintiff's injury."
<u>Lara v. Delta Int'l Mach. Corp.</u>, <u>supra</u>, 2016 WL 1254023 at *13.

37

The second requirement "usually demands that a plaintiff intro-
duce expert testimony that a feasible alternative design exists."
Bourassa v. Black & Decker (U.S.) Inc., No. 1:12-CV-1476
(FJS/CFH), 2015 WL 4715250 at *2 (N.D.N.Y. Aug. 7, 2015).  Spe-
cifically, "an expert is required to ascertain feasibility, to
test alternative designs, and to address the engineering factors
and tradeoffs that go into the design of a product for distribu-
tion in the marketplace."  Rypkema v. Time Mfg. Co., 263 F. Supp.
2d 687, 692 (S.D.N.Y. 2003) (Sweet, D.J.); accord Mathis-Kay v.
McNeilus Truck & Mfg., Inc., No. 06-CV-815S (WMS), 2011 WL 44983-
86 at *7 (W.D.N.Y. Sept. 27, 2011) (The expert must demonstrate,
"through testing and construction of a prototype, that an alter-
native [design] is feasible, practical, economical, and safe []
or . . .  identify[] manufacture[r]s of similar equipment that
have put the proposed design into use.").

        Accordingly, in the usual strict-products-liability
case based on a design defect, "the 'touchstone' of an expert's
report should be a comparison of the utility and cost of the
product's design and alternative designs."  Hilaire v. DeWalt
Indus. Tool Co., 54 F. Supp. 3d 223, 244 (E.D.N.Y. 2014), citing
Barban v. Rheem Textile Sys., Inc., No. 01-CV-8475 (ILG), 2005 WL
387660 at *5 (E.D.N.Y. Feb. 11, 2005), aff'd without published
opinion, 147 F. App'x 222 (2d Cir. 2005) (summary order).  "This

utility versus cost comparison should entail the testing of any proposed alternative design." Lara v. Delta Int'l Mach. Corp., supra, 2016 WL 1254023 at *13; Sorto-Romero v. Delta Int'l Mach. Co., No. 05-CV-5172 (SJF)(AKT), 2007 WL 2816191 at *7 (E.D.N.Y. Sept. 24, 2007) ("In analyzing the reliability of an expert's testimony, the key question is whether it can be (and has been) tested.").  "The presence of this factor in a design defect case also ensures that the focus of the jury's deliberation is on whether the manufacturer could have designed a safer product, not on whether an expert's proposed but untested hypothesis might bear fruit." Colon ex rel. Molina v. BIC USA, Inc., 199 F. Supp. 2d 53, 77 (S.D.N.Y. 2001) (Scheindlin, D.J.).  Therefore, an expert's "failure to test a theory . . . can justify a trial court's exclusion of the expert's testimony." Brooks v. Outboard Marine Corp., 234 F.3d 89, 92 (2d Cir. 2000).

Finally, as noted in section III.A., supra, in perform-ing the reliability inquiry under Daubert, "a court is to con-sider whether the testimony is grounded in facts or data and reliable methods or principles, and whether the witness has applied the principles and methods to the facts of the case." Smith v. Herman Miller, Inc., No. CV-03-5358 (CPS), 2005 WL 2076570 at *3 (E.D.N.Y. Aug. 26, 2005), citing Fed. R. Evid. 702; see also Dreyer v. Ryder Auto. Carrier Grp., Inc., 367 F. Supp.

2d 413, 416-17 (W.D.N.Y. 2005) ("An otherwise well-credentialed expert's opinion may be subject to disqualification if he fails to employ investigative techniques or cannot explain the technical basis for his opinion."). Factors that trial courts may consider in evaluating the reliability of expert testimony include "whether a theory or technique had been and could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation." Nimely v. City of New York, supra, 414 F.3d at 396, citing Daubert v. Merrell Dow Pharm., Inc., supra, 509 U.S. at 593-94. "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Amorgianos v. Nat'l R.R. Passenger Corp., supra, 303 F.3d at 266.

Dr. Ketchman's precise methodology in this case is difficult to discern. Dr. Ketchman took force measurements of the chair, engaged in "dynamic testing" of the chair and made visual observations regarding the chair's features, specifically that the chair's back will recline when pressure is placed on the seat alone if the tension on the backrest is at its lowest setting and the back-stop lever is not engaged. However, as noted

40

above, both CSX and Dr. Ketchman confirm that the measurements taken by Dr. Ketchman are not the basis for his opinions.  Rather, according to CSX and Dr. Ketchman, "[t]he underlying reason for Dr. Ketchman's opinions . . . is self-evident to a qualified objective engineer with product design and human factors expertise" (CSX Ketchman Mem., at 12; Ketchman Decl. ¶ 24).  In addition, the "dynamic" testing that Dr. Ketchman conducted, and which he believes Haworth was required to undertake, similarly does not appear to satisfy any of the factors outlined in <u>Daubert</u>.  In his deposition, Dr. Ketchman testified that, although he has used "dynamic" testing when assessing unidentified chairs in the past, his dynamic testing is not done pursuant to any written standard and that he has never seen reports of dynamic testing to indicate that it is generally accepted in the chair industry (Rubenstein Aff., Ex. F-1, 62:7-63:13).  Further, notwithstanding that Dr. Ketchman testified that these tests are repeatable in that "[t]he person who tipped over backwards [in the chair] once can try it again and do it again" (Rubenstein Aff., Ex. F-1, 65:2-65:16), there is no evidence that the force and movements used by the person engaging in dynamic testing could be exactly replicated in subsequent tests.

Dr. Ketchman also did not appear to address the utility of the Zody Chair's current design in his expert report; rather,

41

he states in his declaration that he "ha[s] not opined that the
chair's tilt-back hazard or lack of adequate warnings and in-
structions should be remedied by any means that affect utility.
That is precisely why I did not consider it" (Ketchman Decl. ¶
36).

       With respect to alternative designs, Dr. Ketchman's
report mentions the Sitwell chair as having a "back lock" design
that "when engaged holds the chair in the reclined position"
(Rubenstein Aff., Ex. E-1, at 13).  In his declaration, however,
Dr. Ketchman states that he "ha[s] not opined on the safety of
the Sitwell chair as a design alternative, but rather . . . used
that chair's back-lock design just to illustrate how its imple-
mentation results in a visual indication to the user of a back-
tilt setting, something the Zody back-tilt feature does not
provide" (Ketchman Decl. ¶ 38).  Dr. Ketchman's declaration
further identifies the Human Scales Freedom chair, which Dr.
Ketchman mentioned briefly in his deposition testimony as a chair
he examined previously for personal use, as an alternative design
(Ketchman Decl. ¶ 37).  Dr. Ketchman's report, however, does not
mention this chair, and there is no indication in Dr. Ketchman's
declaration or deposition testimony as to the types of tests, if
any, he has performed on this chair.

Ultimately, Dr. Ketchman's apparent failure to test any alternative designs, to assess the utility of the Zody Chair or to ground his opinion in any discernible methodology leads to the conclusion that his opinion that the Zody Chair has a design defect is "the mere _ipse_ _dixit_, or say so, of the witness." Smith v. Herman Miller, Inc., supra, 2005 WL 2076570 at *5 (internal quotation marks omitted). Dr. Ketchman's methodology, to the extent he uses any in reaching his ultimate opinion that the chair has a design defect, does not satisfy any of the factors outlined in Daubert for assessing reliability:  his theory does not appear to have been tested, it does not appear to have been subject to peer review, there appears to be no way of calculating whether there is a known or potential rate of error and there is no evidence of acceptance in the relevant expert community. Nimely v. City of New York, supra, 414 F.3d at 396, citing Daubert v. Merrell Dow Pharm., Inc., supra, 509 U.S. at 593-94.

Accordingly, Dr. Ketchman's is precluded from offering any opinion that the Zody Chair has a design defect, that Haworth failed to perform adequate dynamic testing or that a "tilt-back" occurred when plaintiff sat in the Zody Chair.  Smith v. Herman Miller, Inc., supra, 2005 WL 2076570 at *5 (precluding expert testimony on chair design defect where the "expert report consists almost exclusively of his observations concerning the

43

physical characteristics of the chair without supporting measure-ments, and the conclusion that the chair could not withstand a rocking motion"); see also Zaremba v. Gen. Motors Corp., 360 F.3d 355, 358-59 (2d Cir. 2004) (precluding testimony of biomechanical engineer concerning a safer alternative design of a vehicle involved in a rollover accident, finding that his opinion was speculative and unreliable because he failed to prepare alterna-tive design drawings, perform calculations, test the design or subject it to peer review and had not shown general acceptance of the design or methodology); Lara v. Delta Int'l Mach. Corp., supra, 2016 WL 1254023 at *10 (finding expert opinion unreliable where, "other than espousing [a] conclusory assertion, [the expert] admitted that neither prior to nor during the investiga-tion of this case did he perform any tests regarding an alterna-tive design"); Quintanilla v. Komori Am. Corp., No. CV 04-5227 (ETB), 2007 WL 1309539 at *5 (E.D.N.Y. May 4, 2007) (expert's "failure to test his proposed alternative . . . leads to the conclusion that his opinion is based on nothing more than specu-lation"), aff'd, No. 07-2375-CV, 2009 WL 320186 (2d Cir. Feb. 10, 2009) (summary order); Kass v. West Bend Co., No. 02-CV-3719 (NGG), 2004 WL 2475606 at *6 (E.D.N.Y. Nov. 4, 2004) ("Courts have repeatedly rejected expert testimony where a proposed theory or alternative design was not properly tested."), aff'd without

44

published opinion, 158 F. App'x 352 (2d Cir. 2005) (summary order).

However, because, as Dr. Ketchman admits, his force measurements are independent from his ultimate conclusions and because the force measurements may assist the jury at trial, Dr. Ketchman is not precluded from offering fact testimony as to the results of his force measurements or his actual observations of the chair and its characteristics.[15]

>                c.   Ketchman's
>                     Failure-to-Warn Opinion

Haworth argues that Dr. Ketchman's failure-to-warn opinion -- that instructions or warnings should have been attached to the Zody Chair and that Haworth violated the Design Safety Hierarchy, which requires Haworth to warn and instruct users -- should be precluded because it would not be helpful to the jury and because expert testimony is not required on this issue (Haworth Ketchman Mem., at 21-23).  In support of this

---

[15]Whether or not the measurements are relevant as fact evidence is an issue that Haworth does not address directly.  In its memorandum of law, Haworth argues that there is "no intrinsic benefit to these measurements" and attacks their reliability under Daubert (Haworth Ketchman Mem., at 13); however, this argument is centered on the Daubert factors, and reliability specifically.  Accordingly, my ruling is without prejudice to any later motion Haworth wishes to make based on relevancy grounds.

argument, Haworth notes that Dr. Ketchman has not designed warnings for office chairs and has never performed any studies to determine if warnings were effective for changing consumer behavior.[16]  Finally, Haworth also argues that Dr. Ketchman's opinion should be precluded because he does not suggest any language or formatting for the warning.

In response, CSX argues that Dr. Ketchman's testimony should not be precluded because Dr. Ketchman is familiar with product instructions and warnings, has taken courses concerning product warnings and has written warnings for other products (CSX Ketchman Mem., at 18).

A party asserting a failure-to-warn claim must establish "that (1) a manufacturer has a duty to warn; (2) against dangers resulting from foreseeable uses about which it knew or should have known; and (3) that failure to do so was the proximate cause of the harm." Barban v. Rheem Textile Sys., Inc., supra, 2005 WL 387660 at *9, citing Liriano v. Hobart Corp., 92 N.Y.2d 232, 237, 677 N.Y.S.2d 764, 766, 700 N.E.2d 303, 305

---

[16]In his deposition, Dr. Ketchman stated he has been involved in informal "[s]ub-studies involving people who are asked to look at a warning and see what it meant to them" but that he has never "done a study to determine whether warnings or instructions that are provided totally influence people's behavior in the way that you would want them to be influenced" (Rubenstein Aff., Ex. F-1, 50:19-52:13).

(1998).  Importantly, "[w]here a products liability claim is premised upon a failure to warn, a plaintiff may factually support his claims without utilizing expert testimony."  Lara v. Delta Int'l Mach. Corp., supra, 2016 WL 1254023 at *16.

In this case, given Dr. Ketchman's total lack of experience with the design and testing of office chair warnings and instructions, as well the fact that his opinion in this case does not appear to be supported by any concrete methodology or standard, Dr. Ketchman does not appear qualified to testify as an expert with respect to office chair warnings and instructions. Bourassa v. Black & Decker (U.S.) Inc., supra, 2015 WL 4715250 at *5 (precluding expert in power drill failure-to-warn action where he had "no experience in designing instruction manuals or warnings for power tools"); Hutton v. Globe Hoist Co., 158 F. Supp. 2d 371, 376 (S.D.N.Y. 2001) (Motley, D.J.) (precluding expert in support of failure-to-warn claim where there was "no indication as to the bases of [the expert's] theory").  Dr. Ketchman also notes that the Improv chair includes instructions that store in the front of the seat, and characterizes this as an alternative design in his declaration (Ketchman Decl. ¶ 37), but he has not provided any evidence of the efficacy of this alternative design or that it has resulted in greater user safety.  Kass v. West Bend Co., supra, 2004 WL 2475606 at *6 ("Courts have repeatedly

rejected expert testimony where a proposed theory or alternative design was not properly tested."). Further, Dr. Ketchman's conclusion that Haworth violated the Design Safety Hierarchy, which requires warnings and instructions of potential hazards, does not appear to be helpful to the jury given that he is precluded from offering any predicate opinion that the chair actually contained a potential hazard. Because Dr. Ketchman's ultimate opinion regarding warnings does not contain any proposed text or language, or otherwise apply the experience he does have with respect to designing warning labels for other consumer products, his conclusion is no more helpful than that of a layperson to establish a failure to warn. Wald v. Costco Wholesale Corp., 03 Civ. 6308 (JSR), 2005 WL 425864 at *5 (S.D.N.Y. Feb. 22, 2005) (Rakoff, D.J.) ("Questions as to whether [a product's] packaging sufficiently warned [plaintiff] that he would not be protected from injuries . . . are to be answered from the perspective of whether a reasonable person would consider himself adequately warned, not whether people in fact pay attention to such warnings. Because this is a normative question, not an empirical one, a lay juror is as qualified to address this issue as any expert.").

Accordingly, Dr. Ketchman is precluded from offering an opinion on whether the Zody Chair includes adequate warnings.[17] In sum, Dr. Ketchman may testify as to the force measurements he took of the Zody Chair and his actual observation of the chair and its characteristics, but he is precluded from testifying as

---

[17]As discussed in Section I, supra, plaintiff opposes the motion to preclude Dr. Ketchman as to plaintiff's FELA action, arguing that FELA's relaxed standards of proof with respect to showing negligence also permit a relaxed standard with respect to expert testimony in FELA cases. In Wills v. Amerada Hess Corp., 379 F.3d 32, 47 (2d Cir. 2004), the Court of Appeals addressed this very issue with respect to a Jones Act case, which applies the same standard of liability as FELA, and stated that "the standard of causation . . . and the standards for admission of expert testimony under the Federal Rules of Evidence are distinct issues and do not affect one another" and that "even where . . . [a] plaintiff faces a relaxed burden of proof with regard to causation, the district court's admission of expert testimony is nonetheless governed by the strictures of Rule 702 and Daubert." (first alteration in original) (citations omitted); see also Taylor v. Consol. Rail Corp., 114 F.3d 1189 (table), 1997 WL 321142 at *7 (6th Cir. 1997) ("Simply put, [plaintiff] has confused the FELA standard of causation with the standard for admission of expert testimony.  It is well established that the latter is controlled -- even in cases arising under FELA -- by the Federal Rules of Evidence and the seminal case of Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)."); Claar v. Burlington N. R.R. Co., 29 F.3d 499, 503 (9th Cir. 1994); DeRienzo v. Metro. Transp. Auth., 694 F. Supp. 2d 229, 235 (S.D.N.Y. 2010) (Leisure, D.J.) ("The relaxed standard of proof applicable to FELA actions does not alter the requirement that expert testimony meet the standards set forth in Federal Rule of Evidence 702.").  However, in a footnote, the Court of Appeals did note that "Daubert's relevancy inquiry may be affected by the reduced statutory burden of proof in such cases."  Wills v. Amerada Hess Corp., supra, 379 F.3d at 47 n.9.  In this case, Dr. Ketchman's opinions have not been precluded on the basis of relevancy; accordingly, plaintiff's application is denied.

to whether the chair has a design defect, whether Haworth failed to undertake adequate testing and whether the chair lacked adequate warnings.

## 2. Dr. Bellingar

CSX argues that Dr. Bellingar should be precluded from testifying as an expert because she is not qualified to opine concerning the safety of the Zody Chair's design, her opinions are not reliable and her opinion as to the ergonomic properties of the Zody Chair specifically are not relevant to the issues in this case (Memorandum of Law in Support of Defendant's Motion to Exclude Expert Testimony of Teresa Bellingar, dated Dec. 18, 2015 (D.I. 198) ("CSX Bellingar Mem.")).

### a. Dr. Bellingar's Qualifications

CSX argues that Dr. Haworth lacks the necessary qualifications to opine concerning the safety of the Zody Chair's design because Dr. Bellingar admitted at her deposition that her expertise was in ergonomics, not safety, and testified that her opinion as to the safety of the chair was her personal opinion (CSX Bellingar Mem., at 4-5).

50

In opposing CSX's motion, Haworth does not directly respond to this argument, arguing instead that Dr. Bellingar is qualified to opine that Dr. Ketchman's measurements of the chair are of "dubious validity" and were not made in accordance with industry standards (Memorandum of Law in Opposition to Preclude Theresa Bellingar, Ph.D., CPE, dated Dec. 23, 2015 (D.I. 215) ("Haworth Bellingar Mem."), at 7-8).

Under Fed. R. Evid. 702, an expert must possess "scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue."  As noted previously, the proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence.  United States v. Williams, supra, 506 F.3d at 160, citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.10.  I conclude Haworth has not met its burden with respect to Dr. Bellingar's opinion that the design of the Zody Chair was safe.

As CSX notes, Dr. Bellingar testified at her deposition that her position at Haworth "deal[s] with ergonomics" and that she "do[es]n't necessarily deal with safety"; she also stated that ergonomics does not "generally [deal with] the safety" of a product (Bailey Decl., Ex. D, 47:3-47:16).  Further, with respect to her opinion that she prefers a backstop design over a "back

51

lock" design, Dr. Bellingar testified that this was her "personal opinion" and is based on an "ergonomic point of view not a safety point of view," and that she "do[es]n't get involved in safety" (Bailey Decl., Ex. D, 56:3-56:19).  In addition, Dr. Bellingar testified that, prior to her employment with Haworth, she had no training and experience involving chairs (Bailey Decl., Ex. D, 16:6-16:9).  Similarly, a review of Dr. Bellingar's <u>curriculum</u> <u>vitae</u> shows that the vast majority of experience with safety issues (1) is more than fifteen years old and primarily concerns the safety of firefighting equipment or (2) concerns the types of long-term injuries that the field of ergonomics addresses, <u>i.e.</u>, musculoskeletal disorders that commonly occur in office environ- ments.  Finally, unlike Dr. Ketchman, Dr. Bellingar is not a mechanical engineer.

On the other hand, Dr. Bellingar's <u>curriculum</u> <u>vitae</u> and expert report demonstrate that Dr. Bellingar has ample experience with the industry and ergonomic standards for office chair design and office chair testing.  For example, Dr. Bellingar has served, and continues to serve, on several BIFMA subcommittees, such as the Ergonomics Subcommittee, the "X5.1 General Purpose Office Chairs Subcommittee" and the "Healthcare Furniture Standard Development Team" (Rubenstein Aff., Ex. K, at 14).  Notably, the forward to BIFMA Standard X5.1-2011 states that "[t]his standard

52

defines specific tests, laboratory equipment, conditions of test,
and recommended minimum levels to be used in the test and evalua-
tion of the <u>safety</u>, durability, and structural adequacy of
general-purpose office chairs" (Rubenstein Aff., Ex. D, at 2
(emphasis added)).  Accordingly, there appears to be some evi-
dence that Dr. Bellingar has at least some expertise in the
safety of office chair designs.

Nonetheless, given that (1) Haworth does not address
whether Dr. Bellingar is qualified to opine as to safety, (2) Dr.
Bellingar herself testified that she "do[es]n't get involved in
safety" and, perhaps most importantly, (3) Dr. Bellingar's report
includes no explanation as to how her experience leads her to
believe the Zody Chair's design is safe,[18] I conclude that Dr.

---

[18]In fact, in her report, Dr. Bellingar refers to only three
reasons in support of her conclusion that the Zody Chair is safe.
First, she states that the Zody Chair was tested for safety
during its design.  However, in her deposition she stated that
the "cycling" testing the machines undergo is "not under [her]
ambit or responsibility" (Bailey Decl., Ex. D, 42:10-43:5) and
that she did not know whether any experiments or testing were
done on the Zody Chair before it was sold to the public (Bailey
Decl., Ex. D, 35:10-35:19).  Second, she states that the fact
that approximately 1.5 million Zody Chairs have been sold over
nine years with no reported similar accidents "reinforces" her
opinion that the chair is reasonably safe (Rubenstein Aff., Ex.
K, at 21).  This fact, which she states she learned from Haworth-
's legal department, does not support a finding that she has the
qualifications to opine as to safety.  Third, Dr. Bellingar
states that the synchronous tilt design, which Dr. Ketchman
characterizes as a design defect, has been accepted in the
(continued...)

Bellingar is not qualified to opine as to the safety of the Zody
Chair design.  Accordingly, Dr. Bellingar is precluded from
offering any opinion that the Zody Chair utilizes a safe design.
Quintanilla v. Komori Am. Corp., supra, 2007 WL 1309539 at *4
(finding expert unqualified to opine as to a purported design
defect in a printing press, even where the expert was a mechani-
cal engineer, in part because the expert admitted that he is not
an expert in the printing industry).

_____

[18](...continued)
industry since the 1980s and complies with BIFMA standards
(Rubenstein Aff., Ex. K, at 21).  Although compliance with
industry standards "may be relevant to the question of whether a
product was reasonably safe as designed, and with respect to the
feasibility of alternative designs," Church Ins. Co. v. Trippe
Mfg. Co., 04 Civ. 6111 (HB), 2005 WL 2649332 at *2 (S.D.N.Y. Oct.
17, 2005) (Baer, D.J.), it "is not dispositive of the issue of a
design defect and other evidence concerning the design and safety
of the machine may be considered," Clarke v. LR Sys., 219 F.
Supp. 2d 323, 334 (E.D.N.Y. 2002) (internal quotation marks
omitted).  Further, in this case, Dr. Bellingar gives no explana-
tion as to why she believes compliance with the industry stan-
dards means that the chair's design is safe.  In addition, based
on her curriculum vitae and deposition testimony, her experience
with the industry standards appears to be centered primarily
around ergonomic factors and risks (Bailey Decl., Ex. D, 47:3-
47:9).  Accordingly, CSX has not establish that Dr. Bellingar's
familiarity with industry standards pertains to safety consider-
ations.

b.  The Reliability of
Dr. Bellingar's Remaining Opinions

CSX argues that Dr. Bellingar should be precluded from offering any testimony because her opinions are not reliable. Specifically, CSX relies on the fact that Dr. Bellingar (1) never tested or measured the Zody Chair or models similar to the Zody Chair; (2) testified in her deposition that the "cycling" testing the chairs go through is not part of her responsibility at Haworth and (3) relied on information provided to her by Haworth's legal department regarding the number of Zody Chairs sold, the number of lawsuits involving the chair and the number of similar accidents involving the chair in reaching her conclusions (CSX Bellingar Mem., at 6-9).  In addition, CSX argues that Dr. Bellingar should be precluded from offering her opinion as to the ergonomic properties of the Zody Chair and any alternative de-signs because such testimony is not relevant to the issues in this case (CSX Bellingar Mem., at 10).

In response, Haworth first argues that Dr. Bellingar should be permitted to opine on ergonomic benefits of the Zody Chair and its backstop feature because, in a strict products liability action, the jury must assess the utility and safety of the product's design versus the utility and safety of a proposed alternative design.  Haworth next argues that Dr. Bellingar's

55

testimony regarding the BIFMA standards for measuring office chairs and her opinion that Dr. Ketchman's measurements are of "dubious validity" are reliable because Dr. Bellingar serves on the ANSI/BIFMA committee that develops standards for office chairs, including the proper methods for measuring office chairs, and because Dr. Bellingar has worked on the development of the Zody Chair and is familiar with the chair measuring device ("CMD-") associated with the BIFMA standards (Haworth Bellingar Mem., at 2-4, 7).

    With respect to Dr. Bellingar's testimony regarding the BIFMA industry standards for measuring office chairs and her opinion that Dr. Ketchman's measurements are of dubious validity, although it is true that Dr. Bellingar did not test the subject chair, it is also true that it "is common for testimony regarding the 'customs and practices' in a particular industry to be the subject of expert testimony." Reach Music Pub., Inc. v. Warner Chappell Music, Inc., 988 F. Supp. 2d 395, 403 (S.D.N.Y. 2013) (Gorenstein, M.J.); Lippe v. Bairnco Corp., 96 Civ. 7600 (DC), 2002 WL 15630 at *2 (S.D.N.Y. Jan. 7, 2002) (Chin, then D.J. now Cir. J.) ("An expert may properly testify as to the customs and standards of an industry, and [] opine as to how a party's con-duct measured up against such standards." (alteration in origi-nal) (internal quotation marks omitted)).  Here, Dr. Bellingar

56

undoubtedly has experience with and is knowledgeable about office chair industry standards, including the BIFMA standards, having been affiliated with several professional office chair and ergonomic organizations and having served on several BIFMA subcommittees throughout her career.  Further, her review of Dr. Ketchman's report and deposition, which confirm that Dr. Ketchman did not follow those industry standards when measuring the chair during his examination, make her conclusion that Dr. Ketchman did not comply with those standards, or use the CMD mandated by those standards, reliable.  Accordingly, she is qualified to testify as to the office chair industry's standards for measuring office chairs and whether Dr. Ketchman followed those standards when measuring the chair.

Dr. Bellingar may not, however, opine as to whether Dr. Ketchman's measurements are of "dubious validity."  As CSX argues, Dr. Bellingar has never used a CMD to measure a chair and she testified in her deposition that she would not know what the measurements would have been if a certified technician at Haworth had measured the chairs with a CMD (Bailey Decl., Ex. D, 37:20-38:9).  Further, in her deposition, Dr. Bellingar admitted that, because Dr. Ketchman did not follow industry standards, she could not tell if his measurements would be the same as those taken by a CMD (Bailey Decl., Ex. D, 53:20-55:8).  Finally, in her deposi-

tion, Dr. Bellingar stated that her conclusion regarding Dr. Ketchman's testing was that she "disagreed with his approach to measuring the chair in that he didn't use the [CMD] when he was measuring it" (Bailey Decl., Ex. D, 37:11-37:19).  Accordingly, while Dr. Bellingar may opine as to whether Dr. Ketchman followed industry standards when measuring the Zody Chair, her opinion as to the purported dubious validity of Dr. Ketchman's measurements would be based on nothing more than speculation and is, therefore, not reliable.

        With respect to whether Dr. Bellingar should be permitted to testify as to certain facts that she learned from the Haworth Legal Department, as an initial matter, given that Dr. Bellingar is precluded from offering any opinion as to the safety of the Zody design, it is difficult to see how this information would inform any testimony she would give regarding ergonomic properties of the chair and the industry standards for measuring the chair.  Therefore, there appears to be no grounds for the admission of this evidence under Fed. R. Evid. 703, which provides that

> [i]f experts in the particular field would reasonably rely on [information provided by others] in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their

58

          probative value in helping the jury evaluate the opin-
          ion substantially outweighs their prejudicial effect.

Given that Dr. Bellingar is not permitted to offer an opinion on

the safety of the Zody Chair, it is not possible for these facts

to have any probative value "in helping the jury evaluate th[at]

opinion." See Marvel Characters, Inc. v. Kirby, 726 F.3d 119,

136 (2d Cir. 2013) ("Although the Rules permit experts some

leeway with respect to hearsay evidence, Fed. R. Evid. 703, 'a

party cannot call an expert simply as a conduit for introducing

hearsay under the guise that the testifying expert used the

hearsay as the basis of his testimony.'"), quoting Malletier v.

Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007)

(Scheindlin, D.J.).  Nonetheless, Haworth appears to argue that

the information on which Dr. Bellingar relied may be admissible

pursuant to Fed. R. Evid. 803(6) as the records of a regularly

conducted activity (Haworth Bellingar Mem., at 6 (Dr. Bellingar

is "relying upon information kept in the normal course of busi-

ness at Haworth")).  Thus, Dr. Bellingar may not testify to

matters she learned from Haworth's legal department as being the

basis for her opinion.  Whether such testimony is admissible on

some other theory is beyond the scope of the present motion, and

I express no opinion on alternative theories of admissibility.

Finally, with respect to Dr. Bellingar's testimony regarding the ergonomic utility of the Zody Chair, as well as whether the Zody Chair's design is unique in the office chair industry, CSX argues that testimony as to the ergonomic benefits of the chair is not relevant to whether the chair has a design defect.  In making this argument, however, CSX does not address the fact that, to prove a design defect, the jury must determine "whether . . . a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner."  Humphrey v. Diamant Boart, Inc., supra, 556 F. Supp. 2d at 172 (internal quotation marks omitted), citing Voss v. Black & Decker Mfg. Co., 59 N.Y.2d 102, 108-09, 463 N.Y.S.2d 398, 402, 450 N.E.2d 204, 208 (1983); accord Monell v. Scooter Store, Ltd., 895 F. Supp. 2d 398, 411-12 (N.D.N.Y. 2012).  In her expert report, Dr. Bellingar opines as to the ergonomic benefits of a backstop system as opposed to a "back lock" design (Rubenstein Aff., Ex. K, at 20-21).  She also explains that a backstop design is compliant with CGSB industry standards (Rubenstein Aff., Ex. K, at 18).  Because such testimony relates to the utility of the design, Dr. Bellingar's ergonomic testimony is relevant to CSX's claim of a design defect. Similarly, Dr. Bellingar's testimony that the Zody Chair's backstop design complies with industry standards is also relevant to

60

CSX's claim.  See Church Ins. Co. v. Trippe Mfg. Co., supra, 2005 WL 2649332 at *2 ("While compliance with industry standards is certainly not dispositive of a design defect claim grounded in strict products liability, and would also be insufficient to support summary judgment, such evidence should be admissible at trial."); Lippe v. Bairnco Corp., supra, 2002 WL 15630 at *2.[19]

In sum, Dr. Bellingar is precluded from offering any opinion as to the safety of the Zody design or as to the accuracy of Dr. Ketchman's measurements; she may, however, testify as to the ergonomic benefits of the Zody Chair design, the industry standards for measuring office chairs, whether Dr. Ketchman's measurements were taken according to industry standards and whether the Zody Chair design complies with industry standards.

### 3.  Dr. Williams

Plaintiff argues that Dr. Williams should be precluded from testifying at trial because:  (1) Dr. Williams is not quali-fied to offer opinions regarding the cause of plaintiff's inju-ries; (2) her opinions are not supported by a demonstrated and

---

[19]In addition, Article VII of the Federal Rules of Evidence does not preclude Dr. Bellingar from testifying that the Zody Chair is a "unique design" because her testimony is relevant to CSX's claim.  The existence of similar designs is really a factual matter, not expert evidence, and is not properly subject to Daubert.

reliable methodology; (3) Dr. Williams impermissibly evaluates plaintiff's credibility and (4) Dr. Williams vouches for her own credibility.  Plaintiff also seeks costs and reasonable attorney's fees associated with making the motion to preclude Dr. Williams from testifying.  Because I find that Dr. Williams' opinions are not supported by a demonstrated and reliable methodology and are inadmissible on that basis, I do not address plaintiff's remaining arguments.

          a.  The Reliability of Dr. Williams'
              <u>Opinions and Underlying Methodology</u>

          Plaintiff argues that Dr. Williams should be precluded from offering any testimony because her opinions and underlying methodology are not reliable.  Specifically, plaintiff argues that:  (1) Dr. Williams tested an exemplar Zody Chair, not the actual chair at issue, and does not state what kind of testing she performed on the chair; (2) Dr. Williams uses unstated methodologies and (3) the cadaveric study Dr. Williams cites does not reliably support her conclusions (Pl. Williams Mem., at 11-14).[20]

_____

[20]Additionally, plaintiff argues for the first time in his reply memorandum that Dr. Williams' conclusion that the Zody Chair could not produce the magnitude of forces necessary to accelerate plaintiff's body forward is irrelevant because even if plaintiff whipped himself forward in reaction to the unexpected recline, his injuries were caused by CSX's negligence (Reply
                                              (continued...)

         In response, CSX and third-party defendants first argue
that Dr. Williams' use of an exemplar chair goes to the weight of
her testimony, not its admissibility (Memorandum of Law in Oppo-
sition to Plaintiff's Motion to Preclude Jamie Williams, Ph.D.,
dated Jan. 4, 2016 (D.I. 233) ("Def. Williams Mem."), at 14-15).[21]
Next, CSX and third-party defendants argue that Dr. Williams has
provided an adequate basis for her opinions, namely "the basic
principles of Newton's Laws of physics, the Conservation of
Energy, her own extensive background in cervical and lumbar spine
injury cases and her own published papers in the field" (Def.
Williams Mem., at 13-14).  In support, CSX and third-party defen-

_____

        [20](...continued)
Memorandum of Law in Support of "Daubert" Motion Precluding
Biomechanical Evidence, dated Jan. 11, 2016 (D.I. 260) ("Reply
Mem."), at 9-10).  Because this argument is first raised in
plaintiff's reply memorandum, I do not consider it.  Rowley v.
City of New York, 00 Civ. 1793 (DAB), 2005 WL 2429514 at *5
(S.D.N.Y. Sept. 30, 2005) (Batts, D.J.), citing Keefe v. Shalala,
71 F.3d 1060, 1066 n.2 (2d Cir. 1995), Knipe v. Skinner, 999 F.2d
708, 711 (2d Cir. 1993), Nat'l Labor Relations Bd. v. Star Color
Plate Serv., 843 F.2d 1507, 1510 n.3 (2d Cir. 1988), United
States v. Letscher, 83 F. Supp. 2d 367, 377 (S.D.N.Y. 1999)
(Koeltl, D.J.), Domino Media, Inc. v. Kranis, 9 F. Supp. 2d 374,
387 (S.D.N.Y. 1998) (Kaplan, D.J.), aff'd, 173 F.3d 843 (2d Cir.
1999) and Playboy Enters., Inc. v. Dumas, 960 F. Supp. 710, 720
(S.D.N.Y. 1997) (Kaplan, D.J.), aff'd, 159 F.3d 1347 (2d Cir.
1998).

        [21]CSX and third-party defendants also argue that Dr. Wil-
liams was offering an opinion "as to whether the subject model
Zody task chair was capable of generating forces consistent with
those injuries plaintiff claims to have suffered," not whether
the subject chair had a defect (Def. Williams Mem., at 14).

dants cite <u>Berner v. Carnival Corp.</u>, 632 F. Supp. 2d 1208, 1213-
15 (S.D. Fla. 2009), in which the judge held that Dr. Williams'
methodologies reliably supported her opinions.  Finally, CSX and
third-party defendants argue that "[c]adaveric studies are uti-
lized extensively in the biomechanical literature to elucidate
the causation and propagation of injuries under various loading
conditions," and state that the cadaveric study supports Dr.
Williams' findings (Def. Williams Mem., at 15-16) (internal
quotation marks omitted).

    With respect to Dr. Williams' opinion that plaintiff
was not propelled forward by the chair, the fact that Dr. Wil-
liams tested an exemplar chair, in itself, does not render her
methodology unreliable, especially because plaintiff has not
offered any evidence that the exemplar Zody Chair that Dr. Wil-
liams tested was materially different from the actual chair at
issue.[22]  <u>See</u>, <u>e.g.</u>, <u>Nester v. Textron, Inc.</u>, No. 1:13-CV-920-DAE,
2015 WL 7272249 at *15 (W.D. Tex. Nov. 17, 2015) ("While the test
vehicle has a different model name and model year, Plaintiffs

---

    [22]Plaintiff states that "the springs and tensions [<u>sic</u>]
settings may vary from chair to chair" and there may be a "possi-
bility, no less [a] reality, of . . . discrepancies in compo-
nents, their tensile strength, or even their date of manufacture"
(Pl. Williams Mem., at 13 n.2).  However, this speculation is not
evidence of material differences between the actual chair at
issue and the exemplar chair.

have not identified any differences in the vehicle tested that
would undermine [the expert's] testimony . . . .").  Given that
the Zody Chair appears to be a mass produced product, there is no
reason to suspect that the exemplar chair tested by Dr. Williams
is materially different from the subject chair.

Dr. Williams' report is, however, flawed in a more
fundamental way because she provides no methodology to support
her conclusion that plaintiff was not propelled forward by the
chair.  All Dr. Williams offers in support of this conclusion is
a reference to her inspection of an exemplar chair and certain
unidentified tests.  Dr. Williams states that her inspection of
the exemplar chair "revealed that when seated in the chair with
the seatback in the unlocked position and with the minimal resis-
tance set, the seatback is balanced with the applied bodyweight
from the individual seated . . . . The seatback is unable to
overcome the weight of the person sitting in the seat so as to
accelerate them forward" (Pl. Williams Mem., Ex. 1, at 5-6).  The
foregoing suggests that Dr. Williams performed some type of
empirical testing,[23] but the nature of that testing is not dis

---

[23]The fact that Dr. Williams performed empirical testing is
confirmed by the statement in her affidavit that she tested the
exemplar chair "to determine whether the spring force which tends
to restore the chair to upright when the backrest is reclined, is
capable of overcoming the weight of a human being in the seat"
(continued...)

closed nor does Dr. Williams disclose the assumptions she used in the testing, why those assumptions are appropriate or why testing with those assumptions yields relevant information.  In particular, Dr. Williams does not explain why testing with minimal resistance is appropriate nor does she state what occupant bodyweight she assumed.  In short, all Dr. Williams offers is the fact that she performed some type of testing that yielded results.  Daubert and its progeny clearly require more.

Dr. Williams' bare conclusions resemble those offered in Smith v. Herman Miller, Inc., supra, 2005 WL 2076570 at *4, in which the Honorable Charles P. Sifton, United States District Judge, precluded an expert from testifying because his report "consist[ed] almost exclusively of his observations concerning the physical characteristics of the chair without supporting measurements, and the conclusion that the chair could not withstand a rocking motion."  See also Delgado v. Delta Air Lines, Inc., No. 12-23272-CIV (DLG), 2013 WL 9838333 at *4 (S.D. Fla. Aug. 21, 2013) (expert's testimony was unreliable, in part, because his report was "silent as to the methodology he employ[ed] besides observation and measurement of the exemplar step").

---

[23](...continued)
(Williams Aff. ¶ 22).  Dr. Williams' affidavit also provides no information concerning the nature of her testing.

Thus, Dr. Williams' conclusion that plaintiff was not propelled forward by the chair is precluded.

I also find that Dr. Williams' opinion that "[t]he bending loads on [plaintiff's] cervical spine during his rearward motion were not in the correct direction to cause injury to or exacerbate the pre-existing conditions of [plaintiff's] cervical spine intervertebral discs" is not explained by a reliable methodology.  In her affidavit, Dr. Williams identifies the laws of physics and engineering, the principles of Conservation of Energy, Newton's laws of physics, fundamental mechanics, principles in bioengineering and her background, experience and research as the bases on which she relied to reach her conclusion (Williams Aff. ¶¶ 16-19).  In her report, she first states that Newton's laws of physics could be used to understand the behavior of plaintiff's body while seated in the chair (Pl. Williams Mem., Ex. 1, at 5).  She then goes on to state that "[d]uring extension, the posterolateral aspect of [plaintiff's] cervical intervertebral discs would have been under compression . . . . Had the rearward motion of his body resulted in cervical spine injuries, [plaintiff] should have sustained anterior disc herniations or strain/disruption of the ligamentous or muscular structures along the anterior (front) of his cervical spine" (Pl. Williams Mem., Ex. 1, at 5).  However, nowhere does Dr. Williams

67

state how the materials on which she relies support her explanation and conclusion.[24]  Again, I am left with an opinion which is nothing more than an ipse dixit.  See Gen. Elec. Co. v. Joiner, supra, 522 U.S. at 146 ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."); Riegel v. Medtronic, Inc., 451 F.3d 104, 127 (2d Cir. 2006) ("An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion."), aff'd, 552 U.S. 312 (2008).  Dr. Williams also fails to state what bending loads plaintiff actually experienced.  Because Dr. Williams does not explain how she reached her conclusions, her testimony that "[t]he bending loads on Whalen's cervical spine during his rearward motion were not in the correct direction to cause injury to or exacerbate the pre-existing conditions of [plaintiff's] cervical spine intervertebral discs" is precluded.  See, e.g., LinkCo, Inc. v. Fujitsu Ltd., 00 Civ. 7242 (SAS), 2002

---

[24]Moreover, contrary to Dr. Williams' statement that she used the principles of the Conservation of Energy for this conclusion, her report indicates that she instead used it for her conclusion about the magnitude of forces necessary to accelerate plaintiff's body forward to cause injury (Pl. Williams Mem., Ex. 1, at 6).  This further buttresses my conclusion that Dr. Williams has failed to demonstrate a reliable basis for her opinions.

WL 1585551 at *4 (S.D.N.Y. July 16, 2002) (Scheindlin, D.J.)
(precluding expert testimony because expert did not support "his
opinion with references to his experience and explain[] how the
specifics of that experience led to his conclusions").

I also find that Dr. Williams' conclusion that
"[n]either the incident as described, nor the Zody task chair are
able to produce the magnitude of forces necessary to accelerate
Whalen's body forward to cause injury to or exacerbate the pre-
existing conditions of his cervical spine intervertebral discs"
is not explained by a reliable methodology.  In addition to the
bases outlined in her affidavit, Dr. Williams appears to rely on
the principles of Conservation of Energy and Newton's laws of
physics in concluding that "[plaintiff] would have had to accel-
erate his body to at least 6 MPH in about 0.1 seconds or 60 MPH
in 1 second just using his own muscle forces" for the bending
loads to have been sufficient to cause a posterior disc herniati-
on (Pl. Williams Mem., Ex. 1, at 6).  However, as is the case
with Dr. Williams' other opinions, she fails to state how the
materials and information on which she relies support her conclu-
sion that neither the incident nor the Zody Chair could have
produced the forces sufficient to accelerate plaintiff forward to
cause his injuries nor does she explain her conclusion concerning

the acceleration necessary to cause the injuries plaintiff alleges.

CSX and third-party defendants rely on <u>Berner v. Carnival Corp.</u>, <u>supra</u>, in support of the admissibility of Dr. Williams' testimony.  That case is distinguishable.  In <u>Berner</u>, Dr. Williams' testimony was offered in connection with a claim for personal injuries resulting from, among other things, the plaintiff's head hitting the floor.  The parties agreed that the methodology Dr. Williams used to determine the velocity at which the plaintiff's head hit the floor and the impact energy created from that was reliable.  <u>Berner v. Carnival Corp.</u>, <u>supra</u>, 632 F. Supp. 2d at 1214.  Here, by contrast, there is no such agreement about the reliability of Dr. Williams' methodology, and her methodology is unknown.

Dr. Williams' use of a cadaveric study to support her conclusion that neither the incident nor the Zody task chair are able to produce the magnitude of forces necessary to accelerate plaintiff's body forward to cause injury is also troubling.[25] First, Dr. Williams states that "[c]adaveric studies have reported cervical disc failures with bending loads of 168 in-lbs to 238 in-lbs" (Pl. Williams Mem., Ex. 1, at 6).  However, the one

---

[25]The study on which Dr. Williams relies is annexed as Ex. J to the Rubenstein 2d Aff.

study cited does not contain any mention of 168 in-lbs or 238 in-lbs loads (Rubenstein 2d Aff., Ex. J).

Second, the study focuses on cervical spine issues, not cervical disc issues. It mentions cervical disc issues only once in a discussion of ligament disruption between the discs; the remaining injuries mentioned in the study have nothing to do with cervical discs (Rubenstein 2d Aff., Ex. J, at 727-28, 730). Neither Dr. Williams, CSX, nor third-party defendants explain the relationship between cervical spine injuries and cervical disc injuries or the forces necessary to bring about each.[26] See Dine v. Hertz Corp., 03 Civ. 2811 (HBP), transcript of oral decision rendered on Dec. 21, 2004 at 7:25-22:11 (S.D.N.Y.) (Pitman, M.J.) annexed as Ex. 2 to Pl. Williams Mem. (precluding an expert from testifying because the study the expert relied on concerned the injury threshold for ligamental damage, not the threshold for disc injuries).

---

[26]CSX and third-party defendants argue that "[d]espite the fact that Dr. Williams . . . presents scientific data of cadaveric studies, she relies on an injury threshold which is pertinent to cervical disc injuries" (Def. Williams Mem., at 16). However, I previously granted a motion to preclude an expert precisely because there was no explanation of how injury thresholds for ligamentous damage relate to injury thresholds for disc damage. Dine v. Hertz Corp. Transcript at 11:2-11:10, 20:14-22:11. Similarly, here Dr. Williams, CSX and third-party defendants have failed to explain how the injury threshold for cervical spine issues is pertinent to cervical disc issues.

Third, although Dr. Williams described the study as utilizing cadavers with "disc degeneration" similar to plaintiff's (Pl. Williams Mem., Ex. 1, at 6), the study cited also does not actually mention whether the cadavers had any disc degeneration or the degree of disc degeneration.

These multiple infirmities are a ground to preclude Dr. Williams from testifying that neither the incident nor the Zody Chair could produce the magnitude of forces necessary to accelerate plaintiff's body to cause injury.  See Amorgianos v. Nat. R.R. Passenger Co., supra, 303 F.3d at 270 (affirming preclusion of expert testimony "[i]n light of the defects in the methodologies employed by plaintiffs' experts and the district court's reasonable determination that there was a significant 'analytical gap' between the experts' opinions and the studies on which they relied in reaching their conclusions").[27]

Therefore, Dr. Williams cannot testify that (1) plaintiff was not propelled forward by the chair; (2) the bending

---

[27]As further evidence of the unreliability of Dr. Williams' reliance on the cadaveric study, plaintiff points out that while Dr. Williams referred to studies of male and female cadavers, the study she cited used female cadavers only (Reply Mem., at 5), and Dr. Williams never explained whether test results on females are applicable to males (Pl. Williams Mem., at 13).  Plaintiff also states that Dr. Williams never explained whether test results on cadavers are applicable to living people (Pl. Williams Mem., at 13).  Plaintiff offers nothing to show that these issues are material, and I do not, therefore, find them persuasive.

loads on plaintiff's cervical spine during his rearward motion
were not in the correct direction to cause injury to or exacer-
bate the pre-existing conditions of his cervical spine
intervertebral discs and (3) neither the incident nor the Zody
task chair are able to produce the magnitude of forces necessary
to accelerate plaintiff's body forward to cause injury to or
exacerbate the pre-existing conditions of his cervical spine
intervertebral discs.  Dr. Williams' fourth opinion, that the
results of her biomechanical analysis of plaintiff's injuries are
consistent with Dr. Krosser's medical diagnosis, would necessar-
ily be based on unreliable methodology and is therefore precluded
as well.  Thus, Dr. Williams is entirely precluded from testify-
ing.

> b.  Plaintiff's
>     Application for Fees

      Plaintiff seeks from CSX the costs and reasonable
attorney's fees he incurred in making the motion to preclude Dr.
Williams.  Plaintiff claims that he is entitled to attorney's
fees pursuant to Fed. R. Civ. P. 11, Fed. R. Civ. P. 37 and the
Court's inherent power to control discovery abuse and to adminis-
ter justice (Pl. Williams Mem., at 16-17; Reply Mem., at 1).
Plaintiff argues that CSX's position with respect to Dr. Wil-

liams' qualifications to testify about the cause of plaintiff's specific injuries is "blatantly frivolous" because CSX took precisely the opposite position in earlier litigation, <u>Krause v. CSX Transportation</u>, 984 F. Supp. 2d 62 (N.D.N.Y. 2013), and succeeded (Pl. Williams Mem., at 16-17).  According to plaintiff, CSX "ha[s] made no good faith request for a change in the existing law of which [it was] well aware" (Pl. Williams Mem., at 17).

Rule 11, on its face, is inapplicable to, <u>inter alia</u>, disclosures made under Rule 26 such as expert disclosures.  Fed. R. Civ. P. 11(d).  Rule 11 cannot, therefore, provide a basis for the relief plaintiff seeks.[28]

Next, to the extent plaintiff is proceeding under Rule 37, his application is also defective.  Fed. R. Civ. P. 37(a)(5) permits a court to award reasonable expenses to a party who either successfully moved for or opposed an order compelling discovery or disclosure.  Fed. R. Civ. P. 37(b) allows a court to impose sanctions for failure to comply with a court order.  Fed. R. Civ. P. 37(c) permits a court to order payment of reasonable expenses for failure to disclose, supplement an earlier response or admit.  Fed. R. Civ. P. 37(d) allows a court to order sanc-

---

[28]There are several other defects with plaintiff's application under Rule 11.  However, because the Rule is entirely inapplicable to Rule 26 disclosures, I need not address them.

tions if a party failed to attend its own deposition, serve
answers to interrogatories or respond to a request for inspec-
tion.  Fed. R. Civ. P. 37(e) permits a variety of curative mea-
sures when a party fails to preserve electronically stored infor-
mation.  Finally, Fed. R. Civ. P. 37(f) allows a court to order
payment of reasonable expenses for failure to participate in
framing a discovery plan.  No provision of Rule 37 permits an
award of fees because a party's expert is precluded under Fed. R.
Evid. 702.

       "Even in the absence of a discovery order, a court may
impose sanctions on a party for misconduct in discovery under its
inherent power to manage its own affairs." Residential Funding
Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 106-07 (2d Cir. 2002),
citing DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 135-36
(2d Cir. 1998).  In order to impose sanctions under the Court's
inherent power, there must be a "particularized showing of bad
faith, which requires [] clear evidence that the challenged
actions are entirely without color and are taken for reasons of
harassment or delay or for other improper purposes." Vaigasi v.
Solow Mgmt. Corp., 11 Civ. 5088 (RMB)(HBP), 2016 WL 616386 at *19
(S.D.N.Y. Feb. 16, 2016) (Pitman, M.J.) (alterations in original)
(internal quotation marks omitted).

I also decline to award attorney's fees pursuant to my inherent power. Although I conclude that Dr. Williams should not be permitted to testify as an expert, her opinions are not so baseless as to give rise to an inference of bad faith, and plaintiff offers no other evidence of bad faith.

IV.  Conclusion

For the foregoing reasons, Haworth's motion to preclude Dr. Ketchman is granted in part and denied in part, CSX's motion to preclude Dr. Bellingar is granted in part and denied in part and plaintiff's motion to preclude Dr. Williams is granted. Plaintiff's application for fees and costs is denied.  The Clerk of the Court is respectfully requested to close Docket Items 196, 199 and 211.

Dated:  New York, New York
        September 29, 2016

SO ORDERED

_____
HENRY PITMAN
United States Magistrate Judge

Copies transmitted to:

All Counsel of Record